# 22-2827

## IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

MARIO H. CAPOGROSSO,

*Plaintiff-Counter-Defendant-Appellant,*

—against—

ALAN GELBSTEIN, in his official and individual capacity, IDA TRASCHEN, in her official and individual capacity, DANIELLE CALVO, in her official and individual capacity, PEC GROUP OF NY, INC., MARK J.F. SCHROEDER, COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES,

*Defendants-Appellees,*

DAVID SMART, SADIQ TAHIR,

*Defendants-Counter-Claimants-Appellees,*

BOSHRA VAHDATLAMAS, in her official and individual capacity, AKA BUSHRA VAHDAT, ELIZABETH PRICKETT-MORGAN, in her official and individual capacity, JEAN FLANAGAN, in her official and individual capacity, VINCENT PALMIERI, in his official and individual capacity, JOHN and JANE DOE,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPELLEES' JOINT SUPPLEMENTAL APPENDIX
### (LOCAL RULE 30.1(g))
### VOLUME II OF II
### (Pages JSA-180 to JSA-353)

LETITIA JAMES
ATTORNEY GENERAL
STATE OF NEW YORK
28 Liberty Street
New York, New York 10005
(212) 416-8020

*Attorney for the State
  Defendants-Appellees*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendant-Appellee
  David Smart*

# TABLE OF CONTENTS

**Page**

Complaint, dated May 8, 2018, ECF No. 1 .................................................. J.S.A. 1

Order to Answer, dated June 12, 2018, ECF No. 12 ..................................J.S.A. 27

Report & Recommendation re: State Defendants' Motion to
    Dismiss, dated January 30, 2019, ECF No. 51 ..................................... J.S.A. 28

Order Adopting Report & Recommendation,
    dated September 25, 2019, ECF No. 71 .............................................. J.S.A. 58

Order re: Discovery, dated January 10, 2020, ECF No. 104 ......................J.S.A. 91

Transcript of January 10, 2020 Hearing, ECF No. 105 .............................J.S.A. 92

Order Denying Motion for Reconsideration of Discovery Order,
    dated February 3, 2020, ECF No. 108 ................................................ J.S.A. 133

State Defendants' Letter to Magistrate Judge Bloom,
    dated February 25, 2020, ECF No. 113 ...............................................J.S.A. 136

Order re: Depositions of State Defendants,
    dated February 26, 2020, ECF No. 114 .............................................. J.S.A. 138

Protective Order, dated December 16, 2020, ECF No. 148 .....................J.S.A. 143

Order re: Motion to Compel Discovery,
    dated January 13, 2021, ECF No. 154 ................................................ J.S.A. 153

Order re: Plaintiff's Interrogatories to Defendant Smart, dated
    February 15, 2021, ECF No. 159 ........................................................J.S.A. 156

Transcript of March 16, 2021 Hearing, ECF No. 163 ............................. J.S.A. 158

Excerpts from Plaintiff's Responses to Interrogatories and
    Document Production, dated May 17, 2021, ECF No. 178-4 .............J.S.A. 180

Excerpts from the Deposition of Danielle Calvo,
    dated December 17, 2020, ECF No. 178-6 .........................................J.S.A. 185

Declaration of Danielle Calvo, dated May 14, 2021, ECF No. 183 ........J.S.A. 194

Exhibit 1 to the Calvo Declaration, Petition re:
   Mr. Capogrosso, dated January 6, 2011, ECF No. 184 ................. J.S.A. 198

Exhibit 3 to the Calvo Declaration, Report of Workplace
   Violence Incident, dated May 5, 2015, ECF No. 186 ................... J.S.A. 199

Exhibit 4 to the Calvo Declaration, Report of Workplace
   Violence Incident, dated May 11, 2014, ECF No. 187 ................. J.S.A. 201

Exhibit 5 to the Calvo Declaration, Witness Statement, dated
   May 11, 2015, ECF No. 188 ........................................... J.S.A. 203

Exhibit 6 to the Calvo Declaration, Witness Statement, dated
   May 11, 2015, ECF No. 189 ........................................... J.S.A. 204

Declaration of Alan Gelbstein,
dated May 14, 2021, ECF No. 190 ...................................... J.S.A. 205

Exhibit 1 to the Gelbstein Declaration, Written Complaint,
   dated April 21, 2009, ECF No. 191 ................................. J.S.A. 216

Exhibit 2 to the Gelbstein Declaration, Written Complaint,
   dated April 21, 2009, ECF No. 192 ................................. J.S.A. 217

Exhibit 3 to the Gelbstein Declaration, Written Complaint re:
   Mr. Capogrosso, dated June 19, 2009, ECF No. 193 .................. J.S.A. 218

Exhibit 4 to the Gelbstein Declaration, Written Complaint,
   dated July 31, 2009, ECF No. 194 ................................. J.S.A. 219

Exhibit 6 to the Gelbstein Declaration, Email re: "Difficult
   Issues" at Brooklyn South TVB, dated December 23, 2011,
   ECF No. 196 ...................................................... J.S.A. 220

Exhibit 7 to the Gelbstein Declaration, Witness Statement,
   dated December 22, 2011, ECF No. 197 ............................ J.S.A. 222

Exhibit 8 to the Gelbstein Declaration, Witness Statement,
   dated December 22, 2011, ECF No. 198 ............................ J.S.A. 223

Exhibit 9 to the Gelbstein Declaration, Witness Statement,
   dated December 22, 2011, ECF No. 199 ............................ J.S.A. 224

Exhibit 10 to the Gelbstein Declaration, Witness Statement,
    dated December 23, 2011, ECF No. 200 ....................................... J.S.A. 225

Exhibit 11 to the Gelbstein Declaration, Gelbstein Affirmation
    in Support of DMV's Opposition to Article 78 Proceeding,
    dated May 3, 2012, ECF No. 201 ....................................................J.S.A. 226

Exhibit 12 to the Gelbstein Declaration, Report of Workplace
    Violence Incident, dated May 5, 2014, ECF No. 202 ................... J.S.A. 230

Exhibit 13 to the Gelbstein Declaration, Written Complaint,
    dated October 29, 2014, ECF No. 203 ...........................................J.S.A. 232

Exhibit 14 to the Gelbstein Declaration, Written Complaint,
    dated February 3, 2015, ECF No. 204...............................................J.S.A. 233

Exhibit 15 to the Gelbstein Declaration, Written Complaint,
    dated February 5, 2015, ECF No. 205 .............................................J.S.A. 234

Exhibit 16 to the Gelbstein Declaration, Witness Statement,
    dated February 5, 2015, ECF No. 206........................................... J.S.A. 235

Exhibit 17 to the Gelbstein Declaration, Report of Workplace
    Violence Incident, dated February 5, 2015, ECF No. 207 .............J.S.A. 237

Exhibit 18 to the Gelbstein Declaration, Email re:
    "Capogrosso," dated February 9, 2015, ECF No. 208 ...................J.S.A. 241

Exhibit 19 to the Gelbstein Declaration, Memorandum re:
    Mr. Capogrosso, dated March 19, 2015, ECF No. 209 ...................J.S.A. 242

Exhibit 20 to the Gelbstein Declaration, Written Complaint,
    dated May 5, 2015, ECF No. 210.......................................................J.S.A. 244

Exhibit 21 to the Gelbstein Declaration, Witness Statement,
    dated May 5, 2015, ECF No. 211 .....................................................J.S.A. 245

Exhibit 22 to the Gelbstein Declaration, Witness Statement,
    dated May 5, 2015, ECF No. 212.....................................................J.S.A. 246

Exhibit 24 to the Gelbstein Declaration, Report of Workplace
    Violence Incident, dated May 11, 2015, ECF No. 214 ..................J.S.A. 248

Exhibit 25 to the Gelbstein Declaration, Witness Statement,
dated May 11, 2015, ECF No. 215 ...................................................J.S.A. 250

Exhibit 26 to the Gelbstein Declaration, Witness Statement,
dated May 11, 2015, ECF No. 216 ..................................................J.S.A. 251

Declaration of Ida Traschen, dated May 14, 2021, ECF No. 217 ...........J.S.A. 252

Exhibit 2 to the Traschen Declaration, Letter from
I. Traschen, dated May 15, 2012, ECF No. 219 .............................J.S.A. 256

Declaration of James M. Thompson, dated May 17, 2021,
ECF No. 220 ...................................................................................... J.S.A. 258

Excerpts of Exhibits 1 and 2 to the Thompson Declaration,
Transcript of Deposition of Mario Capogrosso, dated
December 18, 2020, ECFs No. 221, 222 ........................................J.S.A. 261

Exhibit 3 to the Thompson Declaration, Letter from
C. McDonough re: "Improper Expulsion of Mario Capogrosso,
Esq.," dated January 25, 2012, ECF No. 223 .................................J.S.A. 300

Exhibit 4 to the Thompson Declaration, Article 78 Petition,
dated March 1, 2012, ECF No. 224 .................................................J.S.A. 303

Exhibit 5 to the Thompson Declaration, Report of
Dr. John T. McCann re: "Mario Capogrosso,"
dated June 14, 2012, ECF No. 225 ..................................................J.S.A. 319

Exhibit 6 to the Thompson Declaration, Article 78 Dismissal,
dated June 22, 2012, ECF No. 226....................................................J.S.A. 321

Exhibit 6 to the Thompson Declaration, Letter from
M. Capogrosso to E. Prickett-Morgan,
dated March 20, 2015, ECF No. 227 ...............................................J.S.A. 322

Report & Recommendation re: Motions for Summary Judgment,
dated February 1, 2011, ECF No. 278 ............................................. J.S.A. 324

Order Adopting Report & Recommendation,
dated September 29, 2022, ECF No. 293 .............................................J.S.A. 344

Judgment, dated September 30, 2022, ECF No. 294 .................................J.S.A. 353

iv

In the Matter of an Article 78 Proceeding, Mario Capogrosso vs. New York State Department of Motor Vehicles, Index No. 7738/2012.

## INTERROGATORY NO. 4:

Identify all formal or informal complaints about you concerning your practice or any aspect of your conduct concerning DMV's traffic violations bureau. For each such complaint please identify the complainant, the date of the complaint, the substance of the complaint, who the complaint was made to, and the complaint's outcome.

Response:

All such complaints, formal and informal, are documented in Plaintiff's Document Production.

## INTERROGATORY NO. 5:

Identify the basis for your contention that each remaining defendant was personally involved in the decision to bar you from practice before the TVB, including all documents or testimony that you believe support that contention.

Response:

At the direction of Defendant Calvo, I placed a phone call to Defendant Traschen on May 11, 2015.

Defendant Traschen fails to respond to letter of complaint seeking clarification, reference Exhibits P-43 to P-58 as provided in Plaintiff's Document Production.

6

Defendant Gelbstein directs the actions of Defendant Calvo and the NYC police as stationed in the Brooklyn TVB. reference plaintiffs Exhibit, P127-129, as provided in Plaintiff's Document Production.

The assertions stated in Michael McElroy affidavit Plaintiff's Exhibit P 59 to P-60, provided in Plaintiff's Document Production.

Defendant Calvo in the presence of NYC police has me removed from the Brooklyn TVB on May 11, 2015 gives me Defendant Traschen's phone number and tells me to call her.

INTERROGATORY NO. 6:

Identify the basis of your contention that Defendant David Smart was an employee, agent or otherwise under the control of the TVB, DMV, or any other body or agency of New York State, or acted under color of state law, including all documents or testimony that you believe support that contention.

Response:

In a conversation with Defendant Gelbstein he tells me that he has authority over everyone in the building and within 100 yards of the building.

He directs the actions of Defendant Calvo and the NYC police as stationed in the Brooklyn TVB. reference plaintiffs Exhibit, P127-129, as provided in Plaintiff's Document Production.

I frequently see Defendant Smart conferencing with Defendant Gelbstein.

7



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

KENT T. STAUFFER
EXECUTIVE DEPUTY ATTORNEY GENERAL
DIVISION OF STATE COUNSEL

LISA R. DELL
ASSISTANT ATTORNEY GENERAL IN CHARGE
LITIGATION BUREAU

By E-Mail and First Class Mail                                    June 20, 2012
Jacqueline A. Rappel, Esq.
McDonough & McDonough, LLP
401 Franklin Avenue, Suite 210
Garden City, New York 11530

     Re:    Capogrosso v. State Dep't of Motor Vehicles, Index No. 7738/2012

Dear Jackie:

     We write on behalf of the New York State Department of Motor Vehicles ("DMV") in response to your e-mail dated June 15, 2012, with attached certification of Dr. John T. McCann, and to advise you that Mr. Capogrosso may appear on behalf of his clients at Traffic Violation Bureau ("TVB") offices as of June 27, 2012.

     Please be advised that if and when Mr. Capogrosso appears at a TVB office, he must strictly adhere to the standards of conduct required of attorneys appearing before State courts. Threatening conduct by Mr. Capogrosso, verbal threats of physical violence, and verbal abuse including the use of ethnic slurs will not be tolerated. DMV reserves all rights to respond to future misconduct including, if warranted, by immediately and permanently barring Mr. Capogrosso from appearing on behalf of DMV licensees at TVB offices.

     Very truly yours,

     SERWAT FAROOQ
     Assistant Attorney General

P-31

NYS Office of the Attorney General                                    June 20, 2106
120 Broadway, 24th floor
New York City, NY 10027


Elizabeth Prickett-Morgan:


My name is Mario H. Capogrosso. I am a duly licensed attorney in the State of New
York. My registration No. is 4244331.

I write to Elizabeth Prickett-Morgan, legal counsel for the NYS Office of the Attorney
General, located at 120 Broadway, 24th floor, New York City, NY 10027.

I write to inform your office that that I have been improperly excluded from practicing
law at the Department of Motor Vehicles Traffic Violations Tribunals in their entirety
and specifically from the Brooklyn South TVB as of May 11, 2015 by:

1) Alan Gelbstein, who is an administrative law judge at the Brooklyn South TVB
located at 2875 West 8th Street, Brooklyn NY on May 11, 2015,

2) Bushra Vahdat, a supervisory administrative law judge, located at the Office of Traffic
Violation, 801 Axinn Avenue, Garden City New York 11530,

and

3) Ida Traschen, who is first assistant legal counsel legal bureau for the State of New
York Department of Motor Vehicles located at 6 Empire State Plaza, Albany NY 12228.

Also note, I have made numerous phone calls to legal counsel Traschen as documented
below seeking clarification as to my improper exclusion from the NYS Department of
Motor Traffic Violations Bureaus in their entirety.

Phone calls made to Ida Traschen were made on:

1) May 11, 2015
2) May 12, 2015
3) May 26, 2015
4) August 4, 2015
5) August 7, 2015
6) August 10, 2015
7) August 12, 2015
8) August 25, 2015


To date all phone calls have gone unanswered by Ida Traschen.

1

P-43

JSA-183

P-134

INCIDENT INFORMATION SLIP
PD 339-164 (Rev. 11-10) Peet(RMU)
KD941v73 - 11a55(9)

Date: 5/11/15

Welcome to   60th PRECINCT
(Command)

We hope that your business with us ___ handled satisfactorily. ___ particular ___ matter has been assigned the following number(s):

Complaint Report No.: ___

Accident Report No.: ___

Accident Report No.: ___

Reported to:   PO Leah Green
(Rank)   (Name)

Local, of Occurrence:   2851 W 8 st

Crime:   Harassment

2951 WEST 8 STREET BKLYN NY 11224
(Address)

(718) 946 - 3311
(Telephone Number)

Date of Occurrence: 5/11/15   Time: 0855

Please keep this report should you have to refer to this matter in the future. If you need any further assistance feel free
___ to contact us at telephone number (718) 946 3311 Please let us know if you have any suggestions on how we can
better serve you. As you may already know, we will provide you with a crime prevention survey of your residence or business.
Please ask for more information in this and other crime prevention initiatives. Our goal is to make you, an your property safe.

COURTESY * PROFESSIONALISM * RESPECT

REMEMBER : CALL "911" FOR EMERGENCIES ONLY!!!!

JSA-184

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MARIO H. CAPOGROSSO,

                PLAINTIFF,

   -against-      Case No.:
                  18 CV 2710 (EK) (LB)


ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity, PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,

                DEFENDANTS.
----------------------------------------X
         DATE:  December 17, 2020
         TIME:  1:24 P.M.


         DEPOSITION of the Defendant,
DANIELLE CALVO, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

DEITZ Court Reporting... A Lexitas Company
800-678-0166

**JSA-185**

```
 1
 2   A P P E A R A N C E S:
 3
 4   THE LAW FIRM OF MARIO H. CAPOGROSSO
        PLAINTIFF PRO SE
 5      21 Sheldrake Place
        New Rochelle, New York 10804
 6      Capogrossom@aol.com
 7
 8   OFFICE OF THE NEW YORK STATE ATTORNEY
     GENERAL
 9      Attorneys for the Defendants
        ALAN GELBSTEIN, in his individual
10      capacity, IDA TRASCHEN, in her individual
        capacity, DANIELLE CALVO, in her
11      capacity, SADIQ TAHIR, in his individual
        capacity, PEC GROUP OF NY, INC., DAVID
12      SMART, and DMV COMMISSIONER MARK
        SCHROEDER, in his official capacity
13      28 Liberty Street, 17th Floor
        New York, New York 10005
14      BY:  JAMES THOMPSON, ESQ.
        james.thompson@ag.ny.gov
15
16
        DMV LEGAL BUREAU
17      Attorneys for the Defendant
        DMV COMMISSIONER MARK SCHROEDER, in his
18      official capacity
        6 Empire State Plaza, Room 522A
19      Albany, New York 11228
        BY:  BARBARA MONTENA, ESQ.
20      File #:  18CV2710
        barbara.montena@dmv.nyc.gov
21
22
                  *      *      *      *
23
24
25
```

```
 1
 2              (Whereupon, all 86 exhibits
 3         were previously marked by Counsel,
 4         Mark Capogrosso.
 5   D A N I E L L E   C A L V O, called as a
 6   witness, having been first duly sworn by a
 7   Notary Public of the State of New York, was
 8   examined and testified as follows:
 9   EXAMINATION BY
10   MR. CAPOGROSSO:
11        Q.     Please state your name for the
12   record.
13        A.     Danielle Calvo.
14        Q.     What is your address?
15        A.     9952 Fort Hamilton Parkway,
16   Brooklyn, New York 11209.
17        Q.     All right.
18               Mario Capogrosso, I'm just
19   going to ask you a couple of questions.  I
20   just want the truth, I want to get to the
21   truth.
22               Now, you had me removed, you
23   came to me on the morning of May 11, 2015
24   at the Brooklyn TVB and you asked me to
25   leave in the presence of police officers.
```

```
 1                    Danielle Calvo
 2              Am I right in saying that?
 3        A.   That's correct.
 4        Q.   Who told you to do that?
 5        A.   I was told by my supervisors.
 6        Q.   Which supervisor?
 7        A.   I was told by Ida Traschen.
 8        Q.   On the morning of May 11, 2015?
 9        A.   What is --
10              MR. THOMPSON:  Is that a
11          question?
12        Q.    On the morning of May 11, 2015
13   you had a telephone conversation with Ida
14   Traschen?
15        A.    If that is the day you were
16   asked to leave?  Yes.
17        Q.    Now, for what reason did you
18   have me removed?
19        A.    It wasn't my decision, it was
20   my supervisor's decision.
21        Q.    It was Ida Traschen's decision?
22        A.    Yes.
23        Q.    Now, what made you have -- who
24   called whom, did Ida Traschen call you or
25   you called Ida Traschen?
```

1               Danielle Calvo

2       A.    I was directed to call her.

3       Q.    By whom?

4       A.    Judge Gelbstein.

5       Q.    Was Judge Gelbstein in the

6  building that morning?

7       A.    No, he was not.

8       Q.    Did you view any of the

9  videotape of the alleged incident between

10  myself and Defendant Smart?

11            MR. THOMPSON:  Objection to the

12       form of the question.  You can

13       answer.

14      A.    Not that I recall, no.

15      Q.    How did you get notice of the

16  fact that there was an incident between

17  myself and Defendant Smart?

18      A.    Someone came into the office

19  and told me.

20      Q.    Who?

21      A.    I don't recall who.

22      Q.    Was it Defendant Smart?

23      A.    I don't recall.

24      Q.    And based on their testimony to

25  you, you decided that there was an incident

```
 1              Danielle Calvo
 2       Q.     Were you knowledgeable of any
 3  of the complaints I had against Defendant
 4  Smart at the Brooklyn TVB that I followed
 5  with Defendant Gelbstein, were you
 6  knowledgeable of any of those complaints?
 7       A.     I know you made a lot of
 8  complaints about a lot of different people,
 9  particularly and specifically, no.
10       Q.     I only make complaints about
11  Defendant Smart.
12              The only thing that was in
13  writing was to Defendant Smart and I'm
14  asking very specifically, did you have any
15  knowledge of any of those complaints?
16              MR. THOMPSON:  Objection, asked
17         and answered.  You can answer.
18       A.     I don't recall specifically,
19  but I may have known at the time.
20       Q.     Did you have supervisory
21  authority over the actions of Defendant
22  Smart at the Brooklyn TVB?
23              MR. THOMPSON:  Objection to the
24         form.  You can answer.
25       A.     To some extent we could ask him
```

```
 1              Danielle Calvo
 2  to do certain things, but he worked for an
 3  outside company.
 4       Q.    So, who did he report to on a
 5  daily basis?
 6       A.    He had to call into his office
 7  every morning and he submitted his time
 8  cards to them, but we had to know he was
 9  there.
10       Q.    Who governed his day-to-day
11  activities at the Brooklyn TVB?
12            MR. THOMPSON:  Objection to the
13       form.  You can answer.
14       A.    We would tell him what we
15  wanted done as far as opening, closing.
16  Things like that.
17       Q.    You governed his day-to-day
18  activities?
19            MR. THOMPSON:  Same objection.
20       Q.    Clerical staff, the clerical
21  supervisors governed his day-to-day
22  activities; is that correct?
23            MR. THOMPSON:  Same objection.
24       A.    To some extent, yes.
25       Q.    And did you receive complaints
```

```
 1                    Danielle Calvo
 2        Q.     Did you observe Defendant
 3   Gelbstein viewing that videotape in your
 4   presence?
 5             MR. THOMPSON:  Objection to the
 6        form.  You can answer.
 7        A.     Not that I recall.
 8        Q.     Did you ever observe Ida
 9   Traschen observe that videotape in your
10   presence?
11        A.     No.
12        Q.     Now, there were many complaints
13   written against me and my office while I
14   was there at Brooklyn TVB by the clerical
15   staff at the Brooklyn TVB.
16             Is that fair to say -- is that
17   a fair statement?
18        A.     Yes.
19        Q.     Is that a fair statement, they
20   didn't like me?
21        A.     I can't say what they felt
22   about it, I can only speak for myself.
23        Q.     Well, they made many complaints
24   about me, that's fair, I mean, I have them.
25   They were all kept by Defendant Gelbstein,
```

```
 1                    Danielle Calvo
 2        sure I got everything.  Give me a few
 3         more minutes.
 4        Q.    Did you tell Defendant Smart to
 5    approach me on the morning of May 11, 2015?
 6        A.    I never told him to approach
 7    you for anything.
 8        Q.    Did you attempt to curtail my
 9    exercise of freedom of speech by having me
10    removed from the Brooklyn TVB?
11            MR. THOMPSON:  Objection to the
12         form of the question.  You can
13         answer.
14        A.    No.
15        Q.    Did you ever observe ticket
16    brokers going to Defendant Gelbstein's
17    office, ticket brokers, you know what a
18    ticket broker is, right?
19            Did you ever observe ticket
20    brokers in Defendant Gelbstein's office?
21            MR. THOMPSON:  Objection to the
22         form, you can answer.
23        A.    Rumor to be, yes.  Do I have
24    proof what they were?  No.
25        Q.    But, you saw them in his
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MARIO H. CAPOGROSSO,

                 Plaintiff,

          -against-                        Case No. 18 Civ. 2710 (EK)(LB)

ALAN GELBSTEIN, *in his individual capacity,* IDA
TRASCHEN, *in her individual capacity,* DANIELLE
CALVO, *in her individual capacity,* MARK J.F.
SCHROEDER, *in his official capacity as Commissioner
of the New York State Department of Motor Vehicles,*
SADIQ TAHIR, *in his individual capacity,* PEC GROUP
OF NY, INC., and DAVID SMART,

                 Defendants.
-------------------------------------------------------------------X

        DANIELLE CALVO hereby declares, pursuant to 28 U.S.C. § 1746, that:

        1.      From June 2012 until February 2016 I worked for the Department of Motor

Vehicles ("DMV") as a Supervising Motor Vehicle Representative 2. I am currently a Senior

Court Clerk at the New York State Office of Court Administration.

        2.      I submit this declaration in support of the State Defendants' motion for summary

judgment in this matter. The contents of this declaration are based on my own personal

knowledge, my review of files kept by the DMV, my review of files produced in this litigation,

and my review of files in my personal possession.

        3.      In my role as a Supervising Motor Vehicle Representative 2, I worked as a senior

clerk at DMV's Brooklyn South Traffic Violations Bureau ("TVB"). I supervised two lower-

grade supervisors and a staff of Motor Vehicle Representatives in carrying out the day to day

functions of the TVB.

        4.      I came to know the Plaintiff during my work at the TVB. He was aggressive and

unstable, and would frequently behave in a threatening manner toward clerks and motorists, yelling or screaming obscenities. I spoke to him on many occasions, asking him not to threaten or harass clerks or others at the TVB.

5.     For instance, on or around April 21, 2009, the Plaintiff was involved in an altercation with an interpreter named Tanya Rabinovich, in which he bumped his body into her. I got involved to help calm down the situation.

6.     The incidents involving the Plaintiff continued, including several in which he behaved in a threatening or harassing manner toward the clerks. Finally, in January 2011, I and 17 other TVB employees signed a petition stating that the Plaintiff was a threat to our physical safety and asking the DMV to take action. A copy of this petition is attached as Exhibit 1. I understand that ALJ Alan Gelbstein and Supervising ALJ Bushra Vahdatlamas had a meeting with the Plaintiff about his behavior.

7.     On or around December 21, 2011, I heard the Plaintiff screaming obscenities at another lawyer named Yaakov Brody, including anti-Semitic slurs. The Plaintiff had also thrown a coffee cup at Mr. Brody. Approximately an hour later the Plaintiff threw a punch at or near another attorney named Jeffrey Meyers. I contacted Supervising ALJ Vahdatlamas, who instructed me to adjourn all the Plaintiff's cases and tell him to leave the building immediately. The Plaintiff was incredibly angry and shouted at me, but eventually left.

8.     I understand that the Plaintiff stated in his Petition that when I intervened to stop his harassment of Mr. Brody I said "Now's our chance to get rid of him." I never said that or anything like it – the Plaintiff just made it up.

9.     After that incident, I am aware that the Plaintiff was suspended from practicing law at the TVB. I understand that he filed a lawsuit, and was allowed to return at some point

2

after taking an anger management course and agreeing to behave properly going forward.

10.     Beginning in 2014, the Plaintiff's behavior began to become more and more aggressive, and we began to receive more complaints.

11.     On or around May 5, 2014, the Plaintiff got into a scuffle with David Smart, a security guard, and a police officer had to intervene. Attached as <u>Exhibit 2</u> is a workplace violence report submitted to me by a clerk who witnessed the incident.

12.     I believe that at some point in 2015 I heard that the Plaintiff had sent a letter to the Office of the Attorney General, but I had not read the letter and did not know its contents. I am not sure if I first heard about the letter before or after the Plaintiff's expulsion from practice in May 2015.

13.     On May 5, 2015, I heard the Plaintiff screaming "don't touch my stuff" over and over again, and went to the lawyers' room at the TVB. I found the Plaintiff screaming at Sadiq Tahir, another attorney, who had apparently touched his bag. I told the Plaintiff that he had to stop screaming and he complied, but after I went to get ALJ Gelbstein and came back, the Plaintiff became enraged again, screaming that he did not want anyone touching his belongings. I filled out a workplace violence report in connection with this incident, which is attached as <u>Exhibit 3</u>. I understand that the Plaintiff continued to be agitated and furious throughout the day, and that he ranted against another lawyer afterward.

14.     On May 11, 2015, a coworker ran to me and told me that the Plaintiff had gotten into a fight with Officer Smart. I called ALJ Gelbstein, who was out of the office, and he told me to contact Ida Traschen. I then called Ms. Traschen, who told me to have the Plaintiff escorted out of the building, and that he could call her for any further details. I escorted the Plaintiff out, with the help of police officers.

3

15.     Although I did not personally witness the altercation between the Plaintiff and Officer Smart, I took three statements from witnesses who did.  A workplace violence report that I submitted with Officer Smart is attached as <u>Exhibit 4</u>.  A statement from Anthony Adinolfi is attached as <u>Exhibit 5</u>.  A statement from George Han is attached as <u>Exhibit 6</u>.

16.     I did not play any role in the decision to ban the Plaintiff from practice at the TVB.  I always thought that the decision was made by TVB higher-ups and the legal department of DMV.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:      May 14, 2021
            Brooklyn, New York

                                        _____
                                        DANIELLE CALVO

4

1/6/11

We the undersigned clerks, supervisors, and judges of Brooklyn South Traffic Violations Bureau state that we feel the presence of attorney Mario Capogrosso on our premises constitutes a threat to our physical safety.  We believe that Mr. Capogrosso's behavior is unstable and hereby state that he has gotten into confrontations with many of us in the past years.  These confrontations have been escalating to the point of where a physical confrontation has nearly ensued between him and a Brooklyn South employee on January 5, 2011 after close of business.  We request that Mr. Capogrosso's behavior be dealt with and that the management of this agency alleviates this threat to our physical safety.

| | |
|---|---|
| *(signatures)* | |

* was signed by all 3 supervisors, 1 judge, and 14 out of 17 clerks. The 3 clerks that didn't sign was because 2 are off and 1 is a new employee.

DMV-0000244

EXHIBIT
Exhibit 7

JSA-198

04/15/2015  14:53    RECEIVED 05/05/2015 14:46    17186363943    TVB ADMINISTRATION
                     1718-266-7478    BROOKLYN SOUTH    PAGE 02/04

FW-964 (12/M)    New York State Department of Motor Vehicles
                 DIVISION OF LABOR RELATIONS
                 **REPORT OF WORKPLACE VIOLENCE INCIDENT**

| | OFFICE USE ONLY |
|---|---|
| Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in. | FILE NUMBER: ____<br><br>Received: ____<br><br>X RE: ____<br><br>X RE: ____<br><br>PRIVACY CONCERN: ☐ YES  ☐ NO |

**NAME OF INDIVIDUAL FILING REPORT**

| Name | Title | Office Location | Phone Number |
|---|---|---|---|
| Danielle Calvo | Supervisor Gr 17 | Brooklyn South TVB | 718-266-5512 |

**INCIDENT REPORTED TO**

| Date Reported | Person Reported To | Title |
|---|---|---|
| 5/5/15 | Alan Gelbstein | Senior ALJ |

**INCIDENT**

| Date | Time | | Location of Occurrence |
|---|---|---|---|
| 5/5/15 | 11:45 | ☑ AM  ☐ PM | Lawyer's room |
| DFI Contacted? ☐ Yes ☑ No | DFI Contact Name | | |

**EMPLOYEES INVOLVED**

| Name | Title |
|---|---|
| Alan Gelbstein | Senior ALJ |
| Danielle Calvo | Supervisor Grade 17 |
| Name | Title |

**OUTSIDE INDIVIDUALS INVOLVED**

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| Mario H. Capogrosso (attorney) | ☑ Male ☐ Female | 914-806-3692 | |
| Address<br>245 Saw Mill River Road Suite 106 | City<br>Hawthorne | State NY | Zip Code 10532 |
| M. Sadiq Tahir (attorney) | ☑ Male ☐ Female | 718-313-7994 | Client ID # |
| Address<br>3087 Brighton 4th Street #2M | City<br>Brooklyn | State NY | Zip Code 11235 |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |

**WITNESSES**

| Name | Sex | Phone | |
|---|---|---|---|
| Kimberly Rivera (MVR) | ☐ Male ☑ Female | 718-266-5512 (work) | |
| Address<br>2875 West 8th Street (work address) | City<br>Brooklyn | State NY | Zip Code 11224 |
| Marisol Cervoni | ☐ Male ☑ Female | 718-266-5512 (work) | |
| Address<br>2875 West 8th Street (work address) | City<br>Brooklyn | State NY | Zip Code 11224 |
| Name | ☐ Male ☐ Female | Phone | |
| Address | City | State | Zip Code |

Continue on other side                                    Page 1 of:

DMV-0000013

**EXHIBIT**
**Exhibit 32**

**JSA-199**

Description of Events Leading to the Incident and What Occured:

I went to the lawyer's room when I heard Mr.Capogrosso screaming "don't touch my stuff". I told him that he needed to stop yelling, that we could not have this here and at that time after repeating myself, Mr.Capogrosso stopped.  This caused a disruption of the office to both the motorists and the staff.  I then went to report what happened to Judge Gelbstein and then we both went back to the lawyer's room to speak to Mr.Capogrosso and Mr.Tahir.  Mr.Capogrosso started raising his voice that he does not want anyone touching his belongings and kept insisting we watch our video tapes.  Mr.Capogrosso alleges that Mr.Tahir touched his bag.

Nature and Extent of Injuries:

Additional Comments:

_____
Danielle Calvo
Name of Individual Filing Report

_____
Signature of Individual Filing Report

5/5/15
Date

_____
JEAN FLANAGAN
Name of Supervisor

_____
Signature of Supervisor

5/5/15
Date

MV-984 (12/11)

Page 2 of 3

**JSA-200**

DMV-0000014

MV-984 (12/11)

**New York State Department of Motor Vehicles**
**DIVISION OF LABOR RELATIONS**
**REPORT OF WORKPLACE VIOLENCE INCIDENT**

| OFFICE USE ONLY |
|---|
| FILE NUMBER: |
| Received: |
| X RE: |
| X RE: |
| PRIVACY CONCERN: ☐ YES ☐ NO |

Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in.

**NAME OF INDIVIDUAL FILING REPORT**

| Name | Title | Office Location | Phone Number |
|---|---|---|---|
| David Smart | Guard-Summit | Brooklyn South TVB | 718-266-5512 |

**INCIDENT REPORTED TO**

| Date Reported | Person Reported To | Title |
|---|---|---|
| 5/11/15 | Danielle Calvo | Supervisor Grade 17 |

**INCIDENT**

| Date | Time | | Location of Occurrence |
|---|---|---|---|
| 5/11/15 | 8:50 | ☑ AM ☐ PM | Brooklyn South TVB near line 1 |

| DFI Contacted? ☐ Yes ☑ No | DFI Contact Name |
|---|---|

**EMPLOYEES INVOLVED**

| Name | Title |
|---|---|
| David Smart | Security Guard-Summit Security |
| Name | Title |
| Name | Title |

**OUTSIDE INDIVIDUALS INVOLVED**

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| Mario H.Capogrosso | ☑ Male ☐ Female | 914-806-3692 | |
| Address | City | State | Zip Code |
| 245 Saw Mill River Road Suite 106 | Hawthorne | NY | 10532 |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |

**WITNESSES**

| Name | Sex | Phone | |
|---|---|---|---|
| George Han-MVR | ☑ Male ☐ Female | 718-266-5512 | |
| Address | City | State | Zip Code |
| 2875 West 8th Street | Brooklyn | NY | 11224 |
| Name | ☑ Male ☐ Female | Phone | |
| Anthony Adinolfi,ESQ | | 718-265-2211 | |
| Address | City | State | Zip Code |
| 2875 West 8th Street | Brooklyn | NY | 11224 |
| Name | ☐ Male ☐ Female | Phone | |
| Address | City | State | Zip Code |

Continue on other side

Page 1 of 2

DMV-0000005

EXHIBIT
Exhibit 33

JSA-201

**Description of Events Leading to the Incident and What Occured:**

Near line 1 Mr. Capogrosso said to security guard David Smart "Are you looking at me?". David replied "You are looking at me". Mr.Capogrosso said "back up, back up", he then pushed David in his chest.

**Nature and Extent of Injuries:**

**Additional Comments:**

911 was called and two officers responded. David went up to the 60pct with them to make a report. They said that they could not arrest Mr.Capogrosso because he pushed David with an open hand not a closed fist. I was told by Judge Gelbstein to go with officers from the police room, to tell Mr.Capogrosso that he must leave the building, and to give him legal's phone number for any further details. I did that and he left the building.

Danielle Calvo
_____
Name of Individual Filing Report

_____
Name of Supervisor

_____
Signature of Individual Filing Report

_____
Signature of Supervisor

5/11/15
_____
Date

_____
Date

MV-984 (12/11)

Page 2 of 2

**JSA-202**

DMV-0000006

**JEFFREY ZIFF & ASSOCIATES, P.C.**
Attorney and Counselor at Law
2875 West 8th Street
Brooklyn, N.Y. 11224
Ph: (718) 265-2211 ☎ Fax: (718) 265-2252
lawtic@gmail.com
zifftrafficlaw.com

William H. Ziff, Esq. ** - Associate
Anthony J. Adinolfi, Esq. * - Associate

May 11, 2015

Re:    TVB Incident, Brooklyn South

To Whom It May Concern:

On Monday, May 11, 2015, I, Anthony J Adinolfi, was standing outside of Hearing Room 4 in Brooklyn South Traffic Violations Bureau in Coney Island, New York, at approximately 9:00 a.m. when Attorney Mario Cappagrosso yelled at and pushed the Security Guard, David, with his right hand to David's chest/ shoulder area.

David was knocked back into a pole that divides the lanes of the line for the service counter. The push also knocked the coat out of David's hand(s).

The attack seemed to be unsolicited and David did not defend himself or push Mr. Capagrosso back at all. David walked away and proceeded to contact the head Supervisor who notified the 60th Precinct.

If you have any questions or concerns please contact me.

Thank you for your attention to this matter.

Respectfully Submitted,

Anthony J Adinolfi, Esq.

** Admitted to practice in New York and New Jersey
* Admitted to practice in New York

DMV-0000009

EXHIBIT
Exhibit 34

JSA-203

MAY 11, 2015

I WAS LEAVING ROOM 5 TO PHOTOCOPY SOMETHING FOR MY
JUDGE. AS I WAS PASSING THE MOTOREST I SAW MR CAPOGROSSO SHOVED SHOVE
THE SECURETY GUARD. DAVED WAS PUSHED BACK. IT WAS A HAND PUSH. I DO
NOT KNOW WHAT OCCURED BEFORE THE PUSH.

DMV-0000008

**EXHIBIT**

Exhibit 35

JSA-204

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MARIO H. CAPOGROSSO,

                       Plaintiff,

           -against-                             Case No. 18 Civ. 2710 (EK)(LB)

ALAN GELBSTEIN, *in his individual capacity*, IDA
TRASCHEN, *in her individual capacity*, DANIELLE
CALVO, *in her individual capacity*, MARK J.F.
SCHROEDER, *in his official capacity as Commissioner
of the New York State Department of Motor Vehicles*,
SADIQ TAHIR, *in his individual capacity*, PEC GROUP
OF NY, INC., and DAVID SMART,

                       Defendants.

-------------------------------------------------------------------X

        ALAN GELBSTEIN hereby declares, pursuant to 28 U.S.C. § 1746, that:

        1.       I am an attorney licensed to practice law in New York State. In May of 2019 I
retired from service as Senior Administrative Law Judge at the New York State Department of
Motor Vehicles' ("DMV") Brooklyn South Traffic Violations Bureau ("TVB"), located at 2875
West 8th Street in Coney Island.

        2.       I submit this declaration in support of the State Defendants' motion for summary
judgment in this matter. The contents of this declaration are based on my own personal
knowledge, my review of files kept by the DMV, my review of files produced in this litigation,
and my review of files in my personal possession.

The TVB System

        3.       The Traffic Violations Bureau is a network of offices where administrative law
judges hear cases involving non-criminal traffic violations. Although the procedures are
streamlined from what would take place in a federal court, cases are adjudicated in similar

manner: the judge is impartial, the prosecution has the burden of proof, and the motorists have a right to be represented by a lawyer.  Attorneys appearing before the TVB are required by regulation to "conform to the standards of conduct required of attorneys appearing before State courts." 15 N.Y.C.R.R. 124.2(a).

    4.    As Senior Administrative Law Judge, I was responsible for overseeing and managing the legal work at the South Brooklyn TVB, including the work of other Administrative Law Judges, in a manner similar to the Chief Judge of a federal court.  I also heard and adjudicated cases myself.  When complaints arose regarding the conduct of an attorney appearing at the TVB, it was my role as Senior Administrative Law Judge to investigate and respond to them.

    5.    I reported to Supervising Administrative Law Judge Bushra Vahdatlamas (also known as Bushra Vahdat), who oversaw all downstate TVB offices.  Ms. Vahdatlamas reported to DMV's First Assistant Counsel, who oversaw the entire TVB system.  During the relevant time period, the First Assistant Counsel was Ida Traschen.

Capogrosso's Background And Disruptive Activity

    6.    The Plaintiff was one of the lawyers who sometimes represented motorists at the Brooklyn South TVB.  He appeared before me regularly in administrative proceedings.

    7.    I received many complaints about the Plaintiff's conduct.  In fact, I received more complaints about Plaintiff than I received about any other attorney in my entire time at DMV.  Whenever a significant complaint came in regarding the Plaintiff's actions, it was my practice to investigate the allegations of the complaint and, if possible, speak with the complaining party and any witnesses.  If he was available, I would then call the Plaintiff into my office to discuss the substance of the complaint, and try to get him to cease and desist with any aggressive or

2

inappropriate behavior. The Plaintiff would routinely promise to stop the behavior, but before long, I would receive new complaints about his conduct and behavior, and the cycle would continue.

8. On numerous occasions, I personally observed the Plaintiff harass TVB employees, motorists, and attorneys. He often used anti-Semitic language when referring or speaking to Jewish attorneys, and once called me a "beanie-wearing kike." When I observed the Plaintiff behave in an aggressive or disturbing way, I would warn him to exercise a calmer demeanor. However, despite repeated warnings, I continued to receive complaints regarding his conduct.

9. Capogrosso's cycle of inappropriate behavior at the TVB dates back to at least 2009, and I have regularly received written complaints about his conduct from numerous attorneys, motorists and TVB staff since that time.

10. For example, attached as Exhibit 1 is a written complaint I received from a witness who observed the Plaintiff yell obscenities at a lawyer's assistant named Tanya Rabinovich on April 21, 2009, and then physically bump into her. Attached as Exhibit 2 is another complaint made to me by a different witness regarding the same incident.

11. On or around June 19, 2009, I received a complaint, attached hereto as Exhibit 3, from Marisol Cervoni, one of the clerks at the Brooklyn South TVB, complaining of aggressive behavior from the Plaintiff, including "yelling, cursing and insulting me." Ms. Cervoni wrote that she "can no longer interact with Mr. Capogrosso . . . because I fear for my safety. On many occasions I have observed him display aggressive behavior towards my co-workers, his clients, the other attorneys and their assistants."

12. Attached as Exhibit 4 is a complaint dated August 5, 2009, made to me by

3

Diantha Fuller, an attorney practicing at the TVB. Fuller's complaint indicated that her assistant, Agnes Paez, had advised her that the Plaintiff approached her and "called me a variety of vulgar and profane names and threatened me with violence," and that she "was especially nervous because I am 6 months pregnant and I was in fear his outbursts would turn violent."

13.     Because of incidents like the foregoing examples, the Plaintiff's aggressive and hostile behavior was deeply concerning to the TVB staff. In January 2011, eighteen TVB employees signed a petition stating that "we feel the presence of attorney Mario Capogrosso on our premises constitutes a threat to our physical safety," that "Mr. Capogrosso's behavior is unstable," and that "the confrontations have been escalating." The staff members asked "that Mr. Capogrosso's behavior be dealt with and that the management of this agency alleviates the threat to our physical safety." A copy of that employee petition is attached as <u>Exhibit 5</u>.

14.     After receiving the petition, I met with the Plaintiff and Supervising ALJ Bushra Vahdatlamas in my office. We emphasized that his aggressive behavior was unacceptable, and that if he did not conduct himself appropriately, he would not be allowed to appear on behalf of motorists at the TVB. During this conversation, the Plaintiff admitted that he sometimes loses his temper, but he agreed to calm down and cease his threatening behavior. He also told us that he would voluntarily stop appearing at the TVB if he had another altercation with anyone.

<u>The Plaintiff's 2011 Suspension From Practice</u>

15.     On December 21, 2011, the Plaintiff was involved in a verbal altercation with an attorney at the TVB in which he used profane and anti-Semitic language. Later that same day, he threw a punch into the air inches away from another attorney. Accordingly, the Plaintiff was told that his remaining cases for the day were adjourned and that he needed to leave the building immediately.

4

16.     On the next day, December 22, 2011, Supervising ALJ Vahdatlamas and I interviewed four attorneys who were present at the TVB during the incidents in question. Attached as <u>Exhibit 6</u> is a December 23, 2011 email from ALJ Vahdatlamas, which memorializes our investigation of the facts and our discussions with the Plaintiff.

17.     As set forth below, the four attorneys also submitted written statements, which comport with what they told me in their interviews.  ALJ Vahdatlamas and I also spoke with several of the TVB clerks regarding the incident.

18.     Attached as <u>Exhibit 7</u> is a statement from Yaakov Brody, one of the attorneys who was harassed by the Plaintiff during the incident.  The statement was given to me on or around December 22, 2011.

19.     Attached as <u>Exhibit 8</u> is a statement from Richard Maher, who witnessed the Plaintiff's harassment of Mr. Brody.  The statement was given to me on or around December 22, 2011.

20.     Attached as <u>Exhibit 9</u> is a statement from Sadiq Tahir, who witnessed the Plaintiff's harassment of Mr. Brody and his subsequent threatening behavior toward another fellow attorney named Jeffrey Meyers.  The statement was given to me on or around December 22, 2011.

21.     Attached as <u>Exhibit 10</u> is a statement from Mr. Meyers, who overheard the Plaintiff's harassment of Mr. Brody and was later physically threatened by the Plaintiff.  The statement was given to me on or around December 23, 2011.

22.     Later on December 22, 2011, Supervising ALJ Vahdatlamas and I met with the Plaintiff in my office to obtain his version of the incidents.  The Plaintiff claimed that everyone in the Brooklyn South TVB hated him because he is not Jewish, and admitted that he had

5

shouted anti-Semitic statements at Mr. Brody and punched "the air in front of Mr. Meyers' face." The Plaintiff did not seem to feel any remorse about his conduct.

23.     After the meeting with the Plaintiff, I consulted with Supervising ALJ Vahdatlamas and Neil Schoen, the Deputy Commissioner for Legal Affairs.  We concluded that the Plaintiff should be indefinitely suspended from practicing at the TVB (the "Suspension"), based on the seriousness of the incident, the Plaintiff's history of aggressive and threatening conduct, and the need to provide a safe environment for motorists, attorneys, and TVB staff.

Capogrosso Is Conditionally Reinstated, But The Disturbing Behavior Continues

24.     On or around April 12, 2012,  Petitioner brought an Article 78 proceeding in state court challenging the Suspension.  DMV opposed the Plaintiff's petition, and I provided an affirmation in support of their opposition, which is attached as Exhibit 11.

25.     I understand that DMV and the Plaintiff settled his Article 78 proceeding on the condition that DMV would lift the Suspension upon the Plaintiff's completion of anger management course, that he subsequently did so, and that the Suspension was thereby lifted in or around June 2012.

26.     I am aware that Plaintiff was advised that upon his return to practice before the TVB, he would be required to strictly adhere to the standards of conduct required of attorneys appearing before State courts, and that threatening conduct, verbal abuse or the use of ethnic slurs would not be tolerated.  The Plaintiff was also warned that any future misconduct could result in the Plaintiff being immediately and permanently barred from practicing before the TVB.

27.     For a year or two, I did not receive any notable complaints about the Plaintiff. However, I became aware that his behavior began to deteriorate again in 2014.

28.     On or around May 5, 2014, Geri Piparo, one of the TVB clerks, filed a workplace

6

violence report stating that the Plaintiff accused David Smart, a security officer, "of looking at him" and "there were heated words exchanged," requiring a police officer to intervene. A copy of that Workplace Violence Report is attached as Exhibit 12.

29. On or around October 29, 2014, I received a written complaint from a clerk named Wanda Alford that the Plaintiff had told a motorist to "give [her] an attitude," and when asked why he did it, responded "I wanted to get a reaction out of you. A copy of the written complaint is attached as Exhibit 13.

30. On or around February 3, 2015, Officer Smart submitted a complaint to me stating that the Plaintiff "deliberately walked into me." A copy of the written complaint is attached as Exhibit 14.

31. On or around February 5, 2015, a motorist named Paul Perez, who was apparently one of the Plaintiff's clients, filed a complaint stating that after a disagreement the Plaintiff "told me to go fuck my self and that we can take it outside." Two TVB clerks, Melissa Vergara and Melanie Levine, also filed reports stating that the Plaintiff engaged in a verbal altercation with Mr. Perez and tried to get him to fight. A copy of Mr. Perez' statement is attached as Exhibit 15. A copy of Ms. Vergara's statement is attached as Exhibit 16. A copy of Ms. Levine's workplace violence report is attached as Exhibit 17.

32. On or around February 9, 2015, a TVB clerk named Geri Piparo sent a complaint to me by email, stating that the Plaintiff had objected that she left a paperclip on a garbage pail, and that he told her to "stick it where the sun don't shine." A copy of Ms. Piparo's email is attached as Exhibit 18.

33. On or around March 19, 2015, attorneys Diantha Fuller and Sadiq Tahir sent me a memo regarding incidents in which the Plaintiff would repeatedly say "shit" at them whenever

7

he passed them. Ms. Fuller wrote that she "simply ha[s] endured this harassing behavior from him daily for the past 6 months and simply want him to stop doing it so that I may not be harmed or hindered in my right to practice here." A copy of the memo is attached as Exhibit 19.

34. I was aware of these and other, more informal, complaints regarding the Plaintiff's behavior in late 2014 and early 2015. Based on what I had seen and heard, it was clear to me that the Plaintiff was once again making the motorists, staff, and attorneys at the TVB feel threatened and insecure. Like many at the TVB, I was seriously concerned about his aggressive and inappropriate behavior, which had already reached a level and frequency that similar to or even exceeded the conduct that had previously resulted in his Suspension.

The Plaintiff's Letter To OAG

35. I understand that at some point in March 2015 the Plaintiff sent a letter to the Office of the Attorney General complaining about Officer Smart, the security guard, and making allegations about me as well.

36. The Plaintiff did not send me a copy of the letter. I believe I was informed of the letter at some point after it was received at the Attorney General's office, but I do not recall when.

37. I do not recall reading the Plaintiff's letter, and sitting here today I do not view the letter as particularly relevant to me or my duties. My recollection is that I did not view the letter as particularly significant, as it was directed to the Attorney General, not DMV, and primarily consisted of rehash of certain stale grievances and unsubstantiated complaints about Officer Smart that the Plaintiff had already communicated to me on a number of occasions, and which had been appropriately considered. The fact that the Plaintiff had criticized me was also not particularly notable, given his history. As a TVB ALJ, receiving occasional criticism from

8

unhappy litigants or attorneys was part of the job and certainly not noteworthy.

38.     I never spoke to the Plaintiff about the letter.  The Plaintiff's allegation that I told him that I did not like what he wrote about me and asked him to practice somewhere else is not true.

The May 5, 2015 Incident

39.     On or around May 5, 2015, the Plaintiff was involved in another aggressive incident.  The Plaintiff became enraged when another attorney, Sadiq Tahir, touched his bag, and began yelling and cursing at him.  Danielle Calvo informed me of the incident, and I went out and attempted to mediate the situation, but the Plaintiff repeatedly interrupted the conversation, overcome with anger against Mr. Tahir.

40.     Mr. Tahir filed a complaint about the incident on or around May 5, 2015, a copy of which is attached as Exhibit 20.  He writes about how Mr. Capogrosso became enraged, how I attempted to calm the tensions, and says that the Plaintiff threatened him again afterwards.   Mr. Tahir writes that the Plaintiff "is more powerful and strong than me and I am afraid that one day he can physically hurt me."

41.     One of the clerks, Kimberly Rivers, made a written statement regarding the incident, which is attached as Exhibit 21.  She wrote that the Plaintiff "scream[ed] obscenities and threats," and that the Plaintiff "is more often than not a menace to the office staff, customers, as well as the other attorneys who practice in this office."

42.     Another attorney, Michael Beer, wrote a statement to me regarding what he witnessed.  He describes how the Plaintiff became angry at him as well, repeating "don't touch my fucking stuff," and that he then "witnessed Mario Capogrosso yelling at Mr. Tahir not to touch his fucking stuff."  Mr. Beer also witnessed the Plaintiff make threatening statements about

9

**JSA-213**

me, saying "if he (I assume Judge Gelbstein) was a man he would put a gun to his own head." Mr. Beer concluded that "[i]t appears to me that over the past few weeks Mario Capogrosso has become more aggressive in both his words and demeanor and has been creating an atmosphere of fear and threatening both attorneys and DMV Staff." A copy of Mr. Beer's statement is attached as Exhibit 22.

43.    Ms. Calvo also filed a workplace violence report regarding the incident, which is attached as Exhibit 23.

44.    I found the Plaintiff's erratic and aggressive behavior in the May 5, 2015 incident very disturbing. The circumstances of this incident, along with the many other complaints received over the previous months and years, were on my mind after hearing about the Plaintiff's confrontation with Officer Smart less than a week later on May 11, 2015, and when Ida Traschen and I subsequently determined that he should be permanently barred from practice at the TVB.

The Plaintiff's Fight With Officer Smart, And the Decision to Bar the Plaintiff From the TVB

45.    I was out of the office on a personal matter on the morning of May 11, 2015, when I received a call from Danielle Calvo, informing me that the Plaintiff had been in a physical confrontation with Officer Smart. I told her to call First Assistant Ida Traschen, who oversaw the TVB system, and who was aware of the Plaintiff's recurring incidents of aggressive behavior. It is my understanding that Ms. Traschen later advised Ms. Calvo to escort the Plaintiff out of the TVB.

46.    Later that day, I spoke with Ms. Traschen. After a lengthy discussion, we concluded that the Plaintiff should be barred from practice at the TVB because of his long history of aggressive behavior, which seemed to only be getting worse, because the prior Suspension and required anger management classes had not been sufficient to resolve his

conduct issues and because the incident with Officer Smart involved physical violence, which the Plaintiff had been previously warned would lead to his being barred from practice before the TVB. I understand that Ms. Traschen informed the Plaintiff of the decision by phone.

47. The Plaintiff's letter to the Attorney General's Office was not discussed and played no role in that decision. We could not ignore the Plaintiff's history, the multitude of complaints that had accumulated about him, his increasingly hostile behavior, or the fact that he had become violent. We would have taken the same action whether or not he had sent a letter to the Attorney General months before.

48. By the time I physically returned to the office that day, the Plaintiff had already been escorted out. Although I was not personally present for the incident where the Plaintiff pushed Officer Smart, it is recorded in several eyewitness statements. Attached as Exhibit 24 is a workplace violence report filed by Ms. Calvo. Attached as Exhibit 25 is a statement by Anthony Adinolfi, who witnessed the incident. Attached as Exhibit 26 is a statement by George Han, a TVB employee who also saw the incident. All of the reports indicate that it was the Plaintiff who assaulted Officer Smart.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:       May 14, 2021
             Brooklyn, New York

                                        _____
                                                ALAN GELBSTEIN

11

To Judge Gelbstein

Re: Incident report (TVB)

On Tuesday, April 21, 2009 at approximately 10:25A, I was at my work station (#7) when I observed and heard Mr. Capogrosso, screaming and yelling profanities and obscenities at Ms. Rabinovich (Tanya). At this time Mr. Capogrosso is sitting down. I observed him get up from his seat and approach Ms. Rabinovich (walking fast and hard toward her) when he bumped real hard into her as he tried to pass by her. (Which was very unnecessary - given he had plenty of room to walk around her.) I noticed she was very shaken by his actions.

This is the end of my statement.

L. Perez Jr
MVR1

P - 80

**EXHIBIT**
Exhibit 3

04·21·09

JUDGE GELBSTEIN
      DEAR SIR,
        ON TUESDAY April 21, 2009 WHILE WORKING
THE CASHIERS WINDOW, STATION BS24 I HEARD A LOUD
VOICE FROM the Lawyers Area. I Looked up AND
SAW Mr CAPOGLOSSO, Esq. SEATED ON the BENCH
STATING " GET Away FROM HERE", He then Rose AND
told "TANYA the Interpreter" to get Away. Mr
CAPOGLOSSO MOVED TOWARD TANYA, AND they seem
to Bump. the Noise Continued UNTIL OUR
supervisor DANIELLE CALVO intervened

                Sincerely,
                 Roy Tucci
                 Roy Tucci
                 CLARK

                        CC. J. Vetere

                                    P. 82

JSA-217


**EXHIBIT**
Exhibit 4

 **Traffic Violations Bureau**

June 19, 2009

**From:**     Marisol Cervoni

**To:**       Alan Gelbstein

**Subject:**  Mr. Capogrosso

On Tuesday June 9, 2009 at approximately 9:45 AM I called the next customer to my counter. The motorist was accompanied by Michael, who is the assistant of Mr. Capogrosso, who is one of the lawyers who represents motorists at their hearings here at Brooklyn South. The motorist handed me her drivers' license and as I was manufacturing a substitute ticket for the motorist, Michael called Mr. Capogrosso over to my window. Mr. Capogrosso, thinking there was a problem approached my counter and aggressively and belligerently began yelling at me. I assured him that there was no problem and that I had already printed the ticket for his client, but at that point he was already out of control and continued yelling, cursing and insulting me. The supervisors, Geri, Danielle and John all came out to see what the commotion was and to resolve the situation, but he refused to listen to reason or leave my counter. I then went into the back office because I felt threatened and was afraid for my safety. Finally one of the supervisors calmed him down and he moved away from my counter. Throughout the day Mr. Capogrosso was taunting me. He would walk past my station making comments and smirking at me.

I can no longer interact with Mr. Capogrosso at the service counter because I fear for my safety. On many occasions I have observed him display his aggressive behavior towards my co-workers, his clients, the other attorneys and their assistants. He even went so far as to assault a female assistant who works for another lawyer.

His aggressive behavior has steadily progressed within the past few months. I no longer feel comfortable at my place of employment because of this individual's behavior and I wish to go on record in the event of any future conflicts.

Marisol Cervoni

*Marisol Cervoni*

Cc:  John Vetere
     Danielle Calvo
     Geri Piparo

P-84

JSA-218





### Diantha L. Fuller, Esq.

REDACTED

Cell: REDACTED
Fax:

August 5, 2009

New York City Traffic Violations Bureau ("TVB") – Coney Island Location
Attn: Senior Judge Alan D. Gelbstein                              *Hand Delivered*
Re: Mario Cappigrosso Incident Report 7/31/09

Dear Judge:

As requested by your staff, below is Agnes Paez's report of the events that transpired on 7/3109  in
the Coney Island Traffic Bureaus which I took directly from an email she submitted to me:

*I, Agnes was speaking with a client on behalf of Diantha Fuller when I was abruptly approached
by Mr. Mario Cappigrosso.  He then stood in front of me, and told Ms. Fuller's client that I was
not a lawyer and he should not be speaking to me.  He then handed my client his business card.
The client did, in fact, know that I was not an attorney and was shocked at Mr. Cappigrosso's
behavior.*

*Mr. Cappigrosso then turned to me and called me a variety of vulgar and profane names and
threatened me with violence to stay away from the Dept. of Motor Vehicles.  He then told his
Paralegal, Michael, that he should follow me around and harass every client that approached
me.*

*Finally, Mr. Cappigrosso told me stay away from him in a very violent manner, towering over me
and spoke so loudly and in a threatening manner that a plain clothes policeman standing next
to me asked if he needed to get involved.  One of the clerks behind the counter then intervened
and sternly asked him to behave because Mr. Cappigrosso was so frightening, not only to me,
but to everyone around him.*

*I was especially nervous because I am 6 months pregnant and I was in fear his outbursts would
turn violent.*

Should you need any additional information regarding this matter or if you have any questions,
please feel free to contact the undersigned.

Regards,

Diantha Fuller, Esq.

P-86



EXHIBIT

Exhibit 6

**Bushra Vahdat**
_____

| | |
|---|---|
| **From:** | Bushra Vahdat |
| **Sent:** | Friday, December 23, 2011 12:05 PM |
| **To:** | Alan Gelbstein; '1sralj@gmail.com' |

Good Morning;

As you are aware I had to deal with some difficult issues at Brooklyn South TVB on Wednesday, December 21st and Thursday, December 22.

Below is a summary of the events:

When I was first appointed to the position of Supervising ALJ the clerical staff at Brooklyn South approached me and handed me an affidavit signed by all of them requesting help dealing with an attorney, Mr. Cappagrosso, who appears in that court on a regular basis. The affidavit stated that they felt physically threatened by this attorney due to his actions in and out of our office. He had verbally abused the clerks on many occasions and had followed a clerk with his car and stopped the clerk's car from moving. He had then asked the clerk to get out of the car and fight it out with him. Nothing had happened since some other clerks had come by and Mr. Cappagrosso had left.

At that time I met with Mr. Cappagrosso in Sr. ALJ Gelbstien's office and we jointly had a conversation with Mr. Cappagrosso.

We explained to him that his behavior was not professional and if he did not stop his foul language and his threats we would have to take action and bar him from the TVB building. At that point he promised us that he would conduct himself according to the rules of conduct for attorneys.

As far as I was aware there were no further incidents with Mr. Cappagrosso in that office.

On Wednesday , December 21 I received an email from Danielle Calvo the SMVRI in Brooklyn (Please see attached). She was very concerned since she had to go into the attorney room and stop Mr. Cappagrosso from shouting religious obscenities. Mr. Cappagrosso had thrown a coffee cup at another attorney, Mr. Brody, in the attorney room and after Mr. Brody had objected Mr. Cappagrosso had started to scream and shout obscenities at everyone around him. A crowd had gathered and the entire court house was disturbed.

About an hour later I received another email from Ms. Calvo stating that Mr. Cappagrosso had tried punching one of the attorneys ,Mr. Mayer, but had stopped about an inch away from his face. Mr. Mayer was very upset and had left the area in fear.

I asked Ms. Calvo to speak to Mr. Cappagrosso and inform him that the rest of his cases for the day were being adjourned and that he had to leave the building at once. She followed my directions and Mr. Cappagrosso left after shouting at Ms. Calvo.

That afternoon I received phone calls from two attorneys who had witnessed the incident with Mr. Brody and Mr. Mayer. Both attorneys confirmed the account related to me by Ms. Calvo.

On Thursday, December 22, I arrived at Brooklyn South before the 8:30 calendar and along with Sr. ALJ Gelbstein interviewed Mr. Mayer, Mr. Brody, Mr. Saddique and Mr. Mehr. Again, they all confirmed the prior day's incident. I also spoke to a few of the clerks who informed me that Mr. Cappagrosso punches the walls of the TVB office and on occasion hits the steal polls in the office with his fists. He makes such loud noise when he does this that all the clerks run into the back clerical area to take shelter.

Mr. Gelbstein and I called Mr. Schoen and asked for his counsel. He agreed with us that the best course of action was to ban Mr. Cappagrosso from the building.

After taking everyone's statement, Mr. Gelbstein and I met with Mr. Cappagrosso. We asked him for his version of the prior day's events and he admitted to shouting the religious obscenities and trying to punch, as he put it, the air in front of Mr. Mayer's face. He was not remorseful and claimed that he needs to punch the walls in our office to let out steam. I also observed that his knuckles were severely bruised.

At this point Mr. Gelbstein and I felt that the wellbeing of the office was at risk and we asked Mr. Cappagrosso to leave the building and not to return till further notice. He was escorted out of the building by two Srgt. From the police room. The clerical staff reiterated to me how scarred they were of Mr. Cappagrosso and how they felt that at any time he may punch one of them instead of the wall.

1

DMV-0000224

**JSA-220**

EXHIBIT

Exhibit 12

Today I spoke to Brooklyn's District Attorney's office. They put me in touch with the Action Center and Mr. Dave Casona responded to my inquiry for an order of protection for the clerical staff. He informed me that Mr. Cappagrosso must be arrested or issued a desk appearance ticket before the DA's office would go to court with us and ask for an order of protection.

I am not sure if Mr. Mayer would file a complaint and I don't know if a desk appearance would be issued based on Mr. Cappagrosso hitting our walls.

I also called Mr. Zarillo from the Bar Association's Grievance Committee. He has not returned my call as of yet. I will be filing a complaint with that body on Tuesday.

Please let me know if you have any questions about this issue.

Thanks for all your help and support.


Bushra Vahdat
Supervising ALJ
Central Administrative Adjudication
30-56 Whitestone Exp. 2nd Floor
Flushing, NY 11354
Phone: 718.539.8470
Fax: 718.539.8491
Bushra.Vahdat@dmv.ny.gov


*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

**JSA-221**

DMV-0000225

I am writing in regards to Mario Capogrosso. On Dec 21, 2011, I was sitting on one of the benches in the attorney's room at the Traffic Violations Bureau at the DMV in Coney Island, Brooklyn. Mr. Capogrosso walked in and went to reach for his briefcase which was lying on the floor next to me. Mr. Capogrosso then said "excuse me" so I could move over so he could get to his briefcase. He already had plenty of room but regardless I shifted my body so he would have even more room to reach for his belongings. He said excuse me a second time as if to tell me I should move over more and that he needed more space even though the bag was next to me and I was not in any way blocking access. Frustrated I told him that he had enough room. Mr. Capogrosso then lashed out on me and said he was being nice by saying excuse me and that next time he would simply "hit me" with his briefcase and not say anything. He then proceeded to tell me that next time I see him I "better get out of his way." I ignored him and went on with my work. Moments later he comes in to the room again still frustrated from the first episode. At this time there were three other attorneys in the room. Mr. Capogrosso took a seat across from me and began to complain how I did not give him enough room when he said excuse me. I continued to ignore him and go on with my work. Eager to show how angry he really was, he took his coffee cup which still had some coffee inside and threw it in my direction toward the garbage can that was next to me. The cup came very close to me and did not even land inside the garbage. I complained to Mr. Capogrosso that this was not civilized behavior and I did nothing to warrant such hostility. Enraged Mr. Capogrosso went on a rant on how I was a "jew fucking cunt" a phrase which he repeated about six or seven times. He went on to say how this place was "run by jews." When I protested to how he could use such language, he stated "what do you care, just call me a fucking Italian ginny." I then told Mr. Capogrosso that he was an anti-Semite and he did not belong in the location.

Yaakov Brody

P-92


EXHIBIT
Exhibit 8

03/02/2012  16:37   1718-539-8491        QUEENS NORTH TVB         PAGE  09/17
03/02/2012  13:11   1718-266-7478        BROOKLYN SOUTH           PAGE  03/11

There were four attorneys sitting in the room when Mario Capagrosso entered: Sadiq Tahir, Yakov Brody, Michael Beer, and myself.

The room is very small; lawyers generally show each other courtesy upon entering or leaving. The room has to accommodate up to a dozen attorneys, their briefcases and overcoats, and the occasional client, so the comportment in the room itself is always gentlemanly of necessity.

When Mr. Capagrosso entered he asked Mr. Brody to move so he could sit. Mr. Brody did his best to reasonably comply with this request. The bench contained the belongings of other attorneys and Brody in fact tried to make more room so that Capagrosso could sit. (Besides the fact that upon Capagrosso's entrance there were four adult males there were also briefcases, files, jackets, and bags full of food and various sundries. Brody not only tried to make room where he was sitting; he moved other files and items to make room to accommodate Capagrosso.)

Far from acknowledging Mr. Brody's attempt to show him courtesy Capagrosso grumbled about Mr. Brody's lack of decorum and began to berate Brody. This was both puzzling and unreasonable because it seemed that Brody was, in fact, making every attempt to accommodate Capagrosso.

Capagrosso then began to inveigh against Brody in vituperative terms as his temper continued to rise beyond all reason given the fact Brody was extending courtesy to him, by now, under duress. Capagrosso's anger escalated unreasonably to the point his remarks became intensely personal, directed at Brody, his person, and his culture, his ethnicity, and his very humanity; the tone quickly approached the intensity of "fighting words". Nothing Brody did or said during Capagrosso's verbal attack was in any way provocative or confrontational. Everyone in the room except Capagrosso seemed to understand he was losing self-control for no reason.

Mr. Brody, upon being inveighed against for no other reason that Capagrosso's own foul mood, which had escalated to a viciousness and *ad hominem* nature, did speak out strongly when Capagrosso referred to him as a "fucking Jew cunt". Michael Beer and Brody both spoke up to demand that Capagrosso refrain from using provocative and hate filled speech directed at Brody's culture and religion. Beer told him flatly that he had crossed a line of decency, and that it wasn't the first time he had done so. Capagrosso by this time was completely out of control, and responded that he had every right to use such language. He expressed the belief that the DMV was in fact run by "fucking Jew cunts." He also went so far as to invite Brody and Beer to refer to him by a slur-adjective aimed at his *own* ethnicity. Neither indulged him his request.

During his angry tirade Mr. Capagrosso also threw a coffee cup he held in his hand across the space in which Brody seat, which may or may not have spattered Brody with the remnants of the coffee's cup. The hate speech, the demeanor, the verbal ejaculations were all, it seemed to me, attempts to humiliate and intimidate Mr. Brody, who had done absolutely nothing more than to try to make room for Capagrosso in a room that is, under the best of circumstances, only large enough to accommodate two or three people.    *Richard F. Maher*

P-250



**EXHIBIT**

Exhibit 9

This is in refference to the incident happened on Dec. 30, 11. Mr. Yaakov Brody was sitting on the bench in lawyer's room. Mr. Copogross walked in the room and said "excuse me". Mr. Brody moved to the side so that Mr. Copogrosso could reach to his bag lying on the floor. He was looking so angry that he again said "excuse me" in a loud voice. Mr. Brody said you have enough room, why are you so rude. Mr. Copogrosso got so upset that he started shouting against Jews. Mr. Beer who also sitting in the room asked Mr. Copogrosso that it is enough you cahn't curse Jews. Mr. Copogrosso said you can call me "fucking Italian ginny" Mr. Brody said that you are anti-semite you don't belong to this place. Mr. Brody shouted that stop it in the meantime Ms. Danial came in the room and tried to cool down the situation.

Little later Mr. Meyers came in the room and asked Mr. Copogrosso that he should apologize for his remarks, he then tried to hit Mr. Meyers. I don't know if he wanted to hit Mr. Meyers or give some massage to other people. Mr. Copogrosso said to Mr. Meyers that I will send you to the hospital. Mr. Meyers said I will not report against you, I will sue you and get every penny you have. Mr. Copogrosso went out of the room and started hitting the wall and steel guards.


M. Sadiq Tahir


P-96

EXHIBIT

Exhibit 10

Phone (718) 996-4705    Cell (347) 733-8447

# *Jeffrey A. Meyers Attorney at Law*

8855  Bay Parkway, Suit 9E

Brooklyn, NY, 11214

December 23rd, 2011

In the A.M of the day of December 21st , 2011, I overheard a loud commotion which I was told resulted in a tirade of anti-Semitic slurs shouted by Mr. Mario Capogrosso.  I later implored Mr. Capogrosso to apologize and and to make peace with his fellow attorneys, but to no avail, his conduct the rest of the day was one of abrasive incoherent loud mutterings in which he smashed his fist against concrete walls and steel beans that are situated outside the DMV hearing rooms, coupled with more anti- Semitic comments, he kept saying "everyone here wants to fight me".

At about 2 o'clock that day I was sitting in the lawyers room across from Mr. Capogrosso  not engaging in any conversation with him when he suddenly became enraged and lunged at me with his fists with great speed and then  smacked his fists against his other hand in a marshal arts form coming within 12 inches of my face. Claiming "I could put you in the hospital with just one punch, i could hit hard objects with my fists without hurting my hands. His eyes were filed  with mindless rage. I loudly exclaimed as his fists flew close at various times" stop Mario, its me Jeffrey I'm your friend" I'll have to sue you if you put me in the hospital. "He kept repeating the phrase " you people, you people".He later told me that he envisioned all of us (Jews) and didn't mean to single me out during his assault on me. I didn't report the incident immediately until I was  called in to the office after an eye witness attorney reported it first and I was asked to verify it.

Jeffrey A. Meyers

*[signature]*

Ex. 1 p. 010

P - 248



EXHIBIT

Exhibit 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

In the Matter of an Article 78 Proceeding                           Index No. 7738/12

MARIO CAPOGROSSO,
                                                                   Hon. Bernadette Bayne
                                    Petitioner,                     Part 18

              -against-                                            **ALJ AFFIRMATION**

NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

                                    Respondent.

ALAN D. GELBSTEIN, hereby affirms, pursuant to CPLR 2106(e), as follows:

1.      I am the Senior Administrative Law Judge ("ALJ") at the Brooklyn South Traffic

Violations Bureau ("TVB") of the New York State Department of Motor Vehicles (the "DMV").

As Senior ALJ, my responsibilities include managing the Brooklyn South TVB office,

supervising the Administrative Law Judges and ensuring proper communication with other

offices and bureaus of the DMV, as well as with the police and the local chapter of the New

York State Bar Association.  I submit this affirmation in opposition to the motion by petitioner

Mario Capogrosso, brought by order to show cause signed by this Court (Sherman, J.) on April

12, 2012, seeking a preliminary injunction enjoining the DMV from enforcing its prohibition of

petitioner from appearing at any TVB office, and in support of the DMV's cross-motion to

dismiss the petition as nonjusticiable. This affirmation is based on personal knowledge and

conversations with DMV employees, DMV licensees, attorneys appearing in the Brooklyn South

TVB and petitioner, as well as my review of the legal files and records maintained by the DMV.

2.      On numerous occasions, I have personally warned petitioner that his threatening

behavior is unacceptable.  Despite repeated warnings, petitioner's conduct has not improved.

3.      As demonstrated below, in light of petitioner's pattern of disruptive and

P-145

EXHIBIT
Exhibit 15

threatening conduct including an incident on December 21, 2011, and given the DMV's

jurisdiction and duty to ensure a safe workplace and to prevent interference with the ordinary use

of and business at the TVB offices, the DMV's decision prohibiting petitioner from appearing at

TVB offices is both rational and nonjusticiable.

Background

4.      Petitioner has been appearing at the Brooklyn South TVB office on an almost

daily basis for the last several years. Petitioner was involved in a heated dispute with another

attorney that nearly turned into a physical altercation the very first day he appeared at the TVB.

5.      Over the course of the time that petitioner has appeared at the Brooklyn South

TVB, I have received numerous complaints regarding his behavior. Copies of written

complaints made against petitioner including descriptions of the incidents that occurred on

December 21, 2011 are annexed to the affirmation of Ida L. Traschen dated April 11, 2012

("Traschen Aff."), submitted in opposition to petitioner's application for temporary restraining

order, as Exhibit B, and are incorporated by reference herein.

6.      I have personally observed petitioner harass TVB employees, attorneys appearing

at the TVB and even his own clients. Petitioner often uses anti-Semitic language when referring

or speaking to Jewish attorneys. Petitioner has called me a "beanie wearing kike."

7.      On numerous occasions, I have warned petitioner to exercise a calmer demeanor

when interacting with TVB employees, other attorneys and his own clients. However, despite

repeated warnings, petitioner's threatening, volatile conduct has not improved.

8.      At one point, I notified the DMV's Division of Field Investigation of petitioner's

pattern of threatening behavior.

9.      Petitioner has a habit of punching the walls and steel beams at the TVB. He often

2

P-146

states that this habit is a result of his being a boxer and having a boxer's attitude. Petitioner also frequently tells people at the TVB office that he practices a lethal form of martial arts, which allows him to punch walls and metal objects without hurting himself.

<u>The Warning Given to Petitioner in January 2011</u>

10.    In January 2011, eighteen employees of the Brooklyn South TVB office sent a petition to Supervising ALJ Bushra Vahdat, who is responsible for supervising the Senior ALJs at each TVB office. The TVB employees' petition stated that petitioner's presence at the Brooklyn South TVB constitutes a threat to their physical safety. As a result, Supervising ALJ Vahdat made a visit to the Brooklyn South TVB to discuss this matter with me and to interview TVB employees.

11.    Thereafter, Supervising ALJ Vahdat and I spoke to petitioner about his disruptive and threatening conduct, and warned him that if he could not conduct himself in a professional manner, he would not be allowed to appear on behalf of licensees at the TVB. During this conversation, petitioner admitted that he sometimes loses his temper, agreed to calm down, and told us that he would voluntarily stop appearing at the TVB if he had another altercation with anyone at the TVB.

<u>The Incident on December 21, 2011 and DMV's Prohibition<br>of Petitioner from Appearing at TVB Offices</u>

12.    On December 21, 2011, petitioner was involved in a verbal altercation with an attorney at the Brooklyn South TVB, and later that same day, he threw a punch into the air in the presence of another attorney. In the Petition, petitioner admits to this conduct, <u>see</u> Petition ¶¶ 12, 14 and Ex. A.

13.    Ms. Danielle Calvo, an employee of the Brooklyn South TVB, contacted Supervising ALJ Vahdat regarding those incidents. Upon Supervising ALJ Vahdat's direction,

3

P- 147

Ms. Calvo advised petitioner that his remaining cases for that day were adjourned and that he must leave the building immediately.

14.     On the next day, December 22, 2011, Supervising ALJ Vahdat and I interviewed four attorneys who were present at the Brooklyn South TVB office regarding the previous day's incidents. Those four attorneys also submitted written statements. See Traschen Aff. ¶ 5 and Ex. B.

15.     Later that same day, on December 22, 2011, Supervising ALJ Vahdat and I met with petitioner in my office, in the presence of two police officers, to obtain his version of the incidents. Petitioner claimed that everyone at the Brooklyn South TVB hates him because he is not Jewish, and admitted that he had shouted anti-Semitic statements at Mr. Brody and punched "the air in front of Mr. Meyers' face" the day in question. During this conversation, I observed that petitioner lacked remorse about his conduct, and that his knuckles were severely bruised.

16.     Supervising ALJ Vahdat and I then directed petitioner to leave the TVB, and notified him that he is prohibited from appearing before any TVB for an indeterminate period, based on the fact that despite repeated warnings, petitioner's presence at the TVB has constituted a continuing threat to the safety and well-being of other individuals present at the TVB.

17.     DMV reserves the right to report petitioner to the New York Bar Association's Grievance Committee.

Dated: Brooklyn, New York
       May 2, 2012

ALAN D. GELBSTEIN
Senior Administrative Law Judge

4

JSA-229

P-148

Case 22-2827, Document 136, 06/06/2023, 3525593, Page56 of 179

05/09/2014  10:27  1718-266-7478          BROOKLYN SOUTH          PAGE  02/04

MV-984 (12/11)

**New York State Department of Motor Vehicles**
DIVISION OF LABOR RELATIONS
**REPORT OF WORKPLACE VIOLENCE INCIDENT**

Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in.

OFFICE USE ONLY

FILE NUMBER:

Received: _____

X RE: _____

X RE: _____

PRIVACY CONCERN: ☐ YES   ☐ NO

5/9/14 - *Reviewed - NS*
*JCS4* — *Please followup*
*with Coney Island*
*F/B*
*thanks*

WV0505/14/B

**NAME OF INDIVIDUAL FILING REPORT**

| Name Geri Piparo | Title SMVR I | Office Location Brooklyn So. 2875 N 8 St Brooklyn, NY | Phone Number 718-266-5512 |

**INCIDENT REPORTED TO**

| Date Reported 5-5-14 | Person Reported To Geri Piparo | Title SMVR I |

**INCIDENT**

| Date 3-5-14 | Time ☑AM ☐PM | Location of Occurrence In front of service counter |
| DFI Contacted? ☐Yes ☑No | DFI Contact Name | |

**EMPLOYEES INVOLVED**

| Name David Smart | Title Security Guard |
| Name | Title |
| Name | Title |

**OUTSIDE INDIVIDUALS INVOLVED**

| Name Mario Cappagroso | Sex ☑Male ☐Female | Phone | Client ID # |
| Address | City | State | Zip Code |
| Name | Sex ☐Male ☐Female | Phone | Client ID # |
| Address | City | State | Zip Code |
| Name | Sex ☐Male ☐Female | Phone | Client ID # |
| Address | City | State | Zip Code |

**WITNESSES**

| Name | Sex ☐Male ☐Female | Phone | |
| Address | City | State | Zip Code |
| Name | Sex ☐Male ☐Female | Phone | |
| Address | City | State | Zip Code |
| Name | Sex ☐Male ☐Female | Phone | |
| Address | City | State | Zip Code |

Continue on other side                                          Page 1 of 2

JSA-230

EXHIBIT
Exhibit 20

**Description of Events Leading to the Incident and What Occured:**

WU050574B

Mario Cappagroso accused David Smart of looking at him + there were heated words exchanged. P.O. Nielsen intervened.

**Nature and Extent of Injuries:**

No injuries.

**Additional Comments:**

Mr. Cappagroso has written a letter to Judge Gelbstein. See Attached.

Case 22-2827, Document 136, 06/06/2023, 3525593, Page57 of 179

Geri Piparo
_Name of Individual Filing Report_

_Name of Supervisor_

Geri Piparo
_Signature of Individual Filing Report_

_Signature of Supervisor_

5-9-14
_Date_

S-9-14
_Date_

MV-984 (12/11)

Page 2 of 2

**JSA-231**

To: Mr. Helbstein (Head Judge)

On October 29, 2014, I was the clerk at counter #5. On line #1 the first person on line was a young male motorist and the second in line was the lawyer capagrosso. While on line, capagrosso was observed talking to the male motorist, I called next on line, to the young male motorist and he immediately prompted me to look at the line. He then stated "you see that man who was behind me on line", (which was capagrosso), he told me to give you an attitude. The motorist also stated that "I told the guy (which was capagrosso), that I'm not here to give her or any other person an attitude or problem. If you want that done, do it yourself." I now called next on line and capagrosso approched my window and I asked him why did he try to encourage the motorist before him to give me an attitude. His response was, (while smiling and snickering), "I wanted to get a reaction out of you." I told him that wasn't nice of you to go around trying to encourage others to cause problems with the clerks for no reason at all. He again, just laughed and went on his way. Then I went to report this situation to my supervisor Danille Calvo.

Yours Truly
Wanda Alford

DMV-0000061

**JSA-232**

EXHIBIT
Exhibit 21

February 3

At 9:15 Am
Mario Capogrosso
Deliberately walked
into me. I asked
him why — and
He said that he
intended to reach
the Court Board.
I Reported the
incident to my
Supervisors.

Unsigned Note of David Smart

GELB-0000059

**EXHIBIT**
Exhibit 22

**JSA-233**

I Paul Perez was treated wrongly
by Esq Mario Capacuso
on 2/5/15.

Mario Capacuso was
taking on a case for me
Paul Perez and didn't live
up to his responsibilty.

I Paul Perez was threatened
by Mario Capacuso and told
to go find another lawyer
because he messed up, at that
time I told him I would
like another lawyer and my
money back and he told me
to go fuck my self and that
we can take it outside,
I Paul Perez refused to fight
with Mario Capacuso and
went to speak with the
DMV superviser.

Paul Perez

Lic# 723 587 541

718 - 688 - 5654

GELB-0000058

JSA-234

**EXHIBIT**
Exhibit 23

On Thursday, February 5, 2015, I was sitting at information station 7. At about 10 am I could hear arguing between Mario Capogrosso & a male motorist who was later identified as Paul Perez. At this point they had been by the some what sectioned off seating area on the opposite side of the wall to the information station 1. I wasn't able to see Mr. Capogrosso but Mr. Perez was standing a couple of feet back from that seating area. In a clear & hostile tone Mr. Capogrosso said to the Motorist to take this outside. Originally the motorist began following, he had even taken off his jacket & swung it onto a stanchion, but only got about halfway before he stopped himself, turned around, picked up his jacket & placed himself on the information line. Mr. Capogrosso did not; he kept walking to the door. when he looked back & saw that Mr. Perez was no longer following him & was now on line 1, Mr. Capogrosso went back to where he originally was, by that seating area. Apparently Mr. Capogrosso once again began trying to antagonize Mr. Perez because Mr. Perez began responding to him. At this point I called next.

When Mr. Perez came to me he handed me his ID and I pulled him up to see what was going on. He had been found guilty on a few tickets on January 21, when he said Mr. Capogrosso represented him, & unfortunately the two weeks given to pay had passed & now Mr. Perez is suspended. I had printed out the bill with the breakdown of the amount owed. He was saying that he wanted to speak to the judge & how it isn't right. Melanie had come out during the commotion & she as well was trying to explain the procedure to him. Meanwhile Mr. Capogrosso had gotten on the information line & Roy, who was at information station 9, had called next & was trying to help him. About this

DMV-0000059

EXHIBIT
Exhibit 24

JSA-235

same time Melanie had went into the back office to do or check on something, & I remained with the Motorist for a few more minutes before he had taken the information we provided & walked away.

As Mr. Perez was leaving Sgt. Grausman began walking over to me. I was beginning to tell him what had happened while watching Mr. Perez walk out the door & Mr. Capogrosso walk over to the door. He stood at it for a moment, Jeffrey Meyers, who was standing to his right against the column next to the door closest to the attorney room, said something to him as he stared through the glass & within that moment he proceeded through both sets of doors & outside. Sgt. Grausman, seeing this, quickly reacted by going towards the doors, but luckily it did not go any further & Mr. Capogrosso came back in.

About 45 mins later Mr. Perez returned, he was still upset but wanted to pay what he owed, as well as, wanting to better understand the appeal process because he also had a pending suspension put in place by the judge on the day of the hearing. Once again Melanie came out & we both assisted him. It was during this period that the Motorist wrote his statement on what had occurred.

Melissa Vergara

**JSA-236**

DMV-0000060

MV-984 (12/11)

**New York State Department of Motor Vehicles**
**DIVISION OF LABOR RELATIONS**
**REPORT OF WORKPLACE VIOLENCE INCIDENT**

Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in.

| OFFICE USE ONLY | |
|---|---|
| FILE NUMBER: | WV020515A |
| Received: | |
| X RE: | |
| X RE: | |
| PRIVACY CONCERN: ☐ YES  ☐ NO | |

**NAME OF INDIVIDUAL FILING REPORT**

| Name | Title | Office Location | Phone Number |
|---|---|---|---|
| Melanie Levine | SMVR1 | Brooklyn South TVB | 718-266-5512 |

**INCIDENT REPORTED TO**

| Date Reported | Person Reported To | Title |
|---|---|---|
| 02/05/15 | Jean Flanagan | TVB Operations Manager |

**INCIDENT**

| Date | Time | | Location of Occurrence |
|---|---|---|---|
| 02/05/15 | 9:55 | ☑AM  ☐PM | Lobby of Brooklyn South TVB |

| DFI Contacted? ☐Yes ☑No | DFI Contact Name |
|---|---|

**EMPLOYEES INVOLVED**

| Name | Title |
|---|---|
| Name | Title |
| Name | Title |

**OUTSIDE INDIVIDUALS INVOLVED**

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| Paul Perez | ☑Male ☐Female | 718-688-5654 | 723587541 |

| Address | City | State | Zip Code |
|---|---|---|---|
| 288 Bay 38th St 25 | Brooklyn | NY | 11214 |

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| Mario Capogrosso | ☑Male ☐Female | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| 245 Saw Mill River Rd Suite 106 | Hawthorne | NY | 10532 |

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| | ☐Male ☐Female | | |

| Address | City | State | Zip Code |
|---|---|---|---|

**WITNESSES**

| Name | Sex | Phone |
|---|---|---|
| Melissa Vergara | ☐Male ☑Female | 718-266-5512 |

| Address | City | State | Zip Code |
|---|---|---|---|
| 2875 W 8th St | Brooklyn | NY | 11224 |

| Name | Sex | Phone |
|---|---|---|
| | ☐Male ☐Female | |

| Address | City | State | Zip Code |
|---|---|---|---|

| Name | Sex | Phone |
|---|---|---|
| | ☐Male ☐Female | |

| Address | City | State | Zip Code |
|---|---|---|---|

**Continue on other side**                    Page 1 c

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

JSA-237



**EXHIBIT**
Exhibit 25

Case 22-2827, Document 136, 06/06/2023, 3525593, Page64 of 179

**Description of Events Leading to the Incident and What Occured:**

Attorney Capogrosso had represented Mr. Perez at trial for three violations on 01/21/15. His fines were due yesterday, on 02/04/15, and now included three suspension termination fees. Attorney Capogrosso and Mr. Perez engaged in a very loud verbal argument, in the lobby, with threats of escalating to a physical altercation, outside in the parking lot. Based on witness statements, at first Mr. Perez appeared to be in favor of meeting Attorney Capogrosso in the parking lot, but then got on the cashiers' line instead. Attorney Capogrosso continued to verbally provoke Mr. Perez into going outside, while he was on line, and throughout his experience at the service counter, being helped by MVR Melissa. I spoke to Mr. Perez, at the counter, regarding his questions about the STFs and about how to possibly file a complaint about his dissatisfaction with the services provided by Attorney Capogrosso. When I returned to the back office, I could hear the verbal confrontation starting up again and I called the police room for assistance.

**Nature and Extent of Injuries:**

None.

**Additional Comments:**

Please also see the attached statement from the motorist, Paul Perez.

Melanie Levine
Name of Individual Filing Report

Jean Flanagan
Name of Supervisor

*Melanie Levine* (signature)
Signature of Individual Filing Report

*Jean Flanagan* (signature)
Signature of Supervisor

02/05/15
Date

02/05/15
Date

Page 2 of 2

MV4684 (12/11)

**JSA-238**

Case 22-2827, Document 136, 05/06/2023, 3525553, Page65 of 179

I Paul Perez was treated wrongly by ESq, Mario Capacuso On 2/5/15.

Mario capacuso was taking on a case for me paul Perez and didn't live up to his responsibilty.

I paul Perez was threatened by mario capacuso and told to go find another lawyer because he messed up, at that time I told him I would like another lawyer and my money back and he told me to go fuck my self and that we con take it outside. I paulPerez refused to fight with mario capacuso and went to speak with the DMV superviser.

Paul Perez

Lic# 723 587 541

718 - 688 - 5654

Case 22-2827, Document 136, 06/06/2023, 3525593, Page66 of 179




# New York State Department of Motor Vehicles
## Coney Island
## Traffic Violations Bureau
## 2875 West 8ᵗʰ Street
## Brooklyn, New York 11224

**Date:** _2|5|15_

**To:** _Labor Relations_

**From:** _Melanie Levine_

## Number of pages including coversheet: _4_

### Our Telephone: 718-266-6867
### Our Fax:        718-266-7478

_Workplace Violence Incident_



## Gelbstein, Alan (DMV)

| | |
|---|---|
| **From:** | Piparo, Geri (DMV) |
| **Sent:** | Monday, February 09, 2015 10:59 AM |
| **To:** | Gelbstein, Alan (DMV) |
| **Cc:** | Levine, Melanie (DMV) |
| **Subject:** | Capagroso |

In November when I hung the dockets I would take the paperclip off and leave it on the garbage pail. Mr. Capagroso thought someone was doing this to annoy him. He made a complant to Judge Gelbstein who called me to find out who was doing this to him. I told Judge Gelbstein that it was me & that I left it for anyone who might want to use it. So I stopped doing it. He then call Judge Vahdat to complain that someone was still putting a paperclip on the garbage pail and leaving an empty coffee cup where he sits. I informed her that it wasn't true.

On November 18 as I was walking through the office Mr. Cappagroso was with a customer and as I passed he said "Geri stick it where the sun don't shine". I said excuse me, he said never mind.

I informed Judge Gelbstein & Judge Vahdat again. Judge Gelbstein went out to speak to him. Where he verbally attacked Judge Gelbstein and me, cursing.

I told him just don't speak to me....ever. I won't deal with him or his problems again.

1

GELB-0000035

**EXHIBIT**

Exhibit 26

**JSA-241**

**Memo to File:**

From:        Diantha Fuller, Esq.

Re:           Mario Capagrosso, Attorney

Date:        March 19, 2015

I am writing in regards to an incident between myself and Mr. Capagrosso that occurred in the lobby of the New York State Brooklyn South Traffic Violations Bureau ("TVB") around 12 noon on March 13, 2015. This memo is simply to record this incident and other occurences. I am not requesting any action to be taken by the TVB. Given Mr. Capagrosso's documented prior bad acts, however, that resulted in his 6 month suspension from the BS TVB with mandated anger management therapy, the below incident of March 13th and other rather minor incidents directed towards myself and others is troubling for me. These incidents demonstrate his prior pattern of aberrant behavior which begin as small acts that then could escalate to more harassing, intimidating and ultimately violent behavior from Mr. Capagroso.

Since I recently returned to practice at the TVB in September 2014, Mr. Capagrosso has repeatedly said "shit" to me whenever he passed by me. At first I thought it was an offhand comment not directed at me. However, as time passed, he increased the frequency of saying "shit" to me when he passed by me, occurring almost several times daily. Upon the increase of the frequency of these verbal taunts, I noticed that this language was indeed directed at me. Since I had not ever spoken to Mr. Capagrosso because of his prior angry intimating behavior that I witnessed when I practiced from November '07 – September '12, I tried to not say anything or let him know I was rattled by his behavior. I also did not want sink to the same level of vulgarity as he in a public forum. Several lawyers who practice at the TVB do not speak to him. M. Sadiq Tahir is one lawyer who does not engage in any conversation with Mr. Capagrosso; and he also, received the same taunts from Mr. Capagrosso, who also said shit to him regularly during this same period of time. Mr. Capagrosso was always careful to speak to Mr. Tahir and me in a low tone and when others were present.

It saddens me to write this, but March 13th, 2015 was the last straw when Mr. Capagrosso passed by me and said again "shit" to me, and I verbally responded loudly in a barrage of swear words, stating that he was crazy and I was sick of him saying "shit" to me. To which he replied the he was "absolutely" (I imagine he meant crazy.) Fortunately this outburst from me was during a period when no motorists were present. Mr. Capagrosso's further response to me was to shake his shoulders and laugh. He frequently will sit by himself laughing and shaking his shoulders as if he is the only one who gets the "joke." Later, when he saw me approach J. Gelbstein, he told me he never said "shit" to me and he would file a complaint/grievance against me. On March 18, 2015 he walked by me, not addressing me directly, but he said I was a "psycho" and mumbled something else.

To further explain why this incident is troubling for me, I have been practicing traffic law since November 2007 when I began as an associate for Terri Kalker, Esq. in the BS TVB. Mr. Capagrosso's intimating and threatening violent behavior towards other lawyers, clients, and Court personnel has

DMV-0000003

JSA-242



**EXHIBIT**

Exhibit 27

been well documented, including incidents I did not observe. During that time I witnessed him punching polls, bending over and grabbing his ankles, and walking in a fast threatening manner – just enough to make one move out of the way, but he was careful to not actually hit people. I could clearly determine that his behavior was unusual, and as such never spoke to him from the first day I arrived when he spoke to me without introducing himself. This is his manner, to talk as one walks by without ever speaking directly to a person. Since I steered clear as best I could from Mr. Capagrosso, I never had direct confrontations with Mr. Capagrosso from the period of 11/2007 through 9/12 when I left for a two year period to work for a mortgage lender as a compliance officer.

Upon my return to my law practice at the BS TVB in September 2014, I was informed by attorneys that for the most part Mr. Capagrosso's anger seemed to be under control since his return from his expulsion from the TVB. However, I still witnessed more bizarre behavior such as an outburst from him directed to a Court Supervisor over paperclips being left on "his" bench; I did not know that benches in a public building were assigned to private attorneys. I also witnessed a near fight and shouting match between Mr. Capagrosso and his motorist client, where he took his jacket off and was ready to fight the client outside.

It is not my intention to harm another attorney's right to practice in BS TVB; rather I simply have endured this harassing behavior from him daily for the past 6 months and simply want him to stop doing it so that I may not be harmed or hindered in my right to practice here. I believe my direct verbal and loud language to him on March 13, 2015 that I do not want him saying "shit" to me has brought to light in public that I do not appreciate nor wish this behavior from him to continue. In short, he was put on notice from me. Given his past history and his continued speaking at me and not to me, I realize that without memorializing this incident, he will continue unfettered in his harassment of me and other attorneys, such as Sadiq Tahir.

Signed by:

Diantha Fuller, Esq.

M. Sadiq Tahir, Esq.

Dated: 3/19/15

Dated: 3/19/15

cc: Senior BS TVB J. Gelbstein

**JSA-243**

DMV-0000004

Dear Sir,

Few weeks ago Attorney, Mario Copogrosso, put his bag on the chair where I regularly sit. Mr. Meyer moved his bag on the bench. A little later he again put his bag on the chair. Mr. Copogrosso & me had a little argument about this issue. I told him that chair is to sit, not for your bag. He tried to provoke me. I think, he thought I am an easy & soft target.

On 5/5/15 I put my bag & files on one corner of the bench as I have been putting my stuff for years. At about 12pm I left the room to use the bathroom, when I came back I saw Mr. Mario moved my bag & files and put his bag instead on the place where I kept my bag. I moved his bag on the other bench. He was looking at me and started shouting at me from outside. He came in the room and yelled at me, "Don't touch my bag!" I told him that you touched my bag and so I put your bag over there. I have nothing to do with your bag. He started yelling at me even louder. I think he wanted to provoke me, but I didn't give him any serious attention & tried to avoid him. He kept yelling at me, in the meantime Ms. Danielle came to the lawyers' room & told him "We don't want to hear it."

Then you came to find out as to what happened. I explained you everything, but he kept interfering during our conversation. You saw his attitude. I don't know as to what he was trying to prove. When you left, he again started shouting and called me "Shit". Then of course I raised my voice too.

After half an hour later I was going to the other side of the building when he passed me and said in a loud voice "Don't touch my stuff again!"

As you know, Ms. Fuller & me complained in writing for his behavior. Whenever he passes me he always said "Shit".

He is more powerful and strong than me and I am afraid that one day he can physically hurt me.

Thank you for your time and assistance on this matter.


Very truly yours,

M. Sadiq Tahir
Attorney At Law

DMV-0000016

**EXHIBIT**
Exhibit 29

JSA-244

May 5, 2015

To Whom It May Concern

On May 5, 2015 at about 11:45 AM I witnessed the lawyer Mario Capogrosso confront Sadiq Tahir, another lawyer. Mr. Tahir was sitting in the lawyer's room when Mr. Capogrosso went in there yelling and cursing in Mr. Tahir's face. Mr. Tahir remained seated as Mr. Capogrosse continued to scream obscenities and threats. Our customers were upset at the display and work was disrupted as Mr. Capogrosso's tirade played out. Mr. Capogrosse is more often than not a menace to the office staff, customers, as well as the other attorneys who practice in this office.

Kimberly Rivers

DMV-0000015

**EXHIBIT**

Exhibit 30

**JSA-245**

TO: Judge Golbstein

FROM: Michael E Beer, Esq

DATED: 5/5/15

On May 5, 2015 at approximately 12:05 pm, I arrived at Coney Island TVB for the 1st time that day. I entered the attorney room and encountered Mario Capogrosso sitting alone in the room with an angry look on his face. Upon my passing the threshold of the door of the room and before even attempting to set my files in the room, I was verbally accosted with the demand of "don't touch my fucking stuff, don't touch my fucking stuff". I replied that I had just arrived and had no intention of touching his stuff. He once again angrily demanded, "don't touch my fucking stuff". I repeated that I was not going to, nor do I touch his stuff. He stated that he was going to put a camera in the room to see who touches his stuff. I said "please do and you will see that I do not touch your stuff". He then immediately stated "piece of shit.. piece of shit". (which I have heard him state to others many time in the past). I said "excuse me what did you just say to me", and the response was it did not relate to you I'm angry at a judge. I replied it sounded like you said it to me.

I stepped out of the room and was advise that apparently this issue of don't touch my fucking stuff was an ongoing issue all day. And I witnessed Mario Caopgrosso yelling at Mr. Tahir to not touch his fucking stuff.

A few minutes later I returned to the room and was again alone with Mario Caopgrosso when he starts ranting that that guy (alluding to Judge Gelbstein) threw

DMV-0000017

EXHIBIT

Exhibit 31

**JSA-246**

out Chuck Willinger and now Chuck Wilinger is dead.  How dare he do that and if he (I assume Judge Gelbstein) was a man he would put a gun to his own head.

Thereafter he also began ranting that he should never have plead to the deal, he should have fought these guys.  They just gave him a hard time over a cup of fucking coffee.

It appears to me that over the past few weeks Mario Capogrosso has become more aggressive in both his words and demeanor and has been creating an atmosphere of fear and threatening both attorneys and DMV staff,

**JSA-247**

DMV-0000018

MV-984 (12/11)

**New York State Department of Motor Vehicles**
**DIVISION OF LABOR RELATIONS**
**REPORT OF WORKPLACE VIOLENCE INCIDENT**

| OFFICE USE ONLY |
| --- |
| FILE NUMBER: |
| Received: |
| X RE: |
| X RE: |
| PRIVACY CONCERN: ☐ YES ☐ NO |

Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in.

**NAME OF INDIVIDUAL FILING REPORT**

| Name | Title | Office Location | Phone Number |
| --- | --- | --- | --- |
| David Smart | Guard-Summit | Brooklyn South TVB | 718-266-5512 |

**INCIDENT REPORTED TO**

| Date Reported | Person Reported To | Title |
| --- | --- | --- |
| 5/11/15 | Danielle Calvo | Supervisor Grade 17 |

**INCIDENT**

| Date | Time | | Location of Occurrence |
| --- | --- | --- | --- |
| 5/11/15 | 8:50 | ☑ AM ☐ PM | Brooklyn South TVB near line 1 |

DFI Contacted? ☐ Yes ☑ No   DFI Contact Name

**EMPLOYEES INVOLVED**

| Name | Title |
| --- | --- |
| David Smart | Security Guard-Summit Security |
| Name | Title |
| Name | Title |

**OUTSIDE INDIVIDUALS INVOLVED**

| Name | Sex | Phone | Client ID # |
| --- | --- | --- | --- |
| Mario H.Capogrosso | ☑ Male ☐ Female | 914-806-3692 | |
| Address | City | State | Zip Code |
| 245 Saw Mill River Road Suite 106 | Hawthorne | NY | 10532 |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |

**WITNESSES**

| Name | Sex | Phone | |
| --- | --- | --- | --- |
| George Han-MVR | ☑ Male ☐ Female | 718-266-5512 | |
| Address | City | State | Zip Code |
| 2875 West 8th Street | Brooklyn | NY | 11224 |
| Name | ☑ Male ☐ Female | Phone | |
| Anthony Adinolfi,ESQ | | 718-265-2211 | |
| Address | City | State | Zip Code |
| 2875 West 8th Street | Brooklyn | NY | 11224 |
| Name | ☐ Male ☐ Female | Phone | |
| Address | City | State | Zip Code |

Continue on other side                                    Page 1 of 2

DMV-0000005

**JSA-248**

EXHIBIT
Exhibit 33

**Description of Events Leading to the Incident and What Occured:**

Near line 1 Mr. Capogrosso said to security guard David Smart "Are you looking at me?". David replied "You are looking at me". Mr.Capogrosso said "back up, back up", he then pushed David in his chest.

**Nature and Extent of Injuries:**

**Additional Comments:**

911 was called and two officers responded. David went up to the 60pct with them to make a report. They said that they could not arrest Mr.Capogrosso because he pushed David with an open hand not a closed fist. I was told by Judge Gelbstein to go with officers from the police room, to tell Mr.Capogrosso that he must leave the building, and to give him legal's phone number for any further details. I did that and he left the building.

| | |
|---|---|
| Danielle Calvo | |
| Name of Individual Filing Report | Name of Supervisor |
| _Signature_ | |
| Signature of Individual Filing Report | Signature of Supervisor |
| 5/11/15 | |
| Date | Date |

MV-984 (12/11)

Page 2 of 2

**JSA-249**

DMV-0000006

# JEFFREY ZIFF & ASSOCIATES, P.C.
Attorney and Counselor at Law
2875 West 8th Street
Brooklyn, N.Y. 11224
Ph: (718) 265-2211 ☎ Fax: (718) 265-2252
lawtic@gmail.com
zifftrafficlaw.com

William H. Ziff, Esq. ** - Associate
Anthony J. Adinolfi, Esq. * - Associate

_____

May 11, 2015

Re:    TVB Incident, Brooklyn South

To Whom It May Concern:

On Monday, May 11, 2015, I, Anthony J Adinolfi, was standing outside of Hearing Room 4 in Brooklyn South Traffic Violations Bureau in Coney Island, New York, at approximately 9:00 a.m. when Attorney Mario Cappagrosso yelled at and pushed the Security Guard, David, with his right hand to David's chest/ shoulder area.

David was knocked back into a pole that divides the lanes of the line for the service counter. The push also knocked the coat out of David's hand(s).

The attack seemed to be unsolicited and David did not defend himself or push Mr. Capagrosso back at all. David walked away and proceeded to contact the head Supervisor who notified the 60th Precinct.

If you have any questions or concerns please contact me.

Thank you for your attention to this matter.

Respectfully Submitted,

*Anthony J. Adinolfi*

Anthony J Adinolfi, Esq.

_____

** Admitted to practice in New York and New Jersey
* Admitted to practice in New York

DMV-0000009

**JSA-250**

**EXHIBIT**
Exhibit 34

MAY 11, 2015

I WAS LEAVING ROOM 5 TO PHOTOCOPY SOMETHING FOR MY JUDGE. AS I WAS PASSING THE MOTOREST I SAW MR CAPOGROSSO SHOVED SHOVE THE SECURETY GUARD. DAVED WAS PUSHED BACK. IT WAS A HAND PUSH. I DO NOT KNOW WHAT OCCURED BEFORE THE PUSH.

DMV-0000008

**EXHIBIT**
Exhibit 35

JSA-251

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MARIO H. CAPOGROSSO,

                  Plaintiff,

          -against-                               Case No. 18 Civ. 2710 (EK)(LB)

ALAN GELBSTEIN, *in his individual capacity*, IDA
TRASCHEN, *in her individual capacity*, DANIELLE
CALVO, *in her individual capacity*, MARK J.F.          **DECLARATION OF IDA**
SCHROEDER, *in his official capacity as Commissioner*    **TRASCHEN**
*of the New York State Department of Motor Vehicles*,
SADIQ TAHIR, *in his individual capacity*, PEC GROUP
OF NY, INC., and DAVID SMART,

                 Defendants.
-------------------------------------------------------------------X

       IDA TRASCHEN hereby declares, pursuant to 28 U.S.C. § 1746, that:

       1.      I am an attorney licensed to practice law in New York State.  In December of

2017 I retired from service as First Assistant Counsel to the New York State Department of

Motor Vehicles.

       2.      I submit this declaration in support of the State Defendants' motion for summary

judgment in this matter.  The contents of this declaration are based on my own personal

knowledge, my review of files kept by the DMV, my review of files produced in this litigation,

and my review of files in my personal possession.

The TVB

       3.      The Traffic Violations Bureau is a network of offices where administrative law

judges hear cases involving non-criminal traffic violations.  Although the procedures are

streamlined from what would take place in a federal court, cases are adjudicated in similar

manner: the judge is impartial, the police officer, who acts as the prosecutor,  has the burden of

**JSA-252**

proof, and the motorists have a right to be represented by a lawyer.

4.      Attorneys appearing before the TVB are required by regulation to "conform to the standards of conduct required of attorneys appearing before State courts." 15 N.Y.C.R.R. 124.2(a). DMV holds attorneys to this standard in order to ensure that the TVB is a safe, fair, and trustworthy forum in which cases can be adjudicated. It was my duty and the duty of the TVB ALJs to enforce these requirements.

5.      As First Assistant Counsel, I was responsible for overseeing the Traffic Violations Bureau ("TVB") on a statewide basis. My duties also included overseeing DMV's Counsel's Office, overseeing safety hearings statewide, managing litigation, and overseeing compliance with Freedom of Information Law requests. A copy of an email from the Commissioner at the time of my promotion setting forth an outline of some of my duties is attached as Exhibit 1.

6.      During my tenure as First Assistant Counsel I oversaw the TVB system, including the Brooklyn South TVB location where the majority of events at issue in this case occurred. During the relevant time period, the Administrative Law Judges at the Brooklyn South TVB reported to Alan Gelbstein, the Senior Administrative Law Judge at that TVB location. Senior ALJ Gelbstein reported to Supervising Administrative Law Judge Bushra Vahdatlamas. Supervising ALJ Vahdatlamas oversaw all downstate TVB locations, and reported to me.

7.      I was familiar with the Plaintiff well before 2015, due to the numerous complaints from attorneys, motorists and TVB staff about his conduct. I was also aware of his 2011 suspension from appearing before the TVB ("Suspension") and his Article 78 proceeding challenging his Suspension. I was the DMV attorney who managed the litigation of the Plaintiff's Article 78 proceeding, and as such I was aware of the major developments in the litigation.

2

8.      After DMV settled the Plaintiff's state court proceeding in 2012, the Plaintiff was permitted to return to practice once he completed a course of anger management counseling. However, DMV warned him that any further aggressive or violent behavior would not be tolerated.  The Plaintiff was advised that verbal threats or abuse could lead to a five-year bar from practice at the TVB ("TVB Practice Bar"), and physical violence could result in the immediate imposition of a permanent TVB Practice Bar.  These warnings are reflected in a May 15, 2012 letter sent on behalf of DMV, which is attached as Exhibit 2.  I reviewed and approved this letter prior to the Assistant Attorney General sending it on DMV's behalf.

9.      Over the course of late 2014 and early 2015, we began receiving an accelerating number of complaints regarding the Plaintiff's conduct, indicating that the Plaintiff has not "learned his lesson" and was again exhibiting aggressive and disturbing behavior.  During that time, we considered the appropriate course of action, knowing that if the Plaintiff further escalated his misbehavior, threatened violence or became violent, we would need to consider a permanent TVB Practice Bar.

10.     In or around March of 2015, I recall learning that the Plaintiff had sent a letter to the Attorney General regarding his personality conflict with a security officer, and that the letter included criticism of ALJ Gelbstein's handling of the Plaintiff's complaints about that security officer.  Plaintiff did not send a copy of the letter to me or to DMV's Counsel's Office.  My recollection is that our office did not view the letter as particularly significant, as it was direct to the Attorney General, not DMV, and contained nothing more than a rehash of certain grievances that the Plaintiff had already communicated to ALJ Gelbstein and that DMV was already aware of.

11.     On or around May 11, 2015, I received a telephone call from Danielle Calvo,

3

informing me that the Plaintiff had been in a physical confrontation with the security guard. I told Ms. Calvo to have the Plaintiff escorted out of the building.

12. I then contacted ALJ Gelbstein by phone to discuss the situation, and reviewed certain recent written complaints and statements about the Plaintiff's conduct that he sent me. Given the Plaintiff's history of hostile and unprofessional behavior, the fact that he had been suspended from practice once before, the increasing pattern of aggression over the previous few months, and the physically violent nature of the incident, we determined that the Plaintiff should be subjected to a permanent TVB Practice Bar.

13. The Plaintiff's letter to the Attorney General played no role in that decision. We decided to institute the TVB Practice Bar based on his own actions, including his violent actions earlier that day—not because of any letter he sent to the Office of the Attorney General. With the Plaintiff's history, we would have taken the same action in any event because he had become physically violent.

14. The Plaintiff called me by phone later that day, and I informed him of DMV's decision.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:    May 14, 2021
          Wynantskill, New York

          _____
          IDA TRASCHEN



**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

KENT T. STAUFFER
EXECUTIVE DEPUTY ATTORNEY GENERAL
DIVISION OF STATE COUNSEL

LISA R. DELL
ASSISTANT ATTORNEY GENERAL IN CHARGE
LITIGATION BUREAU

**(212) 416-6240**

May 15, 2012

<u>By Mail and By E-Mail</u>
Chris McDonough, Esq.
Jacqueline A. Rappel, Esq.
McDonough & McDonough, LLP
800 Westchester Avenue, Suite S-332
Rye Brook, New York 10573

Re:   <u>Capogrosso v. State Dep't of Motor Vehicles</u>, Index No. 7738/2012

Dear Jackie and Chris:

We write to advise you that the New York State Department of Motor Vehicle ("DMV") has pre-approved the anger management course of Dr. John T. McCann, consisting of approximately 20 one-hour sessions of individual counseling, and to set out the conditions for Mr. Capogrosso being allowed to practice at the DMV's Traffic Violations Bureau ("TVB") offices.

Mr. Capogrosso must submit proof, by certified mail, to DMV's Office of Counsel, Attn: First Assistant Counsel Ida Traschen (with a copy to the undersigned attorney) that he has successfully completed the approved anger management program. Such proof shall consist of a certification by Dr. McCann that Mr. Capogrosso has satisfactorily completed the anger management program, and shall specify the number of one-on-one sessions of counseling Dr. McCann had with Mr. Capogrosso, the general subject matter addressed in those sessions, and the basis of Dr. McCann's conclusion that Mr. Capogrosso has learned how to control his behavior so that he will not be disruptive to the business conducted at the TVB, and will not pose a threat to the safety and well-being of DMV employees, or the attorneys and DMV licensees appearing at the TVB through violence, threats of violence, harassment or intimidation.

Upon receipt of such certification, First Assistant Counsel Ida Traschen shall notify Mr. Capogrosso in writing, by certified mail, of the date upon which he may appear on behalf of DMV licensees at TVB offices.

Please be advised that if and when Mr. Capogrosso appears at a TVB office, after his satisfactory completion of the anger management course, he must <u>strictly</u> adhere to the standards

DMV-0000205

**JSA-256**

**EXHIBIT**
<u>Exhibit 16</u>

of conduct required of attorneys appearing before State courts. Threatening conduct by Mr. Capogrosso—such as punching a wall, steel beam, or the air in the presence of another person, or proclaiming that punching heavy objects does not cause him any pain—verbal threats of physical violence, and verbal abuse including the use of ethnic slurs will not be tolerated. These behaviors shall subject Mr. Capogrosso to a prohibition from appearing on behalf of DMV licensees at any TVB office for a period up to and including five years. Please be further advised that in the event that Mr. Capogrosso commits an act of physical violence, he shall be immediately and permanently barred from appearing on behalf of DMV licensees at TVB offices.

Very truly yours,

SERWAT FAROOQ
Assistant Attorney General

**JSA-257**

DMV-0000206

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

MARIO H. CAPOGROSSO,

                            Plaintiff,           No. 18 Civ. 2710 (EK) (LB)

               - against -         **DECLARATION OF JAMES M.**
                                           **THOMPSON IN SUPPORT OF**
ALAN GELBSTEIN, *et al.*,              **THE STATE DEFENDANTS'**
                                           **MOTION FOR**
                           Defendants.    **SUMMARY JUDGMENT**

--------------------------------------------------------------------X

I, James M. Thompson, hereby declare as follows:

      1.     I am a member of the Bar of the State of New York and am admitted to practice in this District. I serve as an Assistant Attorney General in the office of Letitia James, the Attorney General of the State of New York. I represent Defendants Alan Gelbstein, Ida Traschen, and Danielle Calvo, in their individual capacities, and New York State Department of Motor Vehicles ("DMV") Commissioner Mark J.F. Schroeder in his official capacity (collectively, the "State Defendants"), in this action.

      2.     I submit this Declaration in support of the State Defendants' motion for summary judgment, filed contemporaneously herewith, for the limited purpose of putting before the Court certain documents referenced in the accompanying memorandum of law.

      3.     Unless otherwise stated, the facts and circumstances set forth in this declaration are based upon my own personal knowledge and my review of documents and information in the legal file relating to this action maintained by this Office in the regular course of business.

      4.     Attached as <u>Exhibit 1</u> is a copy of the first part of Plaintiff Mario Capogrosso's deposition transcript, and attached as <u>Exhibit 2</u> is a copy of the second part of the transcript. Because the court reporter changed during a late-morning break, the Plaintiff's deposition is

**JSA-258**

memorialized in two different transcripts even though it took place continuously over a single day.  The two transcripts are paginated consecutively, and are referred to interchangeably here and in the accompanying memorandum of law as the "Capogrosso Tr."

5.      Attached as Exhibit 3 is a January 25, 2012 letter from the Plaintiff's one-time counsel to the DMV threatening to file a lawsuit challenging the Plaintiff's first Suspension due to aggressive, unprofessional, and violent conduct.  The Plaintiff authenticated the document during his deposition.  Capogrosso Tr. at 310:10-311:17.

6.      Attached as Exhibit 4 is the Plaintiff's Verified Article 78 Petition, dated March 1, 2012 from the Article 78 special proceeding (Index No. 7738/2012 (Sup. Ct. Kings Cty.)) that he commenced to challenge his Suspension (the "2012 Article 78 Proceeding").  The document is subject to judicial notice.  See Ndremizara v. Swiss Re Am. Hldg. Corp., 93 F. Supp. 3d 301, 313 n.7 (S.D.N.Y. 2015) ("The Court may take judicial notice of pleadings filed in other cases") (citing Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000)).

7.      Attached as Exhibit 5 is a report dated June 14, 2012 from Dr. John T. McCann, who oversaw the anger management course the Plaintiff took in connection with the settlement of the 2012 Article 78 Proceeding.  The Plaintiff authenticated the document during his deposition.  Capogrosso Tr. at 327:4-20.

8.      Attached as Exhibit 6 is the Stipulation of Discontinuance resolving the Plaintiff's 2012 Article 78 Proceeding, stamped by the Motion Support Office of the New York Supreme Court, Kings County on June 22, 2012.  The document is subject to judicial notice.  See Korenblum v. Citigroup, Inc., No. 15 Civ. 3383, 2015 WL 6001275, at *2 n.1 (S.D.N.Y. Oct. 14, 2015) (taking judicial notice of settlement agreement and citing other cases for the proposition that doing so is appropriate).

9.      Attached as <u>Exhibit 7</u> is a letter from the Plaintiff to Assistant Attorney General Elizabeth Prickett-Morgan, dated March 20, 2015, which is referred to in the accompanying memorandum of law as the "AG Letter."  The Plaintiff authenticated the document at his deposition.  <u>See</u> Capogrosso Tr. at 408:2-18.

10.      Attached as <u>Exhibit 8</u> is the certified transcript of a March 16, 2021 telephone conference in this matter before Magistrate Judge Bloom, in which David Smart gave testimony under oath.

11.      Attached as <u>Exhibit 9</u> are the Plaintiff's responses to the State Defendants' interrogatories in this matter.

12.      I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, NY
        May 17, 2021


James M. Thompson

Page 1

1     UNITED STATES DISTRICT COURT

      EASTERN DISTRICT OF NEW YORK

2     ---------------------------------------------X

3     MARIO H. CAPOGROSSO

4                        Plaintiff,

5                                      Case No:

         - against -            1:18-CV-02710

6                                ( EKLB)

7     ALAN GELBSTEIN, et al.,

8                        Defendants.

9     ---------------------------------------------X

10

11                     December 18, 2020

                       9:45 a.m.

12

13

14

15

16

17        VIRTUAL VIDEOTAPED EXAMINATION BEFORE TRIAL OF

18

19    MARIO H. CAPOGROSSO, the Plaintiff, pursuant to

20

21    Notice, taken at the above date and time, before

22

23    MARIA ACOCELLA, a Notary Public within and for the

24

25    State of New York.

Page 14

1        Mario H. Capogrosso
2 provided in this case, and I have all your
3 discovery. That is what I have to refresh my
4 recollection.
5    Q.    Okay. So can you list for me the
6 documents you have in front of you? Because
7 normally when you do a deposition, there is
8 no documents in front of the witness other
9 than what is put in front of them as an
10 exhibit.
11   A.    Well, I do have certain exhibits.
12 I have all the exhibits that were provided to
13 you yesterday. That is what I have. That is
14 what I have in front me.
15   Q.    Okay.
16   A.    There are 86 exhibits. I have
17 all 86 exhibits. You don't want me to refer
18 to them to refresh my recollection, well,
19 then you have to make an objection, but that
20 is what I have in front me.
21   Q.    The problem is that since we are
22 on Zoom, I can't see what is in front of you
23 in the way I could if we were all around the
24 table together. So can I ask you to please
25 clear the desk in front of you.

Page 15

1        Mario H. Capogrosso
2    A.    It is cleared. It is cleared.
3    Q.    Thank you.
4        So, Mr. Capogrosso, why did you
5 decide to go to law school?
6    A.    I liked learning. I liked, you
7 know, pursuing academic endeavors.
8        And truthfully, I was married and
9 divorced, and I was sitting in my apartment
10 all alone. I said -- I had nothing to do at
11 night. Let me go to law school; it will give
12 me something to do.
13       I put in an application. I take
14 the exam. And I didn't study very long for
15 the exam; took the book, I read through it.
16       They accepted me into law school.
17 So rather than siting at home in the
18 apartment, I figured let me sit in a law
19 school. So I worked as an engineer during
20 the day, and at night I went to law school,
21 for four years. Helped me get through my
22 divorce, kept me busy.
23   Q.    And did you have a particular
24 career intention when you applied to law
25 school?

Page 16

1        Mario H. Capogrosso
2    A.    Not really. Not really.
3        I worked as an engineer after I
4 graduated. I graduated in 2000. I still
5 enjoyed working as an engineer.
6        But the company I worked for
7 wanted me to travel, and I didn't want to
8 travel anymore. They wanted me to go to the
9 west coast, California, and be an engineer in
10 one of the power -- out in Washington State,
11 actually, not California.
12       I didn't want to go to Washington
13 State. I just didn't. I said, let me -- I
14 passed two bars, New York and Connecticut,
15 but I was still working as an engineer.
16       I said, all right. Let me send
17 out a resume, see if somebody gives me a job.
18 I got a job offer, and I went and took it.
19   Q.    And where -- where was that job
20 offer?
21   A.    That job offer was at the
22 Brooklyn TVB.
23   Q.    Okay. So you applied to work at
24 the Brooklyn TVB?
25   A.    No. I applied to an attorney,

Page 17

1        Mario H. Capogrosso
2 Terry Kalker, who is a lawyer down there who
3 was looking for a lawyer. I sent him [sic]
4 my resume. She [sic] responded. I said, you
5 know, I don't know what type of work she did.
6        But I went down, started working
7 for her as one of her attorneys.
8    Q.    And how do you spell Ms. Kalker's
9 name?
10   A.    K-A -- I think K-A-L-K-E-R.
11   Q.    And so can you tell me a little
12 bit about working for Ms. Kalker?
13   A.    Well, when I worked for her, it
14 seemed fine when I first started. When I
15 first started, it seemed fine.
16       But she made certain
17 representations to me that she didn't
18 fulfill. Now I was getting -- now medical
19 insurance is very important to me, and making
20 a representation of following through with it
21 is very important to me.
22       She made a representation that I
23 would have medical insurance after three
24 months. I worked for her for three months,
25 and I said, where is my medical insurance?

5 (Pages 14 - 17)

Page 18

1    Mario H. Capogrosso
2  Because I had it in my previous job.
3         Working for an engineer, if they
4  say something, they do it.
5         Terry Kalker didn't do that. She
6  said, well, you will get medical insurance a
7  year and three months from now, which upset
8  me greatly, very greatly.
9         So at that point I said, all
10 right, you don't want to pay me medical
11 insurance, you are not upholding what you
12 said you were going to do.
13        I left her and went into practice
14 for myself. And that is what I started doing
15 in June, June of 2005. I started work for
16 Terry Kalker in April 2005, April or March of
17 2005. I only spent three or four months with
18 her.
19    Q.    And how did she respond when you
20 objected?
21    A.    She continued with that
22 affirmation, you will get your insurance from
23 a year. I said, that is unacceptable. I
24 said, you can't make a representation and
25 don't follow through with it.

Page 19

1    Mario H. Capogrosso
2         So at that point I really -- I
3  started not to trust this woman anymore. I
4  said, that is enough. She was sent in -- I
5  normally, with my engineering firm, if they
6  sent me someplace, they always paid my
7  expenses.
8         She said she was going to pay
9  expenses, and then she decided not to pay
10 expenses. And she sending me to all
11 different courts, all over Long Island and
12 Upstate New York. I said, I can't afford
13 this. I can't afford it. Gas, tolls.
14        So at that point I said, you
15 know, you are not going to truthful with me,
16 I don't feel comfortable working with you. I
17 decided to end it.
18        My clients who I was representing
19 liked me, liked my representation, so I said,
20 I will do this on my own, which is what I
21 did.
22    Q.    So what was your salary with
23 Ms. Kalker?
24    A.    That beginning salary, what I
25 recall was $40,000 a year, back in 2005.

Page 20

1    Mario H. Capogrosso
2    Q.    And that is without expenses?
3    A.    Without expenses. Without
4  medical insurance. No, maybe it was 50. I
5  am not sure. I think maybe it was 50. Maybe
6  it was 50. I think she offered 40, and I got
7  her up to 50, something like that, between 40
8  and 50. It was either 40 or 50. I am not
9  exactly sure. I don't remember. She paid
10 me, you know, a weekly check. It might have
11 been 50. Might have been.
12    Q.    And how did that compare to your
13 engineer -- your work at the engineering
14 firm? What were you paid there?
15    A.    I was paid more, and they were
16 paying expenses. I don't recall the exact
17 last salary I had as an engineer, but it was
18 more than that.
19    Q.    Do you have a ballpark figure,
20 approximately?
21    A.    Maybe 57 or 80, plus they gave me
22 per diem, which means when I went to a job
23 site, which I often did, they gave me a daily
24 per diem.
25        Or if I had to stay there for

Page 21

1    Mario H. Capogrosso
2  several months, they gave me per diem to pay
3  for my living expenses. They treated their
4  employees very well.
5         But I made the decision to try to
6  be a lawyer, because I went to law school at
7  night. I didn't want to do any more
8  traveling. I made that decision, and I
9  wanted to stay in one place for a while.
10        And my company wanted me to
11 travel, and I didn't want to travel anymore,
12 and so I said, let me give it -- I went to
13 law school and I passed two exams, so let me
14 try it. And I did, and my clients liked me.
15    Q.    And so you started your practice
16 before TVB, your solo practice before the TVB
17 at -- in summer of 2005, correct?
18    A.    June, early July, late June,
19 early July 2005.
20    Q.    And can you sort of describe your
21 practice to me.
22    A.    I represented motorists at
23 hearings, traffic violation hearings. The
24 clients loved me. Police officers didn't
25 like me because I really grilled them, did

6 (Pages 18 - 21)

Page 22

1          Mario H. Capogrosso
2 grill them. I went after them.
3          My clients loved me; they did.
4          I submitted several reviews to
5 you, many reviews. My clients really liked
6 me as an attorney, they did. Police officers
7 didn't. I really went after a police officer
8 in the court, I did. It was my obligation.
9 I felt an obligation to my clients to
10 zealously defend.
11          I remember taking that oath when
12 I got admitted into the bar, you have an
13 obligation to zealously defend, and that is
14 what I did.
15     Q.     Was your practice primarily in
16 the South Brooklyn TVB?
17     A.     Yes, pretty much. Occasionally I
18 would get -- what happens is you get a ticket
19 that sometimes go to other courts, another
20 tribunal, so if you took it -- you take it,
21 you went. Sometimes you get one Upstate,
22 Upstate New York or Long Island. And you
23 took the case, you had to go, and I went.
24 Predominately it was in Brooklyn South.
25     Q.     If you have to put a percentage

Page 23

1          Mario H. Capogrosso
2 on that, what percent of your work would you
3 say was in the South Brooklyn TVB?
4     A.     Ninety percent. 90 percent.
5     Q.     Did you practice before any other
6 administrative tribunals other than the TVB?
7     A.     Let me think. Other
8 administrative.
9          I went to criminal court, 346
10 Broadway, which is down in New York City. I
11 went to criminal court often. Occasionally
12          Sometimes they had a pink ticket,
13 which is not a yellow ticket, and I would
14 have to go down to criminal court. But that
15 wasn't a --
16     Q.     Can you explain that to me?
17     A.     Well, sometimes some of these
18 motorists would get, as opposed to a yellow
19 ticket, they would get a pink ticket, which
20 was covered by the penal code of New York
21 State, and it is a little more graver
22 implications.
23          Normally everything got pled out.
24 But I would go down to certain criminal
25 courts. That's where police officers gave

Page 24

1          Mario H. Capogrosso
2 violations, summons that had criminal
3 implications. They were held at a different
4 court, and I went there. But for the most
5 part, that was it.
6     Q.     Did you do any other criminal
7 work outside of the pink tickets?
8     A.     I had one where a guy was accused
9 of stealing some groceries from a grocery
10 store, and another one where a man got
11 involved in an altercation with his --
12 another man concerning parking his truck in
13 front of his business.
14          And I went down to Red Hook
15 Criminal Court in Red Hook. I went out to
16 immigration court once, and I represented a
17 client there who never showed up for his
18 hearing, and the case got thrown out. That
19 is what I recall. That is what I recall.
20     Q.     And so no other administrative
21 tribunal other than TVB?
22     A.     No. That would be it.
23     Q.     Did you ever practice before the
24 OATH, the Office of Administrative Trials and
25 Hearings for New York City?

Page 25

1          Mario H. Capogrosso
2     A.     No. I would have remembered
3 that.
4     Q.     So you said that you had
5 litigated a couple of criminal cases in
6 New York State Court and one immigration
7 case.
8          Have you litigated any other
9 cases in State court, criminal or civil?
10     A.     Well, after that point in time I
11 worked for an attorney down in Brooklyn, so
12 yes, there were other cases I have litigated.
13          I worked for an attorney in
14 Connecticut after I was removed from the
15 Brooklyn TVB system, the New York TVB system.
16 I worked for an attorney in Connecticut.
17          I worked for an attorney -- as an
18 independent -- well, and I worked for an
19 attorney in Brooklyn.
20     Q.     So let's step back to the TVB for
21 a second.
22          Did you like practicing at TVB?
23     A.     I loved it. I loved it. They
24 were short: Got there at 8:30 the day was
25 over by 4:00. I loved it. I loved my

7 (Pages 22 - 25)

Page 70

1        Mario H. Capogrosso
2        THE COURT REPORTER: I need to go
3   off the record.
4        MR. THOMPSON: Yes.
5        THE COURT REPORTER: You need to
6   go off the record for two minutes.
7        THE VIDEOGRAPHER: The time is
8   10:48 a.m. we are off the record.
9        (Discussion off the record).
10       THE VIDEOGRAPHER: The time is
11  10:50. We are on the record.
12   Q.   So, Mr. Capogrosso, we were
13  discussing an instance when you saw Judge
14  Gelbstein in the GE room rescheduling cases.
15  And I may not understand it.
16       But what is wrong with him
17  rescheduling cases, as a judge?
18   A.   If you are carrying a caseload --
19  this is what I am thinking.  If you are
20  carrying a caseload, let me tell you how the
21  game is played.  Attorneys take tickets in,
22  and they would push the tickets out,
23  reschedule three, four, five, six times,
24  stretch the money, they would call.  They
25  would stretch the money.  You get $200 a

Page 71

1        Mario H. Capogrosso
2   ticket, you stretch it out for two years, and
3   plead the guy guilty, and you give the guy no
4   points.  You give the motorist no points.
5        It is called stretching the
6   money, which is what the attorneys were
7   doing.  A lot of attorneys would go to the
8   courtroom and enter a guilty plea, which is
9   one way of handling a ticket.
10       If you stretch it out 18 months,
11  the points don't show up on your license.  If
12  you reschedule a whole bunch of cases, and
13  you push them out 18 months, and then you
14  enter a guilty plea for the guy, and he
15  doesn't get suspended, and they waive the
16  STV, and they give them a minimum fine, you
17  know, the motorist goes home happy.
18       My license is still good.  I am
19  happy I got a minimum fine.  I am not
20  suspended.  That is one way you can play the
21  game.
22       Did I play it like that?  No.
23  They hired me to fight a ticket, I fought a
24  ticket; so my clients liked me.
25   Q.   So, Mr. Capogrosso, I guess I

Page 72

1        Mario H. Capogrosso
2   still don't understand what you contend is
3   wrong about what Judge Gelbstein did.
4   Because if he is a judge, and he is talking
5   to another judge to set up the docket, and
6   when cases will be heard, is there anything
7   wrong with that?
8   A.   I am told -- I don't know.  I
9   don't know.  I am -- I reported what I saw
10  and what I heard.  I don't know.  I reported
11  what -- if you reschedule things on a sidebar
12  without putting in an appearance, and you are
13  entering guilty pleas without putting in an
14  authorization, to me, there is something
15  wrong.
16       I don't know.  Maybe he had a
17  legitimate purpose.  I reported what I saw
18  and what I heard.
19       I know I had a conflict with
20  another attorney over a ticket that we were
21  put in a room.  We bought, put the same one
22  in I want to speak with him about.
23       He says, I am covering the case
24  for Gelbstein.
25   Q.   So let's put a pin on that one

Page 73

1        Mario H. Capogrosso
2   and come to that in just a second.
3        This instance when you saw Judge
4   Gelbstein rescheduling tickets with judge
5   Bohmstein --
6   A.   And entering guilty pleas.
7   Q.   -- and entering guilty pleas.
8        First of all, you said you
9   reported that.
10       Who did you report that to?
11  A.   Who did I report it to?  No, at
12  that point I said, I can't work here anymore.
13  At that point after I was removed, after I
14  was removed, there is nobody to report it to.
15  Nobody is listening.
16       I write to your office.  Your
17  office doesn't respond to me in my letter of
18  complaint.  I wrote a letter to Pricket
19  Morgan, March 20th.  I got no response.
20       I have written to the grievance
21  committee.  I explained this in the grievance
22  committee.  They don't care.  They said they
23  have no authority over this.
24       I have wrote to the Inspector
25  General's office.  They told me it is an

19 (Pages 70 - 73)

Page 78

1         Mario H. Capogrosso
2         Can you spell Gerbasi for me?
3     A.    I believe G-E-R-B-A-S-I.
4     Q.    And so when he said was covering
5  the case, what did that mean?
6     A.    That means he was going to argue
7  the case.  In my opinion, that is what it
8  meant.
9     Q.    Okay.  So let me ask, what's --
10 what's wrong with him arguing a case?
11    A.    You are arguing a case for a
12 judge.
13         I don't know.  I don't know.
14 Maybe there is nothing wrong with it.  I
15 reported what I heard.  I don't know.  You do
16 your investigation.  That is not my job.  I
17 reported truthfully what I heard, what I saw.
18 I don't know.
19    Q.    So he said he was covering -- he
20 said he was covering a case.
21         You know, was Judge Gelbstein the
22 person with the ticket, or I guess what is
23 your concern about?
24    A.    I don't know.  He said he is
25 covering a case for Gelbstein.

Page 79

1         Mario H. Capogrosso
2         If you see ticket brokers -- if I
3  see ticket brokers in your office, and you
4  tell me you don't know what they are doing
5  for a living, I see you pleading guys in the
6  GE and rescheduling cases, and if another
7  attorney tells me he is covering a case for
8  you, my opinion -- and only my opinion, which
9  I am entitled to -- you got a caseload.  You
10 got a caseload, and you are trying to get a
11 piece of the action.  That is my opinion.
12    Q.    When you say you have got a
13 caseload, you think he is practicing law as
14 an attorney at the TVB?
15    A.    As well as being a judge.  Yeah,
16 that is my opinion.  That is my opinion.  I
17 don't know if it is true or not.  That is not
18 my job.  That is my opinion.  I don't know if
19 it is true.  I don't know if that is true.  I
20 reported what I saw and what I heard.
21    Q.    But you never saw Judge Gelbstein
22 arguing a case at the TVB or representing a
23 client at THE TVB; is that correct?
24    A.    No, I never saw him do that.  No.
25    Q.    Let's take a step back,

Page 80

1         Mario H. Capogrosso
2  Mr. Capogrosso.
3         Why did you decide to sue in this
4  case?
5     A.    I want to go back to practicing
6  law at New York TVB.  I want to clear my
7  name.  I want to clear my name.
8         I was removed from the Brooklyn
9  TVB on May 11, 2015.  Nobody looked at this
10 videotape, which we established that
11 yesterday.  Nobody looked at it.
12         Did an Danielle Calvo, somebody
13 told her that there was an incident between
14 me and Smart.  Danielle Calvo makes a call to
15 Judge Gelbstein.  Gelbstein calls Traschen,
16 and Traschen tells Calvo to have me removed.
17         Nobody looks at the videotape.
18 The videotape was never kept.  It is lost.
19 There is affidavit and affidavit and
20 accusations made against me and my name and
21 my reputation as a lawyer that I was never
22 served with so I could respond.
23         I asked yesterday, how come you
24 didn't file an affidavit?  I never received a
25 complaint.  I can't respond to a complaint if

Page 81

1         Mario H. Capogrosso
2  I never received it.
3         I wrote to -- and nobody is --
4  and I wrote to Traschen.  I wrote to Bushra
5  Vahdat.  And I wrote to Judge Gelbstein, and
6  I wrote to your office.
7         And when I write to your office
8  concerning my concern -- detailing my
9  concerns what is going on, I get no response
10 from any of these offices.
11         And then I have some security
12 guard approach me on the morning of May 11th,
13 instigates an altercation, and I am removed
14 within five minutes.
15         I want to clear my name.  I think
16 I was set up.  I think Judge Gelbstein and
17 all these other parties wanted me out because
18 I wasn't playing the game.
19         And I want to clear my name.  I
20 want to get back to work.  I want the money
21 that I lost.  And I think whoever did this,
22 especially if they are judges, should get
23 punished.  They should not be a judges, and
24 they should not be represented --
25    Q.    When you say they wanted you out

21 (Pages 78 - 81)

Page 86

```
         Mario H. Capogrosso
1
2      I don't know if it is right or
3  wrong.  You are the Attorney General; that is
4  your decision.
5      I am telling you what I saw and
6  what I heard.  I am telling you that I didn't
7  feel comfortable dealing with these people.
8  I did not.
9   Q.   Mr. Capogrosso, sitting here
10 today, you are not aware of any statute or
11 regulation or source of authority that says
12 that ticket brokers are not legal or
13 permissible; is that correct?
14  A.   I think you can't make a
15 representation that you are a lawyer when you
16 are not a lawyer and collect a fee.
17  Q.   But --
18  A.   I think that is wrong.
19  Q.   Leaving aside if they don't
20 represent that they are a lawyer, you are not
21 aware of any statute prohibiting ticket
22 brokers, correct?
23  A.   I don't know.
24  Q.   Statute or --
25  A.   I didn't think its ever been
```

Page 87

```
1        Mario H. Capogrosso
2  broached, this question.
3   Q.   Okay.
4   A.   I don't think the question has
5  ever been looked at.
6   Q.   Mr. Capogrosso, did there come a
7  time when ticket brokers were banned from the
8  TVB?
9   A.   I saw ticket brokers there up
10 until the day I left, so obviously they were
11 not banned.  I saw them up till the day -- I
12 know some paralegals were banned because they
13 were taking money, stealing money, but I
14 didn't see ticket brokers banned.
15  Q.   So your testimony is no, there
16 was never a ban on ticket brokers?
17  A.   Not that I was aware of.  I
18 always saw them down there, even up to the
19 day I was asked to leave.
20  Q.   All right.  So a couple more
21 questions about bringing the case.
22      You were expelled from practice
23 in 2015.  You brought this case in 2018.
24      Why did you wait so long to bring
25 the case?
```

Page 88

```
1        Mario H. Capogrosso
2   A.   I wanted to see if they had
3  anything against me.  Seriously.  I gave them
4  three years to bring their case against me.
5  They wanted to sweep my complaints and
6  everything I had under the rug.  If there was
7  a complaint against me or my office, you
8  could have aggrieved me.
9      I was waiting for a grievance.  I
10 was waiting for them to sue me.  If I had
11 assaulted this security guard, I could have
12 been sued for assault.  They brought nothing
13 against me for three years.  I waited three
14 years to see if they had anything against me.
15      They had nothing against me.
16 Nothing.  Not an assault, not a criminal
17 charge, not a grievance to the grievance
18 committee, nothing.  They had nothing to hold
19 their hat on, other than they removed me
20 improperly.  And I think they set me up that
21 morning.  I waited three years because I
22 wanted to see if they had anything against
23 me, and they didn't.
24  Q.   Is it possible they were just
25 satisfied that you were no longer at TVB?
```

Page 89

```
1        Mario H. Capogrosso
2   A.   I know they wanted me out.  They
3  wanted me out, and they got me out, and they
4  wanted -- and they wanted to ignore any
5  complaints or any follow-up.
6      They didn't want to talk to me.
7  I wrote letters, I made phone calls.  Nothing
8  was answered.  I wrote letters to your
9  office, it wasn't answered.  I wrote to
10 Traschen, Bushra Vahdat, Gelbstein.  They
11 were all ignored.
12      I was charged -- I was not
13 charged by the police.  There was nothing
14 they had against me.  I did nothing wrong.
15  Q.   And so you were expelled in May
16 of 2015.
17      Why didn't you bring an Article
18 78 proceeding?
19  A.   Because I couldn't get money.  I
20 had money that I had to return, that I was
21 due.  I couldn't get money in an Article 78
22 proceeding.
23      I wanted a Federal Court judge on
24 this case.  I was tired with this New York
25 State Court, everybody protecting one another
```

23 (Pages 86 - 89)

Page 90

1    Mario H. Capogrosso
2 and brushing complaints under the rug.  I was
3 tired of it.  I wanted a Federal Court judge
4 to listen to this complaint, because they
5 stand above it.  That was my opinion.  I
6 wanted a Federal Court judge, number one.
7        And two, I was owed money, and I
8 can't get that in an Article 78 proceeding.
9    Q.    So you think -- so you think the
10 New York State Courts were corrupt?
11   A.    No.  I didn't think I was going
12 to get a fair hearing.
13   Q.    Why not?
14   A.    I wanted a Federal Court judge.
15 I wanted a judge who stood above it.
16   Q.    Why didn't you think you would
17 get a fair hearing in Kings County Supreme
18 Court?
19   A.    I didn't think I would.
20   Q.    Why not?
21   A.    I saw how all the judges at the
22 TVB were treating me.  I saw how the judges
23 at the TVB, Judge Gelbstein, laughing and
24 giggling when I made my complaint; a spade is
25 a spade.  Bushra Vahdat lying, a judge lying.

Page 91

1    Mario H. Capogrosso
2 I can go into her lies.  Traschen not
3 returning phone calls.
4        I saw how I was being treated.  I
5 didn't think I was going to get a fair
6 chance.  That was my decision.
7        I told you why I made it.  I
8 wanted to see, number one, if they had
9 anything against me, either criminally or by
10 way of a grievance, and they do not.
11       And two, I wanted a judge who
12 stood above it all.
13       And three, I was owed money.
14   Q.    So if you felt that the State
15 Supreme Court was going to be corrupt or
16 unfair, why would --
17   A.    I didn't say that.  I said I
18 wasn't going to get a fair chance.
19       MR. THOMPSON:  Withdrawn.
20   Q.    If you felt the State Supreme
21 Court was going to be unfair, why would the
22 Federal Court be any different?
23   A.    I told you my belief is a Federal
24 Court judge sits above this, sits above it.
25 That is just my opinion.  I am entitled to my

Page 92

1    Mario H. Capogrosso
2 opinion.  And I wanted the money owed to me
3 on this case.
4    Q.    All right.
5        MR. THOMPSON:  Hold on one
6 second.  And this maybe a little dicey,
7 because we are doing this over Zoom, but
8 I am going to share a document with you
9 and with everyone.  So please, everyone
10 let me know if there is a problem
11 viewing this.
12       Can everyone see this document?
13       THE WITNESS:  Yes.
14       MR. THOMPSON:  Mr. Videographer
15 and Madam Court Reporter, can you see
16 the document?
17       THE COURT REPORTER:  Yes.
18       MR. VIDEOGRAPHER:  I am sorry.
19 My mic was muted.
20       I see it, Counsel.
21       MR. THOMPSON:  Okay.  Very good.
22   Q.    Mr. Capogrosso, do you recognize
23 this document?
24   A.    My affirmation of service.
25   Q.    I will scroll down to page two,

Page 93

1    Mario H. Capogrosso
2 because that may make it a little easier to
3 recognize.
4    A.    Yeah.  My response to your
5 interrogatories, yeah.  Yes, I do.
6    Q.    And this is your document that
7 you wrote, correct?
8    A.    Yes.  Well, I have to see my
9 signature.  But yeah, I would assume it is.
10   Q.    We can go down here to page --
11   A.    Yeah, that is my signature.
12   Q.    -- 17.  That is your signature?
13   A.    Yes.
14       MR. THOMPSON:  Madam, I ask you
15 to mark this as Defendant's 1, with the
16 understanding that we discussed before
17 that it will actually be formally marked
18 once it is entered into the Veritext
19 server after the deposition.
20       Is that something that you need
21 to explain on the record, Madam Court
22 Reporter?
23       THE COURT REPORTER:  No.
24       (Whereupon, a document was deemed
25 marked as Defendant's Exhibit 1 for

24 (Pages 90 - 93)

Page 134

M.H. Capogrosso

1       you here?  I had to explain it to 850
2       clients.
3           I can't tell you why.  I
4       have no idea.  I was given nothing in
5       writing.  I was told by Danielle Calvo to
6       leave and told by Ida Traschen I'm not
7       allowed.  I was given nothing in writing.
8       I have nothing to tell them.  I was given
9       nothing by your office.  I have nothing
10      to tell my clients.  I don't know why.  I
11      have no reason.  I was told to leave.
12      Q      All right.
13      A      So my reputation -- so my
14      reputation has been damaged.
15      Q      But you were still able to
16      get jobs in the legal community.  You
17      said you represented clients on dozens of
18      cases, personal injury cases, criminal
19      cases and other cases; isn't that
20      correct?
21      A      It took me a while to get a
22      job.  They're not easy to find,
23      especially as you get older.  They're not
24      easy to find.  It took me a year to find

Page 135

M.H. Capogrosso

1       the first job and then Jiang was nice,
2       then Jiang's office, but it's not easy,
3       it is not and it's not --
4       Q      Did you --
5       A      I liked -- I liked doing
6       what I did.
7       Q      But your reputation --
8       A      People my age are retiring,
9       retiring at this age.  I like to work and
10      it's not easy getting a job at this age.
11      Q      Your reputation didn't
12      prevent you from getting these jobs
13      though, the one in the Perla firm and
14      then the one at the Jiang firm; is that
15      correct?
16      A      I had to leave this type
17      of -- well, they didn't know about this,
18      my reputation.  They didn't know about
19      this lawsuit or that I didn't show up on
20      cases, I wasn't allowed to show up.
21      Neither one of them asked me about this.
22      I would have told them if they did, but
23      they didn't ask me.
24          But in terms of the clients,

Page 136

M.H. Capogrosso

1       yes, it was ruined.  In terms of the
2       employers, no, it was not ruined because
3       I was never asked.
4       Q      So can you specifically
5       identify any economic harm that you've
6       caused -- that you've suffered based on
7       the damage to your reputation?
8       A      If I was to go back to
9       practice this type of law, I'm not going
10      to get as many cases as I did before.  My
11      name and reputation as somebody who shows
12      up and argues a case and represents a
13      client zealously, which is an oath I
14      took, is not the same and it's not by my
15      fault.  It's not by my fault.  I took an
16      oath to zealously advocate and I could
17      not zealously advocate because I was
18      removed for no reason.  No reasons were
19      given to me.  I got a 10 second phone
20      call from Ida Traschen.
21      Q      Okay.  But so the question
22      was can you specifically identify any
23      economic harm that has been caused by the
24      damage to your reputation?

Page 137

M.H. Capogrosso

1       A      I'm not able to generate the
2       income that I was generating at the
3       Brooklyn TVB and I showed you the revenue
4       I was bringing in.
5       Q      But is that because you're
6       not practicing at the Brooklyn TVB or is
7       that because of the damage to your
8       reputation?
9       A      Because I'm not working at
10      the Brooklyn TVB and because of the
11      damage to my reputation.  No one is ever
12      going to give me a case again down there,
13      nobody.
14      Q      Because you --
15      A      Nobody is going to give me a
16      case.
17      Q      Because you can't practice
18      there?
19      A      I can't practice there and
20      if I could they still wouldn't hire me.
21      Q      So it's more a contingent
22      thing in the event that you were to be
23      reinstated?
24      A      Listen, my -- my reputation

4 (Pages 134 - 137)

Page 146

M.H. Capogrosso
1
2    A      Well, this is the date with
3    Tanya Rubinowitz.  This is the lawyer,
4    the woman calling herself a lawyer in
5    Judge Gelbstein's courtroom and this is
6    written by a clerk, I'm not sure who that
7    is, Perez, one of the clerks there and it
8    happened on 2009.
9         This is after I called the
10   District Attorney and I said we have a
11   woman down here calling herself a lawyer
12   on a repeated basis and people asked me
13   where's Tanya, the lawyer.  I said she's
14   not a lawyer.
15        And she approaches me that
16   day and says did you call -- did you call
17   the District Attorney?  I said yes, I
18   did, I admitted it to her and then she
19   starts yelling and berating me and I
20   tried walking away from her.
21        Now, this clerk -- this
22   happened near the attorney's room.  I
23   know exactly where it happened.  Between
24   the attorney's room and the clerks, it's
25   at least 60 feet.

Page 147

1            M.H. Capogrosso
2         But that's what happened.
3    She came at me yelling and screaming why
4    did you call the District Attorney.  I
5    admitted that I did.  I could not have
6    admitted to it.  I could have said I
7    didn't call her, right.  I could have
8    just walked away, but I didn't.  I
9    admitted the truth and I tried walking
10   away.  That's what happened.
11        I wasn't charged.  I wasn't
12   arrested.  I didn't do anything wrong but
13   tried to get away from the situation and
14   telling her the truth.  I told her what
15   happened and what I did.
16   Q      So in this statement from
17   Mr. Perez he writes that he saw -- "He
18   observed and heard Mr. Capogrosso
19   screaming and yelling profanities and
20   obscenities at Ms. Rabinovich, Tanya."
21        Is that true?
22   A      No, it's not.  There's not
23   one --
24   Q      You did not?
25   A      No.  I did not.  I was

Page 148

1            M.H. Capogrosso
2    telling her to get away from me.  I
3    didn't yell any profanity because you
4    know what, they're not listed here.  And
5    what obscenity was used?  The clerk
6    doesn't put it down.
7         I was telling her to get
8    away from me, but I yelled no profanity
9    and no obscenity.  You can't make an
10   allegation that I used a profanity or
11   obscenity if you don't tell me what it is
12   and I used none.  I never talked to a
13   woman like that, never.  I treat women
14   very respectful.
15        I was loud, that I agree I
16   was loud, but I did not use a profanity
17   or obscenity and none is listed.  Tell me
18   which one I used.
19   Q      Mr. Perez also writes that
20   "Mr. Capogrosso was sitting down.  I
21   observed him getting up" -- "get up from
22   his seat and approach Ms. Rabinovich
23   walking fast and hard toward her when he
24   bumped real hard into her as he tried to
25   pass by her, which was very unnecessary

Page 149

1            M.H. Capogrosso
2    given he had plenty of room to walk
3    around her."
4         Is that true?
5    A      I did get up.  She's right
6    in my face, right about three feet away
7    from me, right on top of me.  I did get
8    up and walk away.  I don't recall bumping
9    into her, no.  I would never hit a woman,
10   never, never.
11   Q      Would you bump --
12   A      I don't -- she was like
13   right on top of me, maybe three feet
14   away, pointing her finger at me and
15   yelling at me in Russian and some other
16   nonsense, yelling and screaming at me.
17        Did I bump into her, no.  I
18   would never hit a woman.  But I did tell
19   her to get away from me and I did admit
20   to what I did and she was upset, but she
21   didn't --
22   Q      Did you --
23   A      She was upset.
24   Q      Did you make contact with
25   her in any way?

7 (Pages 146 - 149)

Page 150

1      M.H. Capogrosso
2      A      No, not that I recall, no.
3   She would have filed a police report
4   against me that I hit her and none was
5   filed.  I do not recall hitting her,
6   absolutely not.
7      Q      So I'll tell you,
8   Mr. Capogrosso, we are going to look at a
9   number of reports and this has some
10  similarities to some other ones in there
11  will be a number of reports that say that
12  you were yelling and shouting obscenities
13  and there will be a number of reports
14  saying that you bump into people and then
15  indicate that it's not on purpose.
16     A      Well --
17     Q      Is there any truth to that?
18     A      Well, you can write and say
19  whatever you want.  You can write and say
20  whatever you want.  You know, I was never
21  arrested on anything.  I didn't yell any
22  obscenity.  You have to give me the
23  obscenity I used.  You can make any
24  allegation you want at me.  You have to
25  prove it.  You have to have some type of

Page 151

1      M.H. Capogrosso
2   corroboration.  Is anybody corroborating
3   this, Ms. Perez, that they saw me?
4      Q      Well --
5      A      Was there a police report
6   written against me?
7      Q      Well, this is not a, you
8   know, this is not a statement in a court
9   of law.  This is just a complaint saying
10  what happened; isn't it?
11     A      Well, where's my affidavit
12  in response?  Where's Judge Gelbstein
13  giving me a chance to respond to this so
14  we get right to the heart of the matter
15  in 2009?
16     Q      So this person L. Perez,
17  Jr., do you know who that is?
18     A      No.
19     Q      It says MVR 1.  Do you know
20  what an MVR 1 is?
21     A      No.
22     Q      I would suspect that it
23  means Motor Vehicle Representative 1,
24  which is the pay grade for the people who
25  work as clerks behind the counter.

Page 152

1      M.H. Capogrosso
2      So let's just ask here,
3   Mr. Perez who wrote this statement, is he
4   lying?
5      A      I did not bump into anybody.
6   I did not hit anybody.  I did walk away
7   from this woman who approached me,
8   approached me and asked me if I called
9   the DA on her and I said yes, I did, but
10  that story doesn't get --
11     Q      So --
12     A      -- that story doesn't get
13  told.
14     Q      So Mr. Capogrosso that
15  wasn't quite the question.  The question
16  is is Mr. Perez lying?
17     A      That I used an obscenity,
18  absolutely, absolutely.
19     Q      Why would he lie?
20     A      They like Tanya.  I told you
21  this already.  Tanya was doing business
22  with the clerks.  I saw Tanya at the
23  clerk's counter rescheduling cases as if
24  she was a lawyer.  Maybe she was entering
25  guilty pleas at the counter as if she was

Page 153

1      M.H. Capogrosso
2   a lawyer.  She had a case load.
3      She had an office right
4   outside the DMV and they were doing work
5   for her for some reason, which I don't
6   know, but, you know, it wasn't for free,
7   so they liked Tanya.
8      Q      And so you think Perez was
9   lying because Ms. Rabinovich bribed the
10  clerks --
11     A      That's not --
12     Q      -- is that correct?
13     A      I don't know.  I don't know.
14  I know I didn't bump into anybody.  I
15  know she was right on top of me.  I know
16  I don't use obscenities with women,
17  absolutely not.  There's not one --
18     Q      Okay.
19     A      -- from a motorist.  If you
20  go through all the complaints against me,
21  they're all by clerks.  Not one motorist
22  or client has made a complaint against me
23  that I used an obscenity.  You go through
24  all my complaints.
25     Q      Well, we'll see some --

8 (Pages 150 - 153)

Page 166

```
1           M.H. Capogrosso
2    I made sure he got paid every day for the
3    work he did.
4        Q    And how long did you have an
5    assistant for --
6        A    I don't recall.
7        Q    -- or a paralegal?
8        A    I don't recall how long.
9    You know, it must have been -- all the
10   other attorneys had them, so at some
11   point in time I was doing well, I said
12   let me take on and they all were using
13   them, so I did.
14          I don't recall the exact
15   amount of time.  I know they were all
16   thrown out at one point in time because
17   there were accusations against them, so
18   they were thrown out of all the TVBs.
19       Q    What --
20       A    We weren't allowed to have
21   them anymore.
22       Q    What were these accusations?
23       A    I don't know exactly.  As I
24   understand it, they were stealing,
25   stealing from motorists, stealing from
```

Page 167

```
1           M.H. Capogrosso
2    clients, stealing from lawyers, stealing
3    from each other.
4        Q    Were there accusations
5    against Michael?
6        A    No, no.  Michael was a nice
7    guy, real nice guy.
8        Q    And what was Michael's last
9    name?
10       A    I don't remember, I really
11   don't, but he was a nice guy.  He had a
12   brother --
13       Q    Did you --
14       A    His brother --
15       Q    Did you ever --
16       A    His brother worked for -- go
17   ahead.
18       Q    Did you ever employ an
19   assistant other than Michael?
20       A    His brother and I, when I
21   first came down, his brother was a
22   paralegal for Terry Horton.  We became
23   friends.  I forgot his name.  Andy was
24   his brother.
25          But did I ever employ him,
```

Page 168

```
1           M.H. Capogrosso
2    no.  He worked for -- Andy worked for
3    Eugene Gabase(phonetic).
4        Q    So Michael is the only
5    assistant --
6        A    Yes.
7        Q    -- that you employed; is
8    that correct?
9        A    As I recall, yes, but Andy
10   and I were friends.
11       Q    All right.  So in here, in
12   Exhibit 5 you see Ms. Cervoni writes that
13   the motorist handed her driver's license.
14   "And Michael called Mr. Capogrosso over
15   to my window.  Mr. Capogrosso thinking
16   there was a problem approached my counter
17   and aggressively and belligerently began
18   yelling at me."
19          Do you recall this incident?
20       A    I don't think I was
21   aggressive or belligerent.  I might have
22   been loud.  I do speak loudly.  I want
23   people to hear me when I speak.  I think
24   maybe she's a little oversensitive.
25   Maybe I was trying to understand what was
```

Page 169

```
1           M.H. Capogrosso
2    going on because I cared about my client
3    and what was going on and I actually give
4    a damn about my client and their
5    licenses.
6           So I was trying to get to
7    the heart of the matter, but I was not
8    belligerent or aggressive.  Maybe I was
9    loud.
10       Q    So do you recall this
11   specific incident?
12       A    I recall Michael calling me
13   over, yeah.  I never cursed or insulted
14   the woman, absolutely not, absolutely
15   not.  She doesn't put down what curse or
16   insult I used.  You make general
17   allegations --
18       Q    Does she have to?
19       A    Well, yeah.  If you make an
20   accusation somebody is cursing or
21   insulting me, tell me what I said.  Tell
22   me exactly.  I might have been loud.
23   Listen, I am loud.  I want people to hear
24   me when I speak.  But tell me what word I
25   used to curse or what word I used to
```

12 (Pages 166 - 169)

Page 174

1    M.H. Capogrosso
2 testimony that Ms. Cervoni made this up
3 because you weren't giving money to the
4 clerks?
5    A    She's not telling the truth
6 there. I did not curse and I didn't
7 insult. I don't know why. I'm a zealous
8 advocator in this court, that's what I
9 took an oath to do, zealously advocate.
10 I took an oath when I got sworn in.
11 That's what I do.
12    I didn't curse at --
13    Q    Do you think Ms. Cervoni
14 wanted to see you gone from the TVB?
15    A    I don't know. I don't know.
16 I think we became friends afterwards. I
17 think we became friends right before we
18 left. That's why I wanted to depose her.
19 I think she really liked me at one point
20 in time. She's a very beautiful woman,
21 Marisol and I think at one point -- she's
22 a nice woman and I think at one point we
23 became friends.
24    But was I trying to endear
25 myself to any of these clerks, no. I was

Page 175

1    M.H. Capogrosso
2 trying to do my job. That's all I'm
3 required to do.
4    Q    She writes that -- she
5 writes that "The supervisors, Geri,
6 Danielle and John all came out to see
7 what the commotion was and to resolve the
8 situation, but he" and I assume that
9 means you "refused to listen to reason or
10 leave my counter."
11    Did you refuse to leave?
12    A    I don't recall, no, no.
13 Maybe I -- well, wait a second, wait.
14 Wait a second. Maybe I wanted the issue
15 resolved and I wanted some explanation of
16 the issue, which is my duty to do. I
17 have a duty to my client, not to a clerk,
18 but to my client to make sure the issue
19 is resolved, whatever this issue was.
20    Michael called me over,
21 there was an issue. I have a duty to
22 make sure that issue gets resolved as the
23 attorney for the motorist, that's my job,
24 make sure it's resolved, right? That's
25 the job of the attorney here, right? I

Page 176

1    M.H. Capogrosso
2 had the obligation, so let me resolve it.
3 Let me speak to somebody else if there's
4 an issue and one person can't solve it,
5 you go to another person and maybe they
6 can solve it.
7    So, yeah, I had a duty to my
8 client to resolve that issue, so maybe --
9    Q    So she writes --
10 Mr. Capogrosso, she writes "Throughout
11 the day Mr. Capogrosso was taunting me.
12 He would walk past my station making
13 comments and smirking at me." Is that
14 true?
15    A    No. Taunt? Wait a second.
16 How exactly did I taunt? Now you give me
17 the exact words I used. That's a lie.
18    Smirk? You know, when an
19 issue is resolved with me, it's resolved.
20 I don't hold on -- you know, I don't keep
21 going back after it. I did not smirk. I
22 don't know what smirking is.
23    First of all, is there a
24 problem with smirking? I think we have a
25 Vice President now that smirks all the

Page 177

1    M.H. Capogrosso
2 time. She enjoys smirking. That's my
3 opinion.
4    I don't see anything wrong
5 with smirking, though I don't recall
6 doing it. I don't even know what
7 smirking is. Laughing?
8    Q    Smirking is a little smile.
9    A    All right. We got a Vice
10 President that seems to do it all the
11 time. It's all right for the Vice
12 President.
13    Q    I'm not sure I understand
14 what this has to do with the Vice
15 President.
16    A    Well, I'm telling you we
17 have a Vice President now, Kamala, who
18 likes to smirk.
19    I don't -- I don't know what
20 smirking is. I have an issue, I resolve
21 the issue, I move on. I'm not trying to
22 have a beef with a clerk at a DMV. That
23 is not my issue to have a beef or an
24 argument with a clerk. I need these
25 clerks to help me out.

14 (Pages 174 - 177)

Page 206

1          M.H. Capogrosso
2     Q     Well, a number of people
3  have asserted that you did and we'll see
4  a couple more throughout the course of
5  the day.
6     A     Well, let's go through them
7  one at a time.
8     Q     All right.  She writes
9  again, "I was especially nervous because
10 I am six months pregnant and I was in
11 fear his outbursts would turn violent."
12    A     Well, you --
13    Q     Do you have any response to
14 that?
15    A     You might have any
16 perception you want.  I don't recall
17 having any altercation with this woman,
18 other than telling her I didn't want her
19 working for me anymore and as she was
20 soliciting motorists in the parking lot
21 and soliciting motorists on the DMV floor
22 and Diantha Fuller was condoning all
23 these actions.
24    Q     So is Ms. Fuller lying here?
25    A     About what?  What's

Page 207

1          M.H. Capogrosso
2  Ms. Fuller's statements?
3     Q     Well, she's passing along
4  this statement from her paralegal.
5     A     Well, Ms. Fuller did not
6  observe it now, did she, so I don't know
7  what Ms. Fuller is observing.
8     Q     But Ms. Paez is lying, is
9  that your testimony?
10    A     I did not threaten a woman.
11 I would never threaten a woman in my
12 life.
13    Q     So yes, she's lying?
14    A     Yes, yes, absolutely lying.
15    Q     And you have no -- and you
16 have no sense of why she would lie; is
17 that correct?
18    A     I don't think you need a --
19 I don't know why.  We are all
20 competitive.  We are all going after the
21 same summonses down there.  All going
22 over the same summonses.  Did the woman
23 like me, no.
24    Q     So you think that's why
25 she's lying?

Page 208

1          M.H. Capogrosso
2     A     I don't know why she's
3  lying, I have no idea, but what's -- if
4  you're going to accuse me of threatening
5  you, tell me the words I used or have me
6  arrested, but don't threaten -- don't say
7  something like that --
8     Q     All right.
9     A     -- ruin my reputation and my
10 name and don't give me the specifics of
11 exactly what I did.
12    Q     So let's move on to the next
13 exhibit.
14        MR. THOMPSON:  And,
15    Ms. MacDonald, I can't recall whether
16    we had that marked, but that previous
17    exhibit, let's have that marked as
18    Exhibit 6 if hasn't been already.
19    Q     Mr. Capogrosso, can you see
20 the exhibit?
21    A     Ah, yes, all the clerks
22 don't like me.  They're signing their
23 names, yes, yes.
24    Q     So do you recognize this
25 document?

Page 209

1          M.H. Capogrosso
2     A     Yes, absolutely.
3     Q     And what is this document?
4     A     This is a complaint.  This
5  was something --
6     Q     What is this document?
7     A     I have no idea.  Something
8  that all the clerks signed that Bushra
9  Vahdat had them sign.
10    Q     And  this document was
11 produced by us and it's Bates stamped DMV
12 lots of zeros 244; correct?
13    A     Yeah.  Yes.  The clerks
14 didn't like me, I know that.
15    Q     You see that down in the
16 lower right?
17    A     Yeah.  The clerks didn't
18 like me.  I know that.
19    Q     And so, Mr. Capogrosso,
20 what's this document?
21    A     I don't know.  This is an
22 affidavit by all the clerks.
23    Q     It's not an affidavit.  I
24 don't think there's a notarization or
25 anything.

22 (Pages 206 - 209)

Page 210

1     M.H. Capogrosso
2     A     I don't know what it is.
3  It's a bunch of signatures.
4     Q     Either way --
5     A     It's a bunch of signatures
6  by people at the DMV.
7     MR. THOMPSON:  Ms.
8     MacDonald, can we have this marked as
9     Exhibit 7?
10       (The above-referred-to
11    statement along with signatures was
12    marked as Exhibit 7 for
13    identification as of this date.)
14    Q     And so the people who signed
15 this document, right, "We the undersigned
16 clerks, supervisors and judges of the
17 Brooklyn South Traffic Violations Bureau
18 state that we feel the presence of
19 attorney Mario Capogrosso on our premises
20 constitutes a threat to our physical
21 safety."
22        Why would they think that,
23 Mr. Capogrosso?
24    A     I have no idea.  Tell me the
25 specifics.  I have no idea.  You can't

Page 211

1     M.H. Capogrosso
2  make allegations against a man and his
3  reputation if you don't give me the
4  specifics that occurred and give me an
5  opportunity to respond and resolve it.
6  Let me know what I did.
7     Q     Did people --
8     A     I'd like to know.
9     Q     Did people view you as a
10 threat to their physical safety?
11    A     I don't know.  I have no
12 idea, none.  I can't answer that.  They
13 might have.  They --
14    Q     Did --
15    A     They might have.
16    Q     Were they right to view you?
17    A     I don't know.  I am -- you
18 know, I was dealing with a lot of tough
19 guys down there, a lot of tough
20 motorists.  There are tough guys down
21 there in Brooklyn, they are.  I'm dealing
22 with a lot of tough guys.
23        And do I have a strong
24 presence, absolutely, I admit that.  Do I
25 come across with a strong presence,

Page 212

1     M.H. Capogrosso
2  absolutely.  How you perceive me, that's
3  up to you.  What did I actually do is a
4  different situation.  You can perceive me
5  in any manner you like.  What did I
6  actually do?
7     Q     What do you mean by strong
8  presence?
9     A     I do have a strong presence.
10 I've been told that.  I'm not --
11    Q     What do you mean by the term
12 strong presence?
13    A     Well, I'm not afraid to
14 speak my mind.  I'm not afraid to
15 confront.  I'm not afraid to confront,
16 that's what lawyers do.  I'm -- I -- I
17 state the truth, I get right to the issue
18 and I try to resolve it.  That's who I am
19 as a person, as a man, as an attorney,
20 that's who I am.
21        If you perceive -- if you
22 have a perception of me that you feel,
23 tell me what I did.  Give me an
24 opportunity to resolve it.  Give me the
25 opportunity to resolve it.  Don't just

Page 213

1     M.H. Capogrosso
2  make blatant accusations against a man.
3     Q     When you say strong
4  presence, do you mean strong physical
5  presence?
6     A     I have a strong physical
7  presence, a strong persona.  People say
8  that when I walk in the room, they feel
9  me or they sense me.  I don't know why,
10 they do.  They -- I've been told this.  I
11 don't know why.
12        I'm trying to figure out why
13 they feel intimidated by me.  I don't
14 know why.  But if they do, give me an
15 opportunity to resolve it.
16    Q     But you knew that some
17 people felt intimidated by --
18    A     No, I did not.
19    Q     -- you; is that correct?
20    A     I did not.  I did not.  I
21 speak to everybody the same.  I speak to
22 everybody the same.  If you feel that
23 type -- if you feel that, give me an
24 opportunity to resolve it.  Give me an
25 opportunity.

23 (Pages 210 - 213)

Page 214

M.H. Capogrosso

1  M.H. Capogrosso
2  Q    But were you aware that
3  people were intimidated by your strong
4  physical presence?
5  A    No, no.  Absolutely not.
6  I'm sorry if -- I'm sorry if I have a
7  strong physical presence.  I'm sorry.
8  You're allowed to have a strong physical
9  presence.  You're allowed.  You're
10  allowed.
11  Q    So Mr. Capogrosso --
12  A    You have to let me finish.
13  I can't help that.  You're allowed to
14  have that.
15  Q    So Mr. Capogrosso, they
16  write "We believe that Mr. Capogrosso's
17  behavior is unstable and hereby state
18  that he has gotten into confrontations
19  with many of us in the past years" and
20  you'll see some of the names on this list
21  like Marisol Cervoni are the list of
22  people who have filed complaints or
23  otherwise indicated that they had
24  confrontations with you.
25  A    Well, they --

Page 215

1  M.H. Capogrosso
2  Q    They write "These
3  confrontations have been escalating to
4  the point where a physical confrontation
5  has nearly ensued between him and a
6  Brooklyn South employee on January 5,
7  2011 after the close of business."
8  Do you know what they're
9  referring to?
10  A    Absolutely.  I remember
11  that.  Absolutely.
12  Q    And what incident are they
13  referring to?
14  A    I'm going to the counter on
15  a ticket.  There's George and then
16  there's Cindy.  Cindy is George's
17  girlfriend, I didn't realize this, but
18  she's a nice lady.  I was talking to
19  Cindy.  I actually thought Cindy was a
20  very pretty woman.  I was taking to
21  Cindy.  George is getting upset I guess.
22  I didn't realize they were dating.  I had
23  no idea.
24  He starts yelling and
25  screaming at me.  I said that's enough,

Page 216

1  M.H. Capogrosso
2  I'll talk to you about it later and
3  that's it.  But now I'm not allowed to
4  talk to a clerk.  I didn't know that
5  Cindy and George were dating and now I'm
6  not allowed to talk to Cindy.  So I was
7  talking to Cindy.  George got upset.  He
8  starts yelling and screaming at me.  I
9  said I'll talk to you about it later if
10  you want to talk and I said the word
11  talk.  I didn't threaten anybody.  I said
12  the word talk.
13  Q    Who told you that you
14  weren't allowed to talk to someone?
15  A    George was getting upset.
16  George was getting upset.  I don't know.
17  I was talking --
18  Q    Were you flirting with --
19  A    I wasn't flirting.
20  Q    Were you flirting with
21  Cindy?
22  A    Cindy's a beautiful woman.
23  Cindy was a beautiful woman.  Was I
24  flirting?  I don't know if I was
25  flirting.  Did I like Cindy?  Cindy was

Page 217

1  M.H. Capogrosso
2  very pretty.
3  When I found out that they
4  were dating, I said that's it.
5  Q    What did you say to Cindy?
6  A    I wasn't flirting.  I
7  thought Cindy was a very attractive
8  woman.  Marisol Cervoni is a very
9  attractive woman.
10  Q    But what did you say to
11  Cindy on this day, January 5?
12  A    I don't remember.  I know it
13  was maybe how are you doing, what are you
14  doing for the weekend, are you going --
15  you know, maybe something to that.  I
16  don't know.  I don't remember the
17  specifics.
18  But I do remember I liked --
19  Cindy was a nice lady.  She was a nice
20  lady and she was a beautiful woman.
21  Q    Did you try to -- did you
22  try to fight Mr. Hon (phonetic)?
23  A    No.  Absolutely not.
24  Q    Did you block in his car?
25  A    Absolutely not.  If you look

Veritext Legal Solutions
212-267-6868                                                    516-608-2400

Page 218

```
1           M.H. Capogrosso
2   at the --
3       Q      What happened?
4       A      If you look at the affidavit
5   that George Hon wrote, George Hon wrote,
6   not what Bushra Vahdat said happened,
7   what George Hon wrote was that I was
8   sitting in my car, which I do after work,
9   to make phone calls to my clients, which
10  I'm required to do and that George
11  approached me, got out of his car. At
12  that point I get out of my car.
13          If somebody approaches me in
14  their car, stops their car -- if they
15  stay in the car, I stay in the car. If
16  you get out of your car, I'm getting out
17  of my car. And he approached me. That's
18  what George Hon wrote. Read what
19      Q      So did you have any sort of
20  confrontation with George Hon out in the
21  parking lot?
22      A      I said what's the problem.
23  He started yelling and screaming at me
24  about this and that. I said what's the
25  problem. Then I find out they're dating.
```

Page 219

```
1           M.H. Capogrosso
2   I said fine, hands off, I don't need this
3   aggravation. She's a nice woman, but I
4   don't need the aggravation.
5       Q      So he yelled at you. You
6   didn't yell at him?
7       A      I'm sitting in my car like I
8   do every day. Either I go there, I sit
9   in a park, sometimes I go to the beach.
10  I'm sitting there, I'm making phone
11  calls. I'm sitting in my car.
12          Read what George wrote and
13  then read what Bushra Vahdat wrote, some
14  story, I'm blocking people. Read what
15  George wrote. He approaches me. He gets
16  out of his car. I'm sitting in my car.
17  That's the truth.
18      Q      And so did George and Bushra
19  lie?
20      A      George didn't lie. Bushra
21  lied. Bushra lied.
22      Q      Okay.
23      A      Bushra should not be a judge
24  if you make up a story like that.
25      Q      So, Mr. Capogrosso, you see
```

Page 220

```
1           M.H. Capogrosso
2   this petition where 18 people sign a
3   letter saying that they believe that
4   you're a threat to their safety and that
5   your behavior is unstable.
6           What do you think that the
7   TVB should have done about this petition?
8       A      They should have shown it to
9   me, number one. They should have shown
10  it to me, number one.
11          Number two, they should have
12  told me exactly what I did, exactly what
13  I did and to give me an attempt to
14  resolve it. Give me an attempt to
15  resolve it. Give me the specifics, give
16  me a chance to apologize if I said
17  something wrong or I did something wrong.
18  Give me an opportunity to apologize.
19  Give me an opportunity to address it.
20  Tell me the specifics.
21          Now, the fact that you feel
22  intimidated by my presence, I can't help
23  that. I'm sorry, I can't. I am who I
24  am. I can't help it. I can't change it.
25  I am who I am. I've been very direct
```

Page 221

```
1           M.H. Capogrosso
2   with you, very direct to the Court. I am
3   who I am.
4           But if you feel that well,
5   maybe that's your own personal
6   insecurity. You might have personal
7   insecurities. They're not my
8   insecurities. They're your insecurities.
9   But give me the exact threats that I used
10  or what exactly I did.
11          But if you have personal
12  insecurity, don't put that personal
13  insecurity on me.
14      Q      Mr. Capogrosso, so this is a
15  petition which 18 separate people say
16  that they think that you're unstable and
17  a threat to their safety. How do you
18  feel about that?
19      A      I want to know the
20  specifics. I feel insulted, number one
21  and I feel improperly accused. Tell me
22  what I did. Give me an opportunity to
23  defend myself and respond and respond to
24  it and resolve it. Give me that
25  opportunity. Don't make --
```

25 (Pages 218 - 221)

Page 222

M.H. Capogrosso

1    Q    Do you think you did --
2    A    Don't make accusations and
3 don't give me an opportunity to respond.
4    Q    Do you think you did
5 anything wrong to have 18 people feel
6 that you're a threat to their physical
7 safety?
8    A    I want to know the exact
9 specifics. Tell me what I did.
10    Q    I know, but that's not the
11 question. The question is --
12    A    No, I know.
13    Q    -- do you think you did
14 anything wrong?
15    A    I don't think I did anything
16 wrong, no, I do not. My clients loved
17 me. My clients --
18    Q    Do you think that -- do you
19 think that people get petitions written
20 about them with 18 signatures saying
21 they're a threat to their physical safety
22 if they haven't done anything wrong?
23    A    I don't know why they wrote
24 it. Tell me what I did to threaten their

Page 223

M.H. Capogrosso

1 physical safety. Tell me what I did.
2 Listen, I'm a black --
3    Q    Do you think --
4    A    I'm a black belted martial
5 artist, I am. Can I handle myself,
6 absolutely. Am I more fearful what I
7 would do to somebody as to what they
8 would do to me, absolutely. I walk away
9 from confrontations all the time. I
10 don't want to get into it with anybody, I
11 don't. I've been studying martial arts a
12 long time. I've been in a boxing ring a
13 long time. I don't want to have a
14 confrontation with anybody, I do not. I
15 know how to handle myself.
16    That being said, if you feel
17 intimidated or threatened by me, I can't
18 help that. That's my persona. That's
19 who I am.
20    You tell me the specifics of
21 what I did and I will resolve it.
22    Q    Well, there were a number of
23 complaints that we've discussed and more
24 that we will.

Page 224

M.H. Capogrosso

1    A    Sure.
2    MR. THOMPSON: So,
3 Ms. MacDonald, can I ask you to
4 please mark this as Exhibit 7 if you
5 haven't already.
6    Q    One more quick note,
7 Mr. Capogrosso, you see how many of the
8 signatures on here, such as Marisol
9 Cervoni, supervisor as Roy Tucci, are
10 people who have already signed complaints
11 about your behavior; is that correct?
12    A    Well, they signed
13 complaints, yes. Yes, I've seen the --
14 you presented them, I've looked at the
15 complaints and I've addressed them.
16    Q    And you feel that they were
17 wrong?
18    A    I've already explained them
19 to you. The first time I saw them and
20 the first time I was given an
21 opportunity -- you want to talk about
22 Roy's? I didn't bump into him. Well, I
23 already explained my position on each
24 complaint --

Page 225

M.H. Capogrosso

1    Q    Okay.
2    A    -- that you've presented.
3    Q    And so you feel -- is it
4 fair to say that you feel that these
5 complaints that they were threatened were
6 unfounded?
7    A    They're unfounded because
8 there's no basis for them. Tell me what
9 I did. They're absolutely unfounded.
10 Tell me what I did. You don't have to
11 like me. You know, good attorneys are
12 not liked. I don't have to be liked to
13 do my job. I have to do my job.
14    People don't like me.
15 Either they like me or they hate me, I
16 know that, but I don't have to be liked.
17 I was not shown --
18    Q    I think we have been --
19    A    Well, I have not been trying
20 to endear myself to the clerks. I did
21 not. I was there to do a job. The one
22 time I tried doing it, talking to Cindy,
23 George got upset.
24    Q    So let's move on to a new

26 (Pages 222 - 225)

Page 226

1　　　　M.H. Capogrosso
2　exhibit. I'm going to un-share my
3　screen.
4　　　　MS. REPORTER: Did you guys
5　take a lunch break yet before I came
6　on or --
7　　　　MR. THOMPSON: Would you
8　like one, Mr. Capogrosso?
9　　　　THE WITNESS: I don't need
10　my brakes.
11　　　　MR. THOMPSON: Ms. MacDonald
12　or Mr. Brodsky, you're also -- if you
13　would like one, we can certainly take
14　one. I'm perfectly happy to keep
15　going.
16　　　　MR. VIDEOGRAPHER: You can
17　proceed Counsel, please.
18　　　　MS. REPORTER: I mean I'd
19　like at least every hour and-a-half a
20　five minute break because you guys
21　are going -- and this is my fourth
22　deposition of the day, so --
23　　　　MR. THOMPSON: We can take
24　a -- we can take a five minute break
25　if you'd like.

Page 227

1　　　　M.H. Capogrosso
2　　　　MS. REPORTER: Sure.
3　　　　MR. THOMPSON: Why don't we
4　do that and reconvene at one 1:20.
5　　　　MR. VIDEOGRAPHER: Okay.
6　The time is 1:15. We are off the
7　record.
8　　　　(A short recess was taken.)
9　　　　MR. VIDEOGRAPHER: The time
10　is 1:20. We are on the record.
11　　　　MR. THOMPSON: Actually, I'm
12　having some problems here where it's
13　not letting me share my screen all of
14　a sudden.
15　　　　Actually, can we go back off
16　the record while I figure out what's
17　wrong here? My apologies.
18　　　　MR. VIDEOGRAPHER: Sure.
19　The time is 1:21. We are off the
20　record.
21　　　　(A short recess was taken.)
22　　　　MR. VIDEOGRAPHER: The time
23　is 1:22. We are on the record.
24　Q　　Mr. Capogrosso, I'm showing
25　you a document. Do you recognize this

Page 228

1　　　　M.H. Capogrosso
2　document?
3　　A　　Yes. I recognize the top,
4　yes. Is this the one from Yaakov? Yes,
5　absolutely, yes.
6　　Q　　And what is this document?
7　　A　　This is an affidavit from
8　Yaakov Brody about the incident that
9　occurred on December 22, 2011.
10　　Q　　And this is the document
11　marked P-92 in your production; correct?
12　　A　　Absolutely.
13　　　　MR. THOMPSON: And,
14　Ms. MacDonald, I'll ask that this
15　document be marked Exhibit 8.
16　　　　(The above-referred-to
17　statement was marked as Exhibit 8 for
18　identification as of this date.)
19　　Q　　So who is Yaakov Brody?
20　　A　　He's an attorney that works
21　down there.
22　　Q　　Did you have a good
23　relationship with him?
24　　A　　I never talked to the man.
25　I mean I never talked to him really. I

Page 229

1　　　　M.H. Capogrosso
2　knew he was down there, but I never
3　really had any conversation with him
4　until the morning of -- I thought it was
5　December 22nd of December. He says
6　December 21, 2011.
7　　Q　　And so you never talked to
8　him before this?
9　　A　　Not really, no. He --
10　　Q　　Okay.
11　　A　　He used to like to schmooze
12　with the clerks all the time. He was up
13　there for a half an hour at a time
14　talking to the clerks, not me.
15　　Q　　So Mr. Brody writes
16　"Mr. Capogrosso walked in and went to
17　reach for his briefcase which was lying
18　on the floor next to me. Mr. Capogrosso
19　then said excuse me so I could move over
20　so that he could get to his briefcase.
21　He already had plenty of time, but
22　regardless I shifted my body so he would
23　have even more room to reach for his
24　belongings."
25　　　　Do you recall any of this?

27 (Pages 226 - 229)

Page 234

1    M.H. Capogrosso
2 attorney up to it because out of the blue
3 he just happens to say this.
4    My mind was --
5    Q    Why would --
6    A    You got to let me finish.
7 My mind was someplace else. It was right
8 around Christmas time. I'm not really
9 thinking. I'm thinking about I got to
10 buy Christmas presents and what I'm
11 buying for who. That's where my mind was
12 on that morning. But that's what
13 happened.
14    Q    Why would Bushra Vahdat and
15 Alan Gelbstein want you out?
16    A    Bushra Vahdat -- well, they
17 had complaints against me from the
18 clerical staff, right and they had to
19 have a reason to have me removed and this
20 would have been an excellent reason,
21 right. They had all these complaints
22 that they were filing against me. There
23 was no sum and substance to any of them,
24 right.
25    But in order to get me

Page 235

1    M.H. Capogrosso
2 removed they needed an incident like
3 this, so they created one. They
4 didn't -- they didn't have no -- they had
5 no basis to grieve me. There was no
6 grievance filed against me. They grieved
7 in Emig Tieg (phonetic) in Manhattan
8 North because they had a basis for that,
9 but they had no basis to grieve me
10 because there was no sum or substance to
11 any of these complaints, otherwise they
12 would have, so they created an incident.
13 That's my opinion.
14    And I was blindsided. My
15 mind was someplace else, it was Christmas
16 time and I took the bait. I did the
17 right thing. I did throw a punch at a
18 wall. I didn't hit the wall because I
19 was upset. What makes me a Jew hater
20 anti-Semite? What nerve does this
21 attorney have to call me a Jew hater
22 anti-Semite? I'm working down there 10
23 years. There's not one complaint from a
24 motorist or a client that I used an
25 anti-Semitic remark or a racist remark.

Page 236

1    M.H. Capogrosso
2    What right does this man
3 have to call me an anti-Semite Jew hater?
4    Q    So why would he think that
5 you're a Jew hater anti-Semite? Why
6 would he say that out of nowhere?
7    A    Let me know. I'd like --
8 why don't you ask him? Why don't you ask
9 him? Ask this Mr. Yaakov Brody.
10    Q    Had you ever --
11    A    I'm making too much money in
12 his presence? I don't know. I'm an
13 Italian America down there. I'm
14 surrounded by Jewish lawyers. Most of
15 the lawyers down there are Jewish. Most
16 of the judges are Jewish.
17    Maybe I'm making too much
18 money. I don't know. Maybe I saw what
19 Judge Gelbstein was doing with the ticket
20 brokers. I don't know. But this guy had
21 it in for me --
22    Q    Had --
23    A    -- and I took the bait.
24    Q    Had you ever discussed Jews
25 or Judaism with Mr. Brody before this?

Page 237

1    M.H. Capogrosso
2    A    Absolutely not. Listen, I
3 was there 10 years, 10 years I was there.
4 Look at the complaints against me. Not
5 one client or motorist made a statement
6 that I made an anti-Semitic or a racist
7 remark, not one.
8    Now I have to have this
9 lawyer call me a Jew hater anti-Semite.
10 For what reason?
11    Q    So had you had conversations
12 with Jews -- about Jews or Judaism at all
13 with anyone previous to this?
14    A    No. I don't -- no, no. I
15 don't care who you are, what religion you
16 are. I'm Catholic. I don't care what
17 you want to be. You're Jewish, fine. Do
18 whatever you like. God bless. I could
19 care less.
20    You look at the motorists
21 and the clients that I represented,
22 they're all nationalities, all races, all
23 of them. Not one indicated I made an
24 anti-Semitic or a racist remark and I'm
25 dealing with thousands, almost 850

29 (Pages 234 - 237)

1  M.H. Capogrosso
2  problem is you speak and then you pause
3  and then I think you're done and then I
4  start talking.
5  A  What's the question?
6  Q  So why would Mr. Maher lie?
7  A  Ask Mr. Maher. I have no
8  idea. This is not what happened. I'm
9  telling you what happened. I'm not
10  getting this angry over nothing. I'm not
11  getting this angry if Brody didn't
12  approach me and tell me to go fuck myself
13  twice. I'm not getting angry like this
14  and upset like this if the man didn't
15  approach me and tell me to go fuck myself
16  twice when all I said to the man was
17  excuse me, can I get my coffee.
18  Now whatever you like,
19  but no man's going to get angry like this
20  unless he's told to go fuck himself
21  twice.
22  Q  So you have no idea why
23  Mr. Maher would write this?
24  A  I have no idea. Maybe
25  they're friends. I don't know. I don't

1  M.H. Capogrosso
2  know.
3  Q  Do you have a suspicion?
4  A  No. I don't know. Maybe
5  they're two Jewish American attorneys and
6  I'm an Italian American attorney and
7  they're ganging up on me. I don't know.
8  You figure it out. You ask them. I
9  don't know.
10  Q  Did you --
11  A  That's a fact. He --
12  Q  Did you think that
13  Mr. Maher --
14  A  I don't know. Go ahead.
15  Q  Did you think Mr. Maher
16  wanted you out?
17  A  I don't know if he did or
18  not. I never talked to the man. I
19  didn't like him. I didn't like the way
20  he handled cases. Did I like the man,
21  no. Did I dislike him, no, I really
22  didn't care. He had a job to do, I had a
23  job to do.
24  I wasn't -- I wasn't
25  required to like other attorneys. I was

1  M.H. Capogrosso
2  required to do a job. You know, I choose
3  my friends very carefully. I get -- you
4  know, I choose them very carefully. I
5  don't have to like everybody in this
6  world.
7  Did I like his approach, no,
8  but he had -- he had his right to do his
9  job. I had a right to do my job.
10  Q  Mr. Maher --
11  A  I don't have to like you.
12  Q  Mr. Maher writes again that
13  your remarks, quote, "became intensely
14  personal, directed at Brody, his person
15  and his culture, his ethnicity and his
16  very humanity." Is that true?
17  A  He told me to go fuck myself
18  twice. Did I call him a fucking Jew
19  cunt? I probably called him a fucking
20  something. I don't remember exactly the
21  words I did, but if you're going to tell
22  me to go fuck myself, I am going to
23  respond, all right.
24  Q  So this --
25  A  If you tell me to go fuck

1  M.H. Capogrosso
2  myself twice, that I'm an anti-Semite Jew
3  hater, that I'm making too much money
4  it's my opinion in your presence, I'm
5  going to respond. I'm going to respond.
6  I think any normal man would respond,
7  whether an attorney or not. Outside of a
8  courtroom when it's not -- any normal man
9  is going to respond to an accusation like
10  that.
11  So is this man lying, yeah,
12  he's lying.
13  Q  So Mr. Maher writes, quote,
14  "Nothing Brody did or said during
15  Capogrosso's verbal attack was in any way
16  provocative or confrontational."
17  A  Well, first of all --
18  Q  Do you see that?
19  A  Yeah. Maher wasn't in the
20  room on the first instance. He wasn't
21  there on the second incident either, so
22  he doesn't know what Brody said to me.
23  Brody told me excuse yourself, go fuck
24  yourself, you're a Jew hater anti-Semite
25  twice, not once, twice. The first time I

35 (Pages 258 - 261)

Veritext Legal Solutions
212-267-6868                                           516-608-2400

Page 270

M.H. Capogrosso

1  he's telling me excuse yourself, go fuck
2  yourself.
3  Then I come back, Beer is
4  there. I remember Beer. I'm not sure if
5  Sadiq was there and -- Sadiq must have
6  obviously been there because he does say
7  the words excuse me.
8  And he refused to be --
9  he -- then he said it again to me, excuse
10  yourself, go fuck yourself. At that time
11  I got upset. At that point I got upset.
12  He walked -- at that point I got upset.
13  Yes, I did, I'm not going to deny it. I
14  took an anger management course.
15  Q  So he writes that
16  "Mr. Capogrosso said you can call me a
17  fucking Italian Gini. Mr. Brody said
18  that you're an anti-Semite and you don't
19  belong in this place. Mr. Brody shouted
20  stop it and in the meantime Ms. Daniel,"
21  I guess that means Danielle, "Calvo came
22  into the room and tried to cool down the
23  situation." Is this correct?
24  A  I know Beer was in the room.
25

Page 271

M.H. Capogrosso

1  I don't remember what he was saying. I
2  was upset at that point in time. Listen,
3  I was upset. You know, I don't recall
4  exactly what I said.
5  Did Calvo come out? Calvo,
6  if she came out she took everybody's
7  affidavit, every lawyers' affidavit but
8  mine. She took every lawyers' affidavit
9  but mine as to what happened.
10  Beer I do remember in the
11  room and that's it. That's all I
12  remember. That's what I remember.
13  Q  So is there anyone -- you
14  know, of what we've looked at so far, is
15  there anything that Mr. Tahir has written
16  that is untrue?
17  A  Well, I don't know. I don't
18  know. I'm not going to say that because
19  I'll admit to the fact I said -- that I
20  said excuse me, that's what I'll admit
21  to. I don't know about the rest. I
22  don't recall the rest. I do remember
23  saying excuse me twice. I do -- I do
24  recall -- I do recall being upset. I
25

Page 272

M.H. Capogrosso

1  was.
2  I do recall Beer being in
3  the room, that's what I remember. I
4  don't remember Calvo coming out, but
5  maybe she did. I know Maher was not in
6  the room, that I remember.
7  Q  So Mr. Tahir writes "A
8  little later Mr. Meyers came in the room
9  and" -- I can't actually quite read what
10  he says.
11  A  I have to apologize --
12  Meyers is asking me to apologize to
13  Brody. Meyers is asking me to apologize
14  to a guy that just told me to go fuck
15  myself twice. That's what I have to do.
16  Q  And what happened then?
17  A  I got -- I got upset. For
18  to apologize to a guy that just told me
19  to go fuck myself twice? Are you kidding
20  me? I mean are you really kidding me?
21  That's when I threw the punch at the
22  wall. I didn't hit the wall. I wasn't
23  charged. I wasn't arrested. That's when
24  I really got -- he's asking me to
25

Page 273

M.H. Capogrosso

1  apologize to a guy that just told me to
2  go fuck myself twice.
3  At that point Brody is
4  standing outside the -- outside the room.
5  He looks in and then he goes -- goes to
6  Judge Gelbstein. I think that's what
7  happened. I'm not sure.
8  Q  So Mr. Tahir writes that you
9  said to Mr. Meyers that I'll send you to
10  the hospital.
11  A  I never said that. I never
12  would say that. There's no reason for me
13  having -- being mad at Meyers. No reason
14  for me. Meyers didn't do anything.
15  Meyers just walked in the room. He's
16  asking me to apologize which is just
17  terrible because you know the truth
18  doesn't matter here. You know, the truth
19  doesn't matter as to what actually
20  happened. He's asking me to apologize to
21  a guy that just told me to go fuck myself
22  twice.
23  I never said I was going to
24  put Meyers in the hospital, never. I
25

38 (Pages 270 - 273)

Page 290

1       M.H. Capogrosso
2 would they justify excluding you from the
3 TVB?
4     A    They're not true. They're
5 not true, so there's no reason to exclude
6 me. They're not true. I told you what
7 happened that day. I was blindsided by
8 Brody. I have a right to get mad. Told
9 me to go excuse myself and go fuck myself
10 twice. I have a right to get mad. It's
11 a normal --
12     Q    I understand that you
13 disagree with the fact --
14     A    I was blindsided and that's
15 all that happened that day, that's it.
16         Now, this is a competitive
17 business, I told you that. These lawyers
18 wanted me out. I was making money and
19 every dollar I make is a dollar that they
20 don't make. So the more attorneys they
21 can get out of there, the better it is.
22     Q    Let me rephrase the
23 question. If someone, not you, had used
24 the phrase fucking Jew cunt, thrown a cup
25 of coffee at somebody and tried to punch,

Page 291

1       M.H. Capogrosso
2 you know, the air in front of somebody
3 else's face and told them that they'd put
4 them in the hospital, would that person
5 be someone who could be excluded from the
6 TVB?
7     A    No. I don't know. It
8 didn't happen. I don't know. First of
9 all, it didn't happen. I didn't throw
10 a -- I told you the facts, so I'm not
11 going to -- I'm not going to discuss a
12 hypothetical, what could have or could
13 not happen. Nobody wants to take my
14 affidavit as to what happened here,
15 nobody.
16     Q    Okay. Let's --
17     A    Everybody, you know,
18 everybody here could have looked at the
19 videotape if I'm punching a wall or
20 punching a steel beam. Judge Gelbstein
21 had the ability to pull the videotape and
22 look at the videotape as to what happened
23 and what happened that day and he didn't
24 do it.
25         He had the ability to take

Page 292

1       M.H. Capogrosso
2 my affidavit as to what happened and he
3 didn't do it, he didn't. If I'm punching
4 a wall or a steel beam, let Gelbstein
5 pull the videotape and he didn't do it.
6     Q    So let's move on to another
7 exhibit here.
8     A    And I don't like
9 hypotheticals that don't exist because
10 the facts that you're presenting aren't
11 true. I threw a cup, an empty cup in a
12 coffee -- in a garage can that Brody was
13 sitting next to. I didn't throw a punch
14 in the vicinity of any attorney. I
15 didn't hit any steel beams.
16         If you had the opportunity
17 to look at the videotape, the judge would
18 have saw that and he didn't do it and he
19 had an opportunity to do it.
20     Q    So, Mr. Capogrosso, can you
21 see the document that I just put up?
22     A    Yes.
23     Q    And this document is Bates
24 stamped DMV-0000224; correct?
25     A    Yes.

Page 293

1       M.H. Capogrosso
2     Q    Do you recognize this
3 document?
4     A    Bushra Vahdat's affidavit.
5     MR. THOMPSON: Ms.
6 MacDonald, can I ask you to mark this
7 as Exhibit 12?
8     (The above-referred-to
9 statement was marked as Exhibit 12
10 for identification as of this date.)
11     Q    We'll just discuss this
12 document and then we'll take a bit of a
13 break because I know we are all a little
14 tired.
15     A    I'm not tired. I'm not
16 tired at all.
17     Q    So what is this document?
18     A    I think it's an affidavit
19 from Bushra Vahdat.
20     Q    And Ms. Vahdat writes that
21 when she was first appointed, the
22 clerical staff approached her and handed
23 her an affidavit signed by all of them
24 requesting help dealing with an attorney.
25         Do you think she's talking

**JSA-283**

Page 302

1        M.H. Capogrosso
2    never gave the full story.  She only
3    gives half the story.  She doesn't give
4    my version of what happened that day.
5        Q      So --
6        A      She only gives half a story,
7    Danielle Calvo, half a story.  What
8    precipitated that event?  First of all, I
9    didn't punch Jeff Meyers or throw a punch
10   in his vicinity.  I did not, number one.
11       Number two -- you turned it
12   away.  You turned away from it.  She
13   doesn't say what Brody said to me that
14   day.  Why is that left out?  Why?  Why is
15   Calvo not asking me what happened?  Like
16   that all happened for no reason?
17       She doesn't understand that
18   Brody told me to go excuse myself, go
19   fuck myself twice.  She doesn't put that
20   down.
21       Q      So you'll see here at the
22   bottom of page 1 -- that's not a good
23   highlight.  I can do a better highlight
24   than that.
25       A      You know, this is not a --

Page 303

1        M.H. Capogrosso
2        Q      Ms. Vahdat writes that
3    "After taking everyone's statement
4    Mr. Gelbstein and I met with
5    Mr. Capogrosso.  We asked him for his
6    version of the prior day's events and he
7    admitted to shouting the religious
8    obscenities and trying to punch, as he
9    put it, the air in front of Mr. Mayer's
10   face.  He was not remorseful and claimed
11   that he needs to punch the walls in our
12   office to let out steam.  I also observed
13   that his knuckles were severely bruised."
14       So what --
15       A      All right.  What do you
16   want?  What's the question?  What's the
17   question?
18       Q      My question is what do you
19   recall from this meeting?
20       A      This meeting what I
21   recall -- first of all, Gelbstein told me
22   you're not welcome here.  I was given no
23   opportunity to respond by way of written
24   affidavit as to what happened.  I did not
25   shout religious obscenities.  Again, I

Page 304

1        M.H. Capogrosso
2    was mad and I was upset.  I don't recall
3    what I said.
4        I did not go anywhere near
5    Meyers, nowhere near Meyers.  I was given
6    no opportunity to respond.  I threw an
7    empty coffee cup --
8        Q      Was the --
9        A      Let me finish.  I threw an
10   empty coffee cup --
11       Q      Sure.
12       A      -- not at Brody.  I threw it
13   in a can, in a can that's in the lawyers'
14   room where I'm allowed to do that.  I'm
15   allowed to throw an empty coffee cup in a
16   can in a lawyers' room.  I'm allowed to.
17       She doesn't write down what
18   Brody said to me, that I'm a Jew hater
19   anti-Semite go fuck yourself twice.
20       My hands are bruised.  I've
21   been going to martial arts all my entire
22   life.  My hands are bruised.  Sometimes I
23   get a black eye.  It happens.  I accept
24   the reality of that.  It's not because I
25   hit a wall at the DMV.  Because I go to a

Page 305

1        M.H. Capogrosso
2    boxing gym and a martial arts gym that it
3    happens.  That's when I --
4        Q      So, Mr. Capogrosso, she --
5    you said you weren't able to put in your
6    version of events, but she writes that
7    she asked you for -- we asked him for his
8    version of the prior day's events and he
9    admitted shouting religious obscenities
10   and trying to punch at and that you were
11   not remorseful and claims that you needed
12   to punch the walls in the office.
13       So you were able to verbally
14   give your version of events; weren't you?
15       A      No, I wasn't.  First of all,
16   it's a lie.  First of all, it's a lie.
17   And what she's stating here is -- you
18   have to move this over -- up a little
19   bit, down or up.
20       Q      Sure.
21       A      That I -- this is an
22   absolute lie from a judge that I needed
23   to punch a wall in the office to let off
24   steam.
25       I have to look at it.  It's

46 (Pages 302 - 305)

Page 310

1          M.H. Capogrosso
2    break, but if people need a break,
3    take a break.
4          MR. VIDEOGRAPHER: All
5    right. The time is 2:33. We are off
6    the record.
7          (A short recess was taken.)
8          MR. VIDEOGRAPHER: The time
9    is 2:48. We are on the record.
10   Q    So, Mr. Capogrosso, I've put
11   up an exhibit here. Do you recognize
12   this document?
13   A    Yes.
14   Q    What is this document?
15   A    Well, after the events with
16   Yaakov Brody in 2011, Gelbstein told me,
17   you know, you're not welcome here
18   anymore. I hired a lawyer, he
19   communicated with the DMV and the
20   Attorney General's office and he
21   represented me in an Article 78
22   proceeding.
23   Q    Okay. And you see this
24   document is Bates stamped DMV-0000226;
25   correct?

Page 311

1          M.H. Capogrosso
2    A    Yes.
3    Q    And so this is a document
4    that was filed -- sent on your behalf by
5    your lawyer; correct?
6    A    Yes, at that time, Chris
7    McDonough.
8          MR. THOMPSON: All right.
9    Can you mark this as Exhibit 13?
10         (The above-referred-to
11         letter was marked as Exhibit 13 for
12         identification as of this date.)
13   Q    And is it safe to say that
14   this letter features your version of
15   events?
16   A    Well, as I told them to my
17   lawyer.
18   Q    And I want to go down to a
19   portion here at the bottom of the first
20   page, Mr. McDonough writes "One of the
21   managers of the center, Danielle, heard
22   the exchange, again Mr. Brody was yelling
23   at the cup" -- at the top of his lungs,
24   and came into the room. In front of
25   Mr. Capogrosso she stated now's our

Page 312

1          M.H. Capogrosso
2    chance to get rid of him, referring to
3    Mr. Capogrosso."
4          Can you tell me what's meant
5    by this?
6    A    I don't know what's meant.
7    That's what she said. That's what she
8    said. It's exactly what she said, now's
9    our opportunity to get rid of him.
10   Q    So --
11   A    Her clerks didn't like me.
12   You saw the affidavits written by her
13   clerks with no facts supporting anything
14   I said or did and she stated that, now's
15   our chance to get rid of him and I took
16   the bait. I took the bait.
17   Q    The Danielle mentioned here,
18   is that Danielle Calvo?
19   A    Yes.
20   Q    And so in your
21   interrogatories you mentioned an incident
22   when Ms. Calvo said now's our chance to
23   get rid of him. Is this the incident you
24   were referring to?
25   A    Yeah, yes.

Page 313

1          M.H. Capogrosso
2    Q    So let me ask you, when
3    we -- before the break when we were
4    talking about the incident with
5    Mr. Brody, why didn't you mention
6    Ms. Calvo coming in and saying that?
7    A    When I said during the
8    incident with Mr. Brody? Because at --
9    at that -- you know, today is 2020. I
10   talked to this lawyer when, 2011, 2012,
11   eight years ago and eight years ago I
12   remember her saying it. Today, 2020, I
13   remember exactly what Brody said,
14   exactly.
15         So do I remember what she
16   said in 2012, no, but do I remember what
17   I stated to this lawyer, that's what I
18   said. If that's what I said, yes.
19   Q    So sitting here today, do
20   you contend that Ms. Calvo said these
21   words?
22   A    Yes, I do. I said them in
23   2012, what was it, January, a month after
24   this happened, yes, absolutely. I said
25   that a month, one month after this

48 (Pages 310 - 313)

M.H. Capogrosso

1
2  to talk as a lawyer? What do I have to
3  do, stay quiet?
4      Q      So --
5      A      I don't know what that
6  means --
7      Q      So do you --
8      A      -- stay quiet.
9      Q      Mr. Capogrosso, sitting here
10 today, do you recall this conversation?
11     A      If I said that to my
12 attorney in 2012, then that's a true
13 statement. It's a true statement.
14     Q      Understood, Mr. Capogrosso,
15 but the question was sitting here today,
16 do you recall this conversation with
17 Ms. Vahdat?
18     A      Today do I remember it? Let
19 me think. I did try to make a lot of
20 phone calls. I did make phone calls
21 right after this happened. Do I recall
22 making this exact conversation, I don't
23 remember. I don't remember saying that
24 exact conversation, but I remember if I
25 said it to him at that time that that was

M.H. Capogrosso

1
2  the truth.
3      Q      Okay.
4      A      I had a big client case at
5  that point. I had clients calling me,
6  asking me where are you, what's going on.
7  So was I trying to reach out to people,
8  yes, I was, absolutely.
9          MR. THOMPSON: So let's mark
10     this as Exhibit 13 if we haven't
11     already and I suspect you already
12     did.
13     Q      And let's -- a couple of
14 other quick questions. So you filed an
15 Article 78 lawsuit; is that correct?
16     A      My attorney did on my
17 behalf, Chris McDonough at that point.
18     Q      And how did the lawsuit
19 proceed?
20     A      We went down to court, went
21 before a judge, Judge Gelbstein was there
22 and I was given the opportunity to go to
23 a hearing a year from now, a year from
24 the date -- a year, one year the judge
25 said. We'll hear the case in a year she

M.H. Capogrosso

1
2  told me or you agree to take an anger
3  management course.
4          Well, I had a lot of
5  clients. I had -- I forgot what that
6  letter said, but it was a lot of clients.
7  I had people calling me where are you,
8  where are you, where are you, why aren't
9  you showing up. I had clients calling me
10 left and right. I felt an obligation to
11 these clients because that's who I am.
12 If a guy gives me money to do a job, I
13 feel an obligation to do that job. I
14 feel a very strong obligation to do it
15 and to show up. I show up.
16         And I said all right, if I
17 have to wait a year in order for my case
18 to be heard and that was a bad decision.
19 I should have adjudicated this right at
20 the start because Chris McDonough told me
21 listen, if you go back down there, you
22 sneeze the wrong way, they're going to
23 throw you out. That's what he told me.
24 Chris told me that and he's a good
25 lawyer. He told me the truth. He said

M.H. Capogrosso

1
2  if you sneeze the wrong way, they're
3  going to throw you out again. I said
4  Chris, I got a ton of clients here and I
5  feel an obligation.
6          So I took the course rather
7  than wait a year to get a hearing on the
8  matter and I should have waited. I
9  should have waited it out and I should
10 have adjudicated this back then and I
11 didn't do it.
12     Q      So what were the terms of
13 the agreement that resolved the case?
14     A      I don't know. There were no
15 terms. I was told to take an anger
16 management course, that's it. I was told
17 to take an anger management course,
18 that's all I -- that's all Chris told me
19 to do.
20     Q      Were you told that any
21 violent or aggressive behavior would
22 result in your removal from the TVB?
23     A      I was given a letter, two
24 days before I was supposed to -- allowed
25 to go back in, a letter that was mailed

Veritext Legal Solutions

212-267-6868                                                    516-608-2400

Page 322

```
1          M.H. Capogrosso
2   to my attorney two days before I was to
3   go.  I agreed to take an anger management
4   course, that's all I agreed to, that's
5   it.  I signed no other stipulation.  I
6   agreed to nothing.
7          I know what the rules are
8   and how to act as a lawyer.  I know that.
9      Q      Did --
10     A      But I didn't sign nothing.
11  I agreed to take an anger management
12  course and that's what I did.  That's
13  what I told the judge.
14         Now, your office threw
15  something at me after the fact.  After
16  this agreement that we reached your
17  office puts all these conditions, which I
18  adhered to anyway, but it was after the
19  fact, after I already agreed only to take
20  an anger management course.
21         So go ahead.
22     Q      And what was the Attorney
23  General's office's role in that lawsuit?
24     A      I assume they represented
25  the DMV.
```

Page 323

```
1          M.H. Capogrosso
2      Q      Just for the litigation or
3   for anything else?
4      A      I don't know.  Chris would
5   know that better than me, my attorney on
6   the Article 78.
7      Q      I'm going to bring up an
8   exhibit and, Mr. Capogrosso, can you see
9   the exhibit here?
10     A      Yes.
11     Q      And this is marked in the
12  defendants' production DMV-0000205;
13  correct?
14     A      Yeah.
15     Q      And do you recognize this
16  document?
17     A      No, I don't.  I have
18  probably seen it, but I got to see the
19  whole thing.  Can you scroll down?  I've
20  seen this.
21     Q      Sure.
22     A      Can you scroll down, please?
23  Go ahead.  Now can you go up, please?
24         This is from who, Assistant
25  Attorney General?
```

Page 324

```
1          M.H. Capogrosso
2      Q      It's from Serwat Farooq.
3      A      Fine.  I didn't sign this,
4   but fine.  That was something that --
5      Q      So do you recognize --
6      A      Yeah.  I do recognize it.
7   It's a letter from --
8      Q      Do you recognize it?
9      A      It's a letter from Chris
10  McDonough.  Yeah, Chris is my lawyer.
11  Jackie was the lady that worked under
12  him.
13         I do remember -- I do
14  recognize this.  This is a letter from --
15  I don't know if I remember seeing this
16  letter.  I don't remember.  I don't know.
17  I know I had to take an anger management
18  course.  That's all I remember.
19         I don't think I was ever
20  shown this letter.  Did I --
21     Q      Did you --
22     A      What's the marking on this?
23     Q      I'm not sure.  This came
24  from our production.
25     A      Then I don't -- I don't
```

Page 325

```
1          M.H. Capogrosso
2   remember seeing this.  I remember seeing
3   that one letter that was -- that had the
4   second half of this down.  I only saw
5   this second half on the letter that was
6   sent to me, please be advised --
7      Q      Okay.
8      A      That's the portion I saw
9   where it says please be advised.  That's
10  the letter I saw.  I never saw this top
11  portion of it.  I saw this second half
12  portion of it from please be advised down
13  and that portion of it was sent to me in
14  a letter with your letterhead on it
15  without these first four paragraphs --
16  without these first three paragraphs and
17  it was sent to me two days before I was
18  to go back in.  That's what I remember.
19     Q      So you don't recognize this
20  letter here?
21     A      I recognize the last two
22  paragraphs where it says please be
23  advised.  That's what was sent to me.
24  That's what I recognize.
25     Q      Okay.
```

51 (Pages 322 - 325)

Page 346

1        M.H. Capogrosso
2   so that's what was going on.
3       Q    Is this incident, May 5th of
4   2014, is this the first incident or
5   confrontation you had with Mr. Smart?
6       A    No, no. Like I said, I
7   walked away a million times. I have no
8   reason to have a beef with a security
9   guard. I'm a lawyer. I got two licenses
10  I have to protect. I spent a lot of
11  money, a lot of time getting this
12  license. I don't need a beef with a
13  security guard. I don't need it. I
14  walked away.
15      Q    What was --
16      A    Let me finish. It's not the
17  first time, no, not the first time.
18      Q    When was the first time?
19      A    June of 2012. As soon as I
20  got back in, he comes up from behind me
21  and pushes me from behind. He's like --
22  pushes me.
23        I tell Gelbstein about it.
24  He looks at the security tape I think and
25  he says you don't need this down here. I

Page 347

1        M.H. Capogrosso
2   said the man just assaulted me from
3   behind. Are you going to do anything
4   about it? And that was the end of it.
5   He pushes me from behind, June of 2012
6   when I -- first week I was back in there.
7   I reported it to Gelbstein.
8   He looked at the videotape. He did
9   nothing about it. Did I go to the cops,
10  no, I don't go to the cops. I'm not
11  going to complain about a cop and get a
12  guy arrested. I'm not doing it. That's
13  not who I am.
14        But should he have been
15  removed from the DMV at that point in
16  time, absolutely and he wasn't.
17      Q    Mr. Capogrosso, I'm bringing
18  up another document.
19        And can you see the
20  document? Can you see it okay,
21  Mr. Capogrosso?
22      A    Yeah. I can't see the whole
23  thing. You have to go down.
24      Q    Yeah, sure. Actually, let
25  me zoom out a little bit. Is that

Page 348

1        M.H. Capogrosso
2   easier?
3       A    Who wrote this? Wanda,
4   Wanda was a clerk.
5       Q    And this document is marked
6   or is Bates stamped DMV-0000061; correct?
7       A    Yeah, right. She's accusing
8   me -- okay. Go ahead.
9       Q    Do you recognize this
10  document?
11      A    Yeah. I see this document,
12  yeah.
13      Q    And what is it?
14      A    Wanda is accusing me of
15  telling a motorist to give a clerk an
16  attitude. I don't understand that. I
17  don't understand how I could tell a
18  motorist to give a clerk an attitude. I
19  mean that's just ridiculous.
20        MR. THOMPSON: Can we mark
21  this as Exhibit 21?
22        (The above-referred-to
23  statement was marked as Exhibit 21
24  for identification as of this date.)
25      A    I'm telling a motorist to

Page 349

1        M.H. Capogrosso
2   give a clerk an attitude? How do you
3   tell a motorist to give a clerk an
4   attitude?
5        This is the clerks I had to
6   deal with. I told the guy that I'm not
7   here to give -- now go ahead.
8       Q    So what's your recollection
9   of what happened in this incident on
10  October 29, 2014?
11      A    I never saw -- I was never
12  addressed with this issue. I never saw
13  this until I received this affidavit from
14  your office.
15        But she's telling me that I
16  told a guy that I'm -- to encourage the
17  motorist beforehand to give me an
18  attitude is what she's accusing me of
19  doing. Me, a lawyer, is telling a
20  motorist to go to the clerk and give the
21  clerk an attitude.
22      Q    Now what --
23      A    That's what your clerks are
24  accusing me of.
25      Q    But, sir, do you have,

57 (Pages 346 - 349)

Page 350

```
1        M.H. Capogrosso
2  sitting here today at the deposition, do
3  you have any independent recollection of
4  this?
5     A      No, absolutely not because I
6  wouldn't even know how to say that to a
7  motorist.  Go to a clerk -- no, I have no
8  knowledge of this.  I would not know how
9  to tell --
10    Q      So --
11    A      I would not know how to tell
12 a motorist to go give a clerk an
13 attitude.  I mean this is a clerk whose
14 got some issues.  I was --
15    Q      So did this happen?
16    A      I don't know.  No, it didn't
17 happen, number one and it's ludicrous.
18 How do you tell a motorist to give a
19 clerk an attitude and these are the
20 clerks I got to deal with.
21    Q      So is it Ms. Alford lying
22 here?
23    A      I did not tell a motorist to
24 give a clerk an attitude.  I did not.
25 That's a ridiculous friggon -- that's
```

Page 351

```
1        M.H. Capogrosso
2  a -- excuse my language.  That's a
3  ridiculous accusation against me,
4  ridiculous, but these are the type of
5  clerks I have to deal with.
6     Q      So the question was do you
7  believe that she's lying here?
8     A      I did not tell a motorist to
9  give a clerk an attitude.  I did not.
10 Now --
11    Q      I understand that, but yes
12 or no?
13    A      Maybe she -- I don't know
14 what she's thinking, but I did not tell a
15 clerk -- a motorist to give a clerk an
16 attitude.  First of all, I don't even
17 know how to do that or how a motorist
18 would know how to do that.  How would a
19 motorist know how to give a clerk an
20 attitude?
21    Q      So why would she write this?
22    A      I don't know.  I don't know.
23 They didn't want me there.  I don't know.
24 Maybe you got a bunch of crazy clerks
25 down there.
```

Page 352

```
1        M.H. Capogrosso
2     Q      Did Ms. Alford not want you
3  there?
4     A      Who's Ms. Alford?  Wanda?
5     Q      Wanda Alford who --
6     A      I don't know.
7     Q      -- wrote the letter.
8     A      I don't know.  This is the
9  first -- the first time I saw this
10 complaint that I have an opportunity to
11 respond to is when you sent it to me and
12 I don't even know how to respond to it.
13 I wouldn't know how to deal with this.
14 I'm accused of telling a motorist to give
15 a clerk an attitude.
16        MR. THOMPSON:  And,
17    Ms. MacDonald, if we didn't do that
18    already, let's mark that as Exhibit
19    21.
20    A      Is that threatening conduct
21 or verbal abuse?
22    Q      Mr. Capogrosso, can you see
23 the document that I just put up?
24    A      Yeah.  This is something
25 David Smart wrote.
```

Page 353

```
1        M.H. Capogrosso
2     Q      Do you recognize this?
3     A      Yeah.  I saw it when you
4  gave it to me, yes.  He signed something.
5  It's an unsigned note of David Smart.
6     Q      And this is -- this document
7  is marked Gelb-0000059; correct?
8     A      Yeah.
9     Q      What is this document?
10    A      Some type of complaint by --
11 on February 3, I don't know what year,
12 9:15 a.m.  Smarts telling me that I
13 deliberately walked into him.  I am --
14 there's a board --
15    Q      Mr. Capogrosso, I'm sorry,
16 we lost your audio for a second there.
17 Can you restate that?
18    A      Yeah.  This is -- I'm being
19 accused -- I'm being accused of walking
20 into a security guard.  Now, at the DMV
21 there's a board that was hanging up when
22 I was there and every day there was a
23 calendar on the board as in most
24 courthouses that tell you where each case
25 is going to be heard.
```

58 (Pages 350 - 353)

Page 354

M.H. Capogrosso

1  I go in the morning, right.
2  David would put up or somebody would put
3  up the calendar.  Most times it was David
4  Smart and in the afternoon he would take
5  it down.  So I have to go to the calendar
6  to look at the calendar because in the
7  morning there's a lot of people and
8  everybody's rushing around here and
9  there.  You have to know what courtroom
10  to go in.
11      So I'm walking to the
12  calendar and he tells -- and I'm trying
13  to go to the calendar and he tells me I
14  deliberately walked into him.  I mean
15  that's just stupid.  We are both working
16  in the same location.  We both have to go
17  to the calendar.  He has to hang it up
18  and I have to look at it.
19      I'm deliberately walking
20  into a security?  I have to work in this
21  courthouse.  I'm sorry.  As a lawyer I
22  have to go to the board and look at the
23  docket to see where my case is being
24  held.  This is what I'm being accused of,

Page 355

M.H. Capogrosso

1  deliberately walking into a guard.
2      We work in the same
3  building.  We both have to go to the --
4  to the board in the morning, to the
5  docket.  He has to hang it up.  I got to
6  look at it to see where my case is.
7  That's all I have to say about this.
8      Q    So is Mr. Smart lying?
9      A    That I deliberately walked
10  into him, yes, absolutely.  I don't
11  need --
12      Q    Why is he --
13      A    -- this beef with a security
14  guard.  I don't need a beef with a
15  security guard at a courthouse that I'm
16  trying to make a living at.
17      Q    And why do you think he's
18  lying?
19      A    I don't know.  Why would I
20  deliberately walk into a security -- I'm
21  going to the board to check the calendar.
22      Q    Did he have any animis
23  towards you?
24      A    I told you, I reported to

Page 356

M.H. Capogrosso

1  Gelbstein that he stole $80 and a $150
2  fee and I found that out when I got back
3  after taking my anger management course.
4  I told you that.  Cindy told --
5      Q    And --
6      A    And then I wrote to the
7  motorist.  The motorist confirmed it.  I
8  didn't go to the police because that's
9  not what I do.  I'm not going to get the
10  guy arrested.  Like maybe I should have
11  looking back on this thing now.
12      Q    And would you have --
13      A    Gelbstein investigated it.
14  Gelbstein admits to me that Smart said he
15  took the money and he gave it to me,
16  which is an absolute lie.  First of all,
17  I authorized nobody to take money on my
18  behalf, collect money on my behalf.  He
19  had no authority to collect a fee on my
20  behalf, this security guard, Smart and
21  Gelbstein believes it, that he gave me
22  the money.  Gelbstein believes this.
23      I told him the security
24  guard had no authority to take the money,

Page 357

M.H. Capogrosso

1  but he allows the security guard to stay
2  and then the harassment started and I
3  guess this is one of the ways he did it.
4  He's saying I deliberately walked into
5  him.
6      Q    And would it be correct to
7  say that you feel that Mr. Smart had a
8  grudge against you after this?
9      A    Absolutely, absolutely he
10  had a grudge.  He wouldn't let it go.  If
11  you steal, I'm going to report it.  It's
12  a theft.  It's a theft.  I am a lawyer.
13  I am an officer of the court.  You steal,
14  you're not stealing from me.  You're
15  stealing from that cab driver who $80 is
16  a lot of money to.
17      Q    And do you believe that he
18  wanted -- not he.  Do you believe that
19  Mr. Smart wanted to get rid of you --
20      A    Absolutely.
21      Q    -- because of this threat?
22      A    Absolutely.  He wouldn't
23  start the harassment.  I told you all the
24  incidents.  He gets in my face.  What's

59 (Pages 354 - 357)

Page 358

1      M.H. Capogrosso
2  the problem?  Fuck you, you're the
3  problem.  I told you that.
4      Q      One last question.
5  Mr. Capogrosso, this note is marked
6  February 3 at 9:15 a.m.  Do you recall
7  what year this was?
8      A      It was after.  I don't know.
9  It's the first time -- the only time I
10  saw this note is when you produced it to
11  me in discovery.  I assume -- I assume it
12  was after the incident with Brody because
13  that's when I reported the theft.
14      Q      After the incident with?
15  I'm sorry, I didn't quite hear that.
16      A      With Brody.  It was after I
17  came back in June of 2012 --
18      Q      Okay.
19      A      -- because that's when I
20  reported the theft.
21      Q      So, Mr. Capogrosso, I'm
22  going to bring up --
23          MR. THOMPSON:  Oh, and
24      actually before we are done, I don't
25      know if I marked that, but

Page 359

1      M.H. Capogrosso
2  Ms. MacDonald if we didn't please
3  mark that as Exhibit 22, that note.
4          (The above-referred-to note
5      was marked as Exhibit 22 for
6      identification as of this date.)
7      Q      Mr. Capogrosso, do you see
8  the document that I just put up?
9      A      Yeah, Paul Perez.
10  Absolutely, I remember this one.
11      Q      And do you recognize this
12  document?
13      A      Well, I recognize it because
14  you produced it.  I never saw it before.
15  Just the fact that you produced it.
16      Q      And this document is marked
17  Gelb-0000058; correct?
18      A      Yes.
19      Q      And it's your testimony that
20  you never saw this document before the
21  case; correct?
22      A      I never saw any of these
23  affidavits before this case.
24          MR. THOMPSON:  Ms.
25      MacDonald, can I ask you to mark this

Page 360

1      M.H. Capogrosso
2  as Exhibit 23?
3          (The above-referred-to
4      statement was marked as Exhibit 23
5      for identification as of this date.)
6      Q      And, Mr. Capogrosso, who is
7  Paul Perez?
8      A      What I remember, he was a
9  motorist that came down to the DMV.  I
10  did not represent him on any hearings
11  even though there's a work -- there's an
12  incident report that says I represented
13  him in court.  I never represented -- and
14  it could have been investigated and it
15  wasn't.  I never represented him on his
16  hearing.
17          He had a hearing before
18  Judge Walters, that I know because I was
19  sitting outside the courtroom.  He came
20  outside the courtroom while I was sitting
21  on the bench and I think he was with his
22  girlfriend and they asked me if I'm a
23  lawyer because I'm sitting there with a
24  suit on and my calendar and can you help
25  him write an appeal.  I said I'll take

Page 361

1      M.H. Capogrosso
2  the appeal.  He was very nice when I
3  first met him, very nice.  Sat down, I
4  said I'll take it on appeal.  Collect a
5  fee on the appeal.
6          I never represented him in a
7  courtroom.  I did not get his license
8  suspended.  I was not the -- I was not in
9  the courtroom with him.  I did not argue
10  his case.  I was hired to write the
11  appeal.
12          The next day he comes down.
13  He finds out that his license got
14  suspended.  This guy had a terrible
15  license, terrible.  He comes in, comes at
16  me, starts yelling at me.  I said here,
17  take your appeal -- take your appeal and
18  I gave him his money back.
19          No.  First thing he says
20  was -- is that he curses me out.  He says
21  I'm going to cut you with a knife and
22  slash the tires of your car.  I said I
23  didn't get your license suspended.  I'm
24  hired to write the appeal.  I'm going to
25  cut you -- his exact words, I'll never

60 (Pages 358 - 361)

Page 362

1        M.H. Capogrosso
2   forget it, I'm going to cut you with a
3   knife and I'm going to slash tires of
4   your car.
5        At that point I gave him his
6   money back on his appeal and he keeps
7   saying it to me, I'm going to cut you
8   with a knife, I'm going to slash the
9   tires of your car.
10        I look around for the
11   security guard. He's nowhere to be
12   found, Smart. Smart's not there. The
13   police officers are there, but they're
14   not doing anything about this.
15        At that point in time
16   Gelbstein told me if you got an unruly
17   client -- and I don't know if this guy's
18   got a knife on him or not, I really don't
19   know because there's no -- there's no
20   metal detectors coming into DMV. You
21   just walk in and out. You can carry
22   anything you want, guns, knives,
23   whatever.
24        Gelbstein told me if you got
25   a bad client, unruly client, you got to

Page 363

1        M.H. Capogrosso
2   go outside the courthouse and speak to
3   him outside, which I proceeded to do with
4   this guy. He just threatened me twice,
5   he's going to cut me with a knife and
6   slash the tires of my car. I said let's
7   go outside, we got to talk, which is what
8   Gelbstein told me to do and I obeyed.
9   That's what happened here.
10        And he didn't go out -- he
11   walked halfway and he turned around. I
12   obeyed what defendant Gelbstein told me
13   to do. I'm not going to be threatened
14   with a knife and tell me the tires of my
15   car were going to be slashed. The
16   security guard is nowhere to be found,
17   Smart. The police officers don't want to
18   get involved. It's not going to happen
19   to me.
20        And I obeyed what Gelbstein
21   did. I went out -- he said talk to him
22   outside. I said let's go talk outside,
23   which is what I did. That's what
24   happened here. And it could have been
25   investigated, that I was not in this

Page 364

1        M.H. Capogrosso
2   courtroom, I did not argue his case, I
3   did not get his license suspended. I did
4   not.
5        And the facts of this case
6   were never investigated, nor was my --
7   nor was I ever given an opportunity to
8   state what happened in this case.
9   Apparently --
10   Q    Mr. Capogrosso --
11   A    -- but Perez made a
12   statement.
13        Go ahead.
14   Q    Mr. Capogrosso, when Perez
15   writes that you were taking on a case for
16   him and, quote, "didn't live up to his
17   responsibility," what does he mean?
18   A    I have no idea. I don't
19   know. I don't know. The next day he
20   comes in, the day after he got suspended
21   in court, the day after Walters suspended
22   his license he comes in and tells me I'm
23   going to cut you with a knife and slash
24   the tires.
25        I didn't argue your case,

Page 365

1        M.H. Capogrosso
2   Mr. Perez. I didn't argue your case.
3   Here's your money back on the appeal. I
4   don't want you as a -- take your money
5   back. I'm not going to -- I'm not
6   going -- I'm not going to be threatened
7   by a client with a knife.
8   Q    Do you think -- do you think
9   he blamed you for the loss of his case at
10   the TVB?
11   A    I think he might have been
12   on drugs, seriously on drugs this guy
13   because when I met him for the first
14   time, he was a normal nice guy, normal,
15   had a normal conversation because I could
16   size up a guy pretty quickly. I've been
17   dealing with these clients for a long
18   time. I can size you up. He was normal
19   and nice. His girlfriend was nice.
20        The next day I'm cutting you
21   with a knife and I'm slashing the tires
22   of your car. That's the incident.
23   That's what happened.
24   Q    So his version of events
25   says that he told you he wanted another

61 (Pages 362 - 365)

Page 398

```
1              M.H. Capogrosso
2     Q      And what is this document?
3     A      Some complaint that Diantha
4  wrote about me and I'm saying the word
5  shit, which I wasn't.
6     Q      And this document is Bates
7  stamped DMV-0000003; correct?
8     A      Yes.
9     Q      So Ms. Fuller says that
10 since she came back to practice at the
11 TVB in September 2014, you would say shit
12 whenever she passed by you --
13    A      No.
14    Q      -- is that correct?
15    A      No.  I say eesha.  I say
16 eesha.
17    Q      You said what?
18    A      Eesha, eesha.  I was
19 practicing martial -- it's just something
20 I say to myself.  I say it quietly, I say
21 it under my breath.  It was never the
22 word shit.  It was the word eesha,
23 E-E-S-H-A.  I'm saying it for a long
24 time.  It gets me motivated.
25    Q      What --
```

Page 399

```
1              M.H. Capogrosso
2     A      It's just something I say.
3     Q      What does eesha mean?
4     A      It just means something to
5  me.  It keeps me motivated.  It's under
6  my breath.  It's very low.  It was never
7  the word shit.  It was never directed to
8  any person.  I say it to myself.  It
9  keeps me motivated.
10             There's no -- no prohibition
11 against speaking to yourself.  It's said
12 quietly.  It keeps me motivated.  It
13 means something to me.  I'm allowed to
14 say it.  If there was a problem with it,
15 all you had to do was tell me once, I
16 would never say it again, but it was not
17 the word shit and it was not directed to
18 her.
19    Q      So, in fact, she says that
20 she did say it was a problem.  She says
21 that on March 13, 2015 you passed by her
22 and said shit to her and she responded --
23 and she responded saying that you were
24 crazy and that she was sick of you saying
25 shit to her.
```

Page 400

```
1              M.H. Capogrosso
2     A      Well, I didn't say --
3     Q      Do you recall that
4  conversation?
5     A      I never said that word, no.
6  I never said the word.  No, she's -- I
7  never said the word.  I told you what I
8  said.
9     Q      Do you recall the
10 conversation where she --
11    A      No.  I do not.
12    Q      -- objected to you saying
13 it?
14    A      No.  She's verbally --
15 verbally swearing at me, that's not
16 appropriate.  I say the word eesha and
17 I'm allowed to say it and I'll continue
18 saying it.  There's nothing wrong with
19 it.  It means something to me.
20             Now, if there was a problem
21 with that --
22    Q      Okay.
23    A      -- you don't barrage me with
24 swear words.  You say Mr. Capogrosso,
25 what are you saying, can you please tell
```

Page 401

```
1              M.H. Capogrosso
2  me and if I -- and I would explain it to
3  her.
4     Q      And did you --
5     A      She didn't do that.  She
6  didn't do that.  What she did was a
7  barrage of swear words, telling me I'm
8  psycho and crazy.
9             Now, I'm allowed to say the
10 word because you are allowed.  It's
11 called freedom of speech.
12    Q      And when you said eesha,
13 what does eesha mean to you?
14    A      It means something to me.
15    Q      What does it mean to you?
16    A      It just means something to
17 me.  It keeps me motivated.
18    Q      Okay.  But you're saying it
19 means something and I'm asking you what
20 it means.
21    A      It's just a little something
22 I say.
23    Q      And what is the meaning of
24 the little something that you say?
25    A      It's a motivational phrase
```

70 (Pages 398 - 401)

1        M.H. Capogrosso
2   that I say to myself. I've been saying
3   it forever.
4     Q     Where does it come from?
5     A     It just comes from where it
6   comes from. I don't know where it comes
7   from. It just comes.
8     Q     It's just a thing that you
9   say for no reason at all?
10    A     It's a thing I say that
11  keeps me motivated, yes.
12    Q     And you would say it
13  whenever you walked by Ms. Fuller?
14    A     No. I would say it when I
15  was feeling kind of tired or a little --
16  a little fatigued because it's a
17  fatiguing day down there. It wasn't --
18    Q     And you said --
19    A     It was before anybody. I
20  would just be -- you know, I had a hard
21  day, I'd just keep moving and it just
22  keeping me motivated.
23    Q     And you see more that this
24  is signed by Mr. Tahir as well; correct?
25    A     Yeah. I'll tell you where I

1        M.H. Capogrosso
2   got it from. I was training in a martial
3   arts gym a long time ago when I was a
4   younger guy and the instructor used to
5   say it all the time that I was training
6   with me at the time and it kept us
7   motivated throughout the course
8   seriously.
9        So I'm not going to give you
10  his name, a man I trained with at the
11  time, but it was in a gym and he would
12  say it to keep us -- and after that, you
13  know, we were -- I picked up on it.
14        Does it have anything to do
15  with shit or talking to this woman who's
16  calling me a psycho and swearing at me,
17  no. It's something I picked up in a
18  martial art gym a long time ago when I
19  was training and he would say it. I
20  never questioned him what it meant, but
21  it kept us going.
22        So that's where I picked it
23  up from, but it was not the word shit and
24  it wasn't directed to anybody.
25    Q     If this behavior were true,

1        M.H. Capogrosso
2   and I know you don't think it is, but if
3   you were saying shit to another attorney
4   every time you walked past her, would
5   that justify your exclusion from the TVB?
6     A     I'm not going to -- I'm not
7   going to get into hypotheticals. I don't
8   know. I didn't -- first of all, I didn't
9   say the word shit. Ask me what I said.
10  Don't swear at me with a barrage of swear
11  words and tell me I'm a psycho. Just
12  talk to me and --
13    Q     And you --
14    A     -- I'll tell her. Like I
15  told you, I would tell her.
16    Q     You had been warned by --
17    A     I told you. Like I told
18  you, I would tell her.
19    Q     Mr. Capogrosso, you had been
20  warned by the DMV that verbal abuse could
21  get you expelled; correct?
22    A     There was no verbal abuse
23  here, I'm sorry, there wasn't.
24    Q     I know you don't think so,
25  but the question is had you been warned

1        M.H. Capogrosso
2   before that verbal abuse could get you
3   expelled?
4     A     I saw the letter to that
5   effect. There was no verbal abuse.
6     Q     So were you worried after
7   this complaint from Ms. Fuller and
8   Mr. Tahir and this incident with
9   Ms. Fuller that you would be expelled
10  from the TVB?
11    A     No, because there was no
12  verbal abuse. It's called freedom of
13  expression. There was no verbal abuse --
14    Q     So were --
15    A     -- so stop making -- there
16  was no verbal abuse.
17    Q     Were you worried that this
18  incident would lead to your expulsion?
19    A     I'm allowed -- you know,
20  people pray all day. They say various
21  prayers. I'm down at the DMV, there's
22  guys praying. They're allowed to pray.
23  I'm allowed to say a word to myself
24  quietly under my breath. There was no
25  verbal abuse.

71 (Pages 402 - 405)

Page 410

M.H. Capogrosso

1       M.H. Capogrosso
2  Smart, the constant harassment by Smart
3  and I don't want an incident on this
4  floor and I'm seeing what's happening.
5  This guy, Smart, is provoking me into a
6  fight. He gets in my face. What's the
7  problem? Fuck you, you're the problem.
8  Because I complained about him stealing
9  $80 and a fee and he's allowed to remain
10  by Gelbstein. Vahdat's not --
11    Q   So --
12    A   Go ahead. Vahdat's not
13  listening to me.
14    Q   Mr. Capogrosso, was
15  Ms. Elizabeth Prickett-Morgan part of
16  DMV?
17    A   I said let me call -- let me
18  write a letter to the Attorney General's
19  office, that's all I said to myself. I
20  think that was the correspondence address
21  when I looked you up on the website.
22    Q   So -- and so did you file
23  this believing that Elizabeth
24  Prickett-Morgan was the Attorney General
25  of New York State?

Page 411

1       M.H. Capogrosso
2    A   I filed it with the Attorney
3  General of New York State and when I
4  looked you up on the website, that was
5  the correspondence address that I found
6  to correspond with.
7    Q   So --
8    A   I looked you up to send it
9  in and they put her name there, so that's
10  the one I used.
11    Q   So what's, you know, what's
12  the connection between the Attorney
13  General's office and DMV?
14    A   The Attorney General's
15  office represented DMV in my Article 78
16  proceeding, right.
17    Q   But hadn't --
18    A   They're the lawyers.
19    Q   Hadn't the Article 78
20  proceeding been over for three years by
21  this point?
22    A   Yeah, but they're the ones
23  who put all these conditions on me, right
24  and I had to act in a certain way, right,
25  even though other attorneys were verbal

Page 412

1       M.H. Capogrosso
2  abusing me is acceptable or using swear
3  words is acceptable or calling me a
4  psycho, Diantha Fuller, which is
5  acceptable.
6    So I don't want an incident.
7  The basis of this letter is this, I don't
8  want another incident at the TVB. I
9  don't want anything to happen to me,
10  right. I don't want an incident.
11    You gave me this letter. No
12  verbal abuse, threatening physical
13  conduct. I'm trying to be, you know, a
14  perfect gentleman, which is what I was,
15  right. I'm trying to do the right thing.
16  I'm trying to be a perfect gentleman,
17  handle my cases, do what I have to do.
18    I'm seeking relief here.
19  Gelbstein, when I complain about Smart,
20  he laughs and giggles and tells me a
21  spade is a spade. So let me call the
22  Attorney General's office who sent me
23  this letter, who represented me in the
24  Article 78, who gave me all these
25  conditions and tell her what's going on

Page 413

1       M.H. Capogrosso
2  down here.
3    Q   But Elizabeth
4  Prickett-Morgan --
5    A   And your office does not
6  seem to care. They lose it in their
7  mailroom. They lose it they eventually
8  find it. They don't respond to it. They
9  don't give me any response to it and
10  Smart approaches me in the morning on
11  May 11.
12    Q   Elizabeth Prickett-Morgan
13  didn't represent DMV in your case; did
14  she?
15    A   I don't know. You would
16  have to talk to my attorney, Chris
17  McDonough, on this. I don't know who
18  did.
19    When I looked you up on
20  the -- on Google for a correspondence
21  address, Prickett-Morgan's name was
22  attached to it. That's why I wrote that.
23    Q   Did you speak with an
24  attorney about filing this letter?
25    A   No.

73 (Pages 410 - 413)

Page 414

M.H. Capogrosso

1    Q    Did you speak with
2    Mr. McDonough?
3    A    No. Chris did tell me if
4    you sneeze the wrong way, they're going
5    to throw you out again.
6    Q    So I guess my question is
7    you wrote this letter to the office that
8    represented DMV in the case three years
9    ago to an attorney who wasn't even on the
10   case.
11        Why do you think anyone
12   would care about this letter?
13   A    I'll say it again, the
14   Article 78 you gave me all these
15   conditions, right, in that letter, that
16   was from your office, no verbal abuse, no
17   threatening of physical contact or
18   conduct, right. That was from your
19   office, right, from your office, the
20   Attorney General's office. I did not
21   deal with the Attorney General's office.
22   Chris McDonough dealt with the Attorney
23   General's office.
24        I'm trying to adhere to all

Page 415

M.H. Capogrosso

1    of these rules and regulations
2    specifically put on me, on me, that I had
3    to deal with now and I'm getting all this
4    harassment by Smart because I reported a
5    theft. I go to Gelbstein. Gelbstein
6    doesn't want to hear it. He laughs and
7    giggles, tells me a spade is a spade
8    concerning Smart.
9         Who else do you want me
10   writing to? If I'm supposed to adhere to
11   the conditions that you put on me, the
12   Attorney General's office, I got to go to
13   the Attorney General's office, say how do
14   I -- what do I do in this situation?
15        I can't adhere if I've got a
16   security guard who doesn't want to leave
17   me alone.
18   Q    So, Mr. Capogrosso, you
19   testify a moment ago that you wrote this
20   letter because you were worried that
21   there would be an incident?
22   A    Absolutely.
23   Q    Can you tell me what you
24   mean by that?

Page 416

M.H. Capogrosso

1    A    I said this guy Smart
2    wouldn't stop. I went into detail with
3    it and Gelbstein's giving me no
4    protection. He's not telling this guy --
5    or he's incapable, incompetent or
6    complicit, I state that. Smart will get
7    in my face, what's the problem? Fuck
8    you, you're the problem. He gives me the
9    sign of the cross and a spear hand. He
10   bumps into me.
11   Q    And were you worried that
12   this incident --
13   A    Then the incident happens.
14   On May 11 this guys comes again. He
15   comes, he gets in my face again. I put
16   up my hand. I tell him to back up.
17   Q    Let me ask you,
18   Mr. Capogrosso, when you wrote this
19   letter were you worried that this
20   incident would be used to justify your
21   expulsion from the TVB?
22   A    Would I -- I saw something
23   coming. I saw something coming. This
24   guy Smart didn't want to stop. I don't

Page 417

M.H. Capogrosso

1    know if Gelbstein -- I think Gelbstein
2    was putting him up to it. I really
3    believe Gelbstein was putting --
4    Gelbstein wanted me out. I really think
5    Gelbstein wanted me out of here and --
6    Q    And that's --
7    A    -- I think Gelbstein put
8    Smart up to it, I really do believe that,
9    because he didn't look at the videotape.
10   On the morning of May 11, he was
11   conveniently not in the DMV, just not
12   there. He was not in the TVB, in the
13   Brooklyn TVB conveniently.
14        I think he put this guy
15   Smart up to it. He wanted me out and I
16   saw it coming and I'm seeking --
17   Q    Is that part --
18   A    -- relief. I'm seeking
19   relief. I'm seeking for somebody to
20   allow me just to practice law like every
21   other lawyer.
22   Q    And is that part of why you
23   wrote the letter?
24   A    I'm seeking relief from your

74 (Pages 414 - 417)

Page 426

1 M.H. Capogrosso
2 MR. THOMPSON: Ms.
3 MacDonald --
4 MS. REPORTER: Yes. Let's
5 take a five minute break.
6 MR. THOMPSON: Sure. That's
7 fine. We'll be back at 4:33.
8 MR. VIDEOGRAPHER: The time
9 is 4:28. We are off the record.
10 (A short recess was taken.)
11 MR. VIDEOGRAPHER: The time
12 is 4:33. We are on the record.
13 Q Mr. Capogrosso, you still
14 see that we have Exhibit 28 up?
15 A Yes.
16 MR. THOMPSON: And,
17 Ms. MacDonald, in case we didn't mark
18 it as Exhibit 28, let's please do
19 that.
20 Q You write in this letter
21 that upon completion of the anger
22 management course you were allowed to
23 practice law in all DMV courts on an
24 equal and unbiased standing with all
25 other attorneys in the DMV; is that

Page 427

1 M.H. Capogrosso
2 correct?
3 A That was my assumption, yes.
4 Q You say it was your
5 assumption. What do you mean by that?
6 A I'm a lawyer. I'm licensed
7 in the State of New York. I should be
8 treated like every other lawyer. I see
9 no reason why I shouldn't be. I should
10 be held to the same standard as every
11 other lawyer practicing, no different. I
12 took my course that I needed to take. I
13 should be held on the same standard as
14 every other lawyer.
15 Q But, in fact, you weren't
16 quite on the same standing because you
17 had been warned that any further incident
18 would lead to your expulsion; isn't that
19 true?
20 A Well, that was an improper
21 warning in my opinion. I should be
22 treated like any other lawyer, any other
23 lawyer.
24 Q So why was it improper for
25 DMV to warn you that further incidents

Page 428

1 M.H. Capogrosso
2 would lead to an expulsion?
3 A Well, I don't know why they
4 threw that letter to me. Like I said,
5 they threw it at me two days before I was
6 to go back to the DMV. I agreed to
7 nothing but to take an anger management
8 course, that's it.
9 Q Well, once again --
10 A I took the course. I should
11 be treated like every other lawyer, not
12 on a special, you know, special -- I
13 should be treated like every other
14 lawyer. That's all I agreed to was take
15 a course.
16 I wouldn't have agreed to
17 anything else if I knew this letter was
18 going to be thrown at me.
19 Q Mr. Capogrosso, you write
20 that "On numerous occasions your security
21 guard Dave Sparks told me to go F
22 myself."
23 A I didn't know his name at
24 that point. It's Smart, not Sparks. I
25 didn't know his last name.

Page 429

1 M.H. Capogrosso
2 Q How did you not know his
3 last name at this point?
4 A I didn't know it.
5 Q You had been interacting
6 with him for years you said.
7 A We all knew him by David. I
8 never talked to him about his last name.
9 I know people said S Smart something or
10 Smarks or something. I thought it was
11 Sparks.
12 I knew him -- I knew him as
13 the security guard, that's it. I know
14 his first name was David.
15 Q When you --
16 A That's what I knew.
17 Q When you write,
18 Mr. Capogrosso, when you write "Will
19 provide proof upon request," what proof
20 would you have provided?
21 A I sent you all my letters,
22 all my -- all the complaints I filed with
23 Gelbstein.
24 Q So the proof would have been
25 your own letters to Judge Gelbstein?

77 (Pages 426 - 429)

M.H. Capogrosso

1  writes later that he left the room and
2  that the issue of don't touch my fucking
3  stuff was an ongoing issue all day.
4  Quote, "And I witnessed Mario Capogrosso
5  yelling at Mr. Tahir to not touch his
6  fucking stuff."
7       Q       Does that refresh your
8  recollection at all about --
9       A       No.
10      Q       -- what happened on May 5?
11      A       No.  What I remember on
12  May 5 was one thing.  I walked in that
13  attorneys' room to sit on a chair.  It
14  was at the end of the day, to sit on a
15  chair or maybe I placed my bag on the
16  chair and Tahir said this is my chair and
17  get your stuff off it or don't sit on it,
18  but I know it involved Tahir's chair that
19  nobody was allowed to touch.
20      And maybe I put my bag on
21  the chair for a minute or I sat on the
22  chair for a minute or something to that
23  effect, but that was it and Tahir thought
24  that this chair, he owned the chair in

*(Note: line numbering realigned below)*

M.H. Capogrosso

1  the room.
2       Q       Mr. Beer writes --
3       A       That's what happened on May
4  5.
5       Q       So you never had an
6  altercation with Mr. Beer?
7       A       Not that I recall, no.  Beer
8  was a nice guy.  He was a really nice
9  guy.
10      Q       So why -- so you said that
11  he was lying about this.  Why would
12  Mr. Beer lie?
13      A       I don't know why.  I know
14  what happened that day.  I know exactly
15  what happened.  There was a chair there.
16  I wanted to sit down in the chair.  I
17  wanted to make a phone call.  I was
18  tired.  Maybe I stood up and put my bag
19  on the chair because there was nowhere
20  else to put the bag.  Maybe I was still
21  on the phone and Tahir comes in and gets
22  all upset and maybe Tahir was trying to
23  move my bag, I don't know, off his
24  personal chair because nobody was allowed

M.H. Capogrosso

1  to touch his chair.
2       And this is an attorneys'
3  room for all the attorneys, but nobody's
4  allowed to touch his chair or put
5  anything on his chair.  So maybe I told
6  Tahir leave my bag alone.
7       Q       Did you --
8       A       But did I use those words,
9  no, I never said that, no.
10      Q       Mr. Beer writes that you
11  started ranting that guy, alluding to
12  Gelbstein, threw out Chuck Willinger and
13  now Chuck Willinger is dead.  What does
14  that mean?
15      A       Well, Willinger was an
16  attorney when I first started.  I have to
17  read it.  Can you go back up?
18      Q       Sure.
19      A       Go back up.
20      Willinger was an attorney.
21  I never said for the judge to put a gun
22  to his head.  Willinger was a guy that
23  was a lawyer down at the Brooklyn TVB
24  when I first got there and he had some

M.H. Capogrosso

1  issues, Mr. Willinger.  To say the least,
2  he had some issues and he wasn't -- he
3  was -- as I understand it, eventually we
4  became friends me and him, as I
5  understand he had issues with drugs, a
6  lot of drugs.
7       And he was making money at
8  the start, but then he got involved with
9  cocaine and he winds up committing
10  suicide.  They found him dead on his bed
11  one day.
12      Q       Sorry.
13      A       He wasn't showing up for
14  cases because he was on so much drugs.
15  He wasn't showing up and Gelbstein threw
16  him out because he wasn't showing up for
17  some reason.  I don't know why he threw
18  the guy out of the DMV.
19      And he never gave the guy a
20  hearing.  Never gave him an opportunity
21  to at least, you know, give him a chance.
22      Q       Is there an entitlement to a
23  hearing if you're thrown out of the DMV?
24      A       Oh, no.  It's my personal

M.H. Capogrosso

1       Are they all lying about
3 you?
4    A    Now, Kimberly Rivers would
5 have been -- I don't know. Let's address
6 them one at a time. I told you what
7 happened that day. I told you what
8 happened that day. I was in the
9 attorneys' room, there was a chair in the
10 attorneys' room. I'm telling you what
11 I -- what I recall. Either I sat on the
12 chair or I put my bag on the chair.
13 Tahir thought this is only his chair,
14 that nobody could touch it. He walks in
15 the room, starts moving my -- tells me
16 to -- and I'm sitting in the chair.
17       At some point I might have
18 gotten up and put my briefcase on it and
19 he starts moving my briefcase. I said
20 don't touch my briefcase and he shouldn't
21 have touched it. He shouldn't have
22 touched it. He doesn't own the chair in
23 the lawyers' room. He doesn't own it.
24    Q    So Mr. Capogrosso --
25    A    Now, what would you -- the

M.H. Capogrosso

2 man should not have put his hands on my
3 briefcase if that's what he did on that
4 day, but I was in the -- I was either
5 sitting on his chair or my briefcase was
6 on his chair and I'm making a phone call
7 to a client and I'm telling the other
8 lawyer leave my briefcase alone, that I
9 probably said or I was sitting on his
10 chair, which I had a right to do.
11    Q    Mr. Capogrosso, if -- and I
12 know you don't believe that it's true and
13 I know you don't agree, but if everything
14 that these four people said about you was
15 true and you had been yelling and cursing
16 at people about moving your stuff and
17 saying that the judge should put a gun to
18 his head, would those be grounds to expel
19 you from the TVB?
20    A    No. First of all, I'm not
21 going to talk about hypotheticals because
22 none of that that they're saying
23 happened. I told you exactly what
24 happened that day. I'm not going to deal
25 in hypotheticals. I know what happened

M.H. Capogrosso

2 that day. I was there. I was there.
3    Q    Let me --
4    A    I know what happened.
5    Q    Let me you ask a question.
6    A    Well, let me ask you a
7 question. Tahir said the word mother
8 fucker throughout the day. He doesn't
9 get removed. He said the word mother
10 fucker to everybody and everyone, every
11 client sometimes. He says mother fucker
12 judge this, he got a bad hearing. He
13 says it all the time.
14       Diantha Fuller cursed me
15 out. She curses. Are they being removed
16 from the Brooklyn TVB, no. No, they're
17 not. So what is their basis? Attorneys
18 curse all the time if it's not on -- they
19 do it at -- they curse all the time down
20 there. I'm sorry --
21    Q    So let me ask you --
22    A    -- but I don't see any other
23 attorney getting thrown out.
24    Q    Mr. Capogrosso, let me ask
25 you the question if I may. I have a

M.H. Capogrosso

2 question for you. What conduct or
3 behavior would justify someone being
4 expelled from the TVB?
5    A    I have no idea. I don't
6 know. I didn't verbally abuse anybody.
7 I used the word eesha, eesha.
8    Q    So --
9    A    That's not verbal abuse.
10 Imagine I said stay away from my stuff, I
11 don't think that's verbal abuse. Maybe I
12 sat in somebody's chair. That's not
13 verbal abuse. I didn't threaten anybody
14 with any physical conduct -- with any
15 physical -- with anything.
16    Q    So --
17    A    I didn't threaten anybody.
18    Q    -- Mr. Capogrosso --
19    A    I don't know.
20    Q    You don't know what standard
21 of behavior -- you don't know what
22 infractions would justify someone being
23 expelled from the TVB?
24    A    Well, have the same standard
25 for everybody. Have the same standard

McDONOUGH & McDONOUGH, LLP
COUNSELORS AT LAW

401 Franklin Avenue, Suite 210
Garden City, New York 11530

(516) 333-2006
FAX (516) 333-0200
NEWYORKETHICSLAWYER.COM

January 25, 2012

Barbara J. Fiala, Commissioner
Department of Motor Vehicles
6 Empire State Plaza
Albany, New York 12228

Re:     Improper Expulsion of Mario Capogrosso, Esq.

Dear Ms. Fiala:

This office represents Mario Capogrosso, Esq. In connection with his unilateral expulsion from the Brooklyn South DMV Adjudication center, and suspension from all DMV Adjudication centers. The purpose of this submission is to request reconsideration of the decision of December 23, 2011, as that decision was arbitrary and capricious, violated his constitutional rights of due process and has severely impacted his professional and personal lives.

Mr. Capogrosso has been practicing in the New York State Department of Motor Vehicle adjudication centers since 1995. He has mainly practiced in the Brooklyn South location. He has practiced by zealously representing his clients and has never had any founded complaints or grievances regarding his work. He has had nothing but a stellar record and his practice has grown as his clients appreciate his hard work and routinely seek out his representation.

On December 22, 2011, Mr. Capogrosso was in the attorneys' room at the Brooklyn adjudication center. He put his coffee down to the side of a table and thereafter asked another attorney, who regularly practices at the same center, Yakov Brody, Esq., "Excuse me, can I get my coffee." Out of nowhere Mr. Brody started screaming and spewing ethnically based expletives at Mr. Capogrosso; which will not be repeated here. Mr. Brody was yelling at the top of his voice. Mr. Capogrosso backed away, but thereafter Mr. Brody again began screaming racially expletives at him without cause. Feeling attacked Mr. Capogrosso responded in kind. While Mr. Capogrosso realizes his outburst was uncalled for and unprofessional, and is extremely shameful that he stooped to the level of his attacker, his response was in retaliation to the out of the blue verbal attack by Mr. Brody, which started the whole situation.

One of the managers of the center, Danielle, heard the exchange (again, Mr. Brody was yelling at the top of his lungs) and came into the room. In front of Mr. Cappagroso She stated "now's our chance to get rid of him", referring to Mr. Capogrosso. After she and Mr. Brody had left the room, Jeffrey Myers, Esq. then entered the room and sat where Mr. Brody had been sitting. He told Mr. Capogrosso that he overheard the exchange and said that Mr. Capogrosso should have hit Mr. Brody. Mr. Capogrosso responded "This is what I would have done" and punched the air. He **never** punched anyone or touched anyone during this whole exchange.

DMV-0000226

EXHIBIT
Exhibit 13

Meanwhile, apparently Mr. Brody and Danielle had called both the police and Bushra Vahat, the supervising Administrative Law Judge, with regard to the situation. The police and Ms. Vahat obtained affidavits from everyone in the courtroom, even people who did not witness the exchange. They did **not** take a statement from Mr. Capogrosso or ask for his version of events.

The next day, December 23, 2010, Mr. Capogrosso arrived at the Brooklyn South center ready to work for the clients he was meeting there. When he arrived he encountered chaos. There were "police" in the courtroom taking affidavits from attorneys who were not even present the day before. Judge Gelpstein, the supervising Administrative Judge of the center, met Mr. Capogrosso in the courtroom and asked to see him in his office. When Mr. Capogrosso arrived in the office there were two "officers" in blue uniforms and Judge Vahat in the office. Mr. Capogrosso was told by Judge Gelpstein "You have to leave and if you come back here you are going to be arrested." Judge Vahat added "If you go into any Department of Motor Vehicle center you are going to be arrested." After Judge Vahat proclaimed this ad hoc expulsion, Mr. Capogrosso started to speak and ask what was going on. Judge Vahat told him that he wasn't wanted there and to get out. Mr. Capogrosso left the Brooklyn South adjudication center immediately thereafter.

Two weeks later Mr. Capogrosso contacted Judge Vahat and asked her to explain her determination. She advised that if Mr. Capogrosso was "good" and "stayed quiet" she would *reconsider* her determination three months later, and at that time determine *if* he can go back *into other* Department of Motor Vehicle adjudication centers, but he would **not** be allowed back into the Brooklyn South center. She further stated that he *might* eventually work his way back into the Brooklyn South center, but for an *indefinite* period of time he was prohibited from entering that center.

Mr. Capogrosso's livelihood is based in the Brooklyn South adjudication center. That is where his clients are, that is where the cases he handles are venued. He has approximately 496 clients currently, and someone has to appear on their matters. This illegal and improper prohibition is preventing Mr. Capogrosso from representing his clients and has deprived him of his livelihood. Since the date of this incident and determination, Mr. Capogrosso has been forced to hire other attorneys to handle his cases in the Brooklyn South center so that no defaults or other negative results occur.

To date, Mr. Capogrosso has not received anything in writing with respect to this determination. Moreover, as stated above, no hearing was ever conducted in connection with this matter nor was Mr. Capogrosso even heard with respect to the facts surrounding the incident that led to the determination to prohibit Mr. Capogrosso from the adjudication centers. Clearly, the determination of Judge Gelpstein and Judge Vahat was arbitrary and capricious and violated Mr. Capogrosso's constitutional due process rights.

This matter is akin to that in *Lindemann v. American Horse Shows Association*, 164 Misc.2d 937, 624 N.Y.S.2d 723 (Sup.Ct. N.Y.Cty. 1994). In *Lindemann* the defendant banned members from participation in equestrian sporting events, initiated after the members' indictment for alleged participation in a scheme to electrocute horses. The Court therein held "[u]nder New York law a fair hearing involving the possible suspension of a property right is 'an obligation imposed … by those fundamental principles of basic justice and fair play which underlie our entire system of jurisprudence (citation omitted)." *Id* at 730. Moreover, the Court found that "[t]here can be no fair and impartial hearing unless the person charged is accorded a meaningful opportunity to respond to the charges and to rebut them." *Id* at 731. "As noted by our Court of Appeals in *Saumell v. N.Y. Racing Association, Inc.*, 58 N.Y.2d at 242, supra, while the association "was not obligated to resolve questions of credibility

**JSA-301**

DMV-0000227

before denying petitioner access to its facilities, the evidence ... was at best equivocal and, in light of the 20-day delay and importance of access to petitioner's livelihood, an insufficient basis for exclusion without a hearing." *Id* at 733.

In the instant matter, Mr. Cappagosso was similarly banned indefinitely from his livelihood, without a hearing and without decision makers even hearing Mr. Capogrosso's side of the story. No affidavit was taken from Mr. Capogrosso nor was he entitled to view the alleged 'evidence' against him. Yet, summarily, the supervising Administrative Judges banned him from entering the centers at which he practices law.

Putting aside the violation of Mr. Capogrosso's constitutional rights in the matter, and the arbitrary and capricious nature of the determination, the penalty imposed was so disproportionate to the alleged offense as to shock the conscience. If sanction imposed 'shocks the judicial conscience" it "constitutes an abuse of discretion as a matter of law" (citations omitted). *Diefenthaler v. Klein*, 27 A.D.3d 347, 811 N.Y.S.2d 653 (1st Dept. 2006). In the instant matter, the expulsion of Mr. Capogrosso from all adjudication centers for a three month period of time and from the Brooklyn South center at which he makes his living indefinitely based upon the incident that occurred is shocking to the conscience and clearly an abuse of discretion. Mr. Capogrosso did not start the verbal assault. While he now recognizes that he shouldn't have verbally struck back, it was not he who first used ethnic comments and profanity in a professional setting. Indeed, Mr. Brody was not punished in the same way (or at all), yet he created this whole situation and made similar types of improper comments. Moreover, while Mr. Capogrosso realizes he should not have even intimated how he would have punched by swinging at the air, he did not touch or strike any person; a demonstration which took place when Mr. Brody was not in the room.

In sum, Mr. Capogrosso was verbally attacked while merely trying to do his job. He reacted to the attack and went on the defensive. The situation never should have occurred, and unfortunately escalated out of control - but this situation occurred due in no part to the actions of Mr. Capogrosso. He was the victim of a horrible verbal assault; yet he has been the one prejudiced. To ban him from entering any adjudication center for three months and from indefinitely entering the Brooklyn South center where he earns his livelihood is so disproportionate to the offense it is shocking and abusive.

By reason of all of the foregoing, it is respectfully requested that the prohibition imposed upon Mr. Capogrosso be reversed. He should be allowed to enter any adjudication center he needs to in order to continue representing his clients forthwith.

As this matter has had a direct and substantial impact upon Mr. Capogrosso's practice and income, we await your prompt response to this submission.

Very truly yours,

Chris McDonough

CGM/hs

**JSA-302**

DMV-0000228

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------X

In the Matter of an Article 78 Proceeding      Index No. 7739 /12

MARIO CAPOGROSSO,        **VERIFIED PETITION**

            Petitioner,

      -against-

NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

            Respondent.

-------------------------------------------------------------------X

     Petitioner, MARIO CAPOGROSSO, by his attorneys, MCDONOUGH &

MCDONOUGH, LLP, petitioning the court, allege upon information and belief:

     1.      That at all times hereinafter mentioned, petitioner, MARIO

CAPOGROSSO (hereinafter "CAPOGROSSO"), was and still is a resident of the State

of New York.

     2.      That at all times hereinafter mentioned, respondent, the NEW YORK

STATE DEPARTMENT OF MOTOR VEHICLES, was and is a department, agency or

board with powers and duties derived from the laws of the State of New York.

     3.      In accordance with the laws of the State of New York, the Traffic

Violations Bureau was and is an agency that was created to assume jurisdiction over

traffic infractions.

     4.      That in accordance with the powers given to it by the laws of the State of

New York, the Traffic Violations Bureau maintains adjudication centers throughout the

3

**EXHIBIT**

Exhibit 14

State of New York including, including an adjudication center in Brooklyn South which handles traffic infraction matters.

5.      On September 22, 2004, CAPOGROSSO was admitted to practice law in the Appellate Division Second Department and is and was at all relevant times an attorney in good standing.

6.      In or about 2005, CAPOGROSSO began practicing as an attorney in the Traffic Violations Bureau representing individuals and corporations charged with various traffic infractions.

7.      The majority of CAPOGROSSO'S work takes place in the Traffic Violations Bureau adjudication center located in Brooklyn South.

8.      From the onset of his practice in the Traffic Violations Bureau adjudication centers, CAPOGROSSO has zealously represented his clients and has never had any founded complaints or grievances regarding his work.  He has had nothing but a stellar record and his practice has grown in his chosen area of practice as his clients appreciate his hard work and routinely seek out his representation and refer him to others.

9.      On December 22, 2011, CAPOGROSSO was in the attorneys' room at the Brooklyn South Traffic Violations Bureau adjudication center when an altercation took place between another attorney and himself.

10.     Shortly after entering the attorneys' room, CAPOGROSSO put his coffee cup down to the side of a table and thereafter asked another attorney, Yakov Brody, Esq., who regularly practices at the same center, "Excuse me, can I get my coffee."

4

11.     In response, and without provocation, Mr. Brody started screaming and spewing ethnically based expletives at CAPOGROSSO; which will not be repeated herein. Mr. Brody was yelling at the top of his voice. CAPOGROSSO initially walked away in an effort to end the onslaught, but Mr. Brody resumed his rant of racially charged expletives at CAPOGROSSO, for which Mr. Brody had no cause. At this point of the continuing attack, CAPOGROSSO responded in kind.

12.     CAPOGROSSO realizes his outburst was ill considered and unprofessional and he is extremely ashamed at his resort to lowering himself to the level of his attacker. However, his response was a reaction to an unprovoked and relentless ethnic and vile verbal attack by Mr. Brody, which Mr. Brody initiated without cause and refused to end even when CAPOGROSSO backed away from the initial attack.

13.     One of the managers of the Brooklyn South center, Danielle Calvo, heard the exchange (again, Mr. Brody was yelling at the top of his lungs) and came into the room. In front of CAPPOGROSO she stated: "Now's our chance to get rid of him", referring to CAPOGROSSO.

14.     After Ms. Calvo and Mr. Brody had left the room, Jeffrey Myers, Esq. entered the room and sat where Mr. Brody had been sitting. He told CAPOGROSSO that he overheard the exchange and told CAPOGROSSO that he would have been justified in striking Mr. Brody. CAPOGROSSO responded in the heat of the moment: "This is what I would have done" and punched the air.

15.     CAPOGROSSO never punched anyone or touched anyone during the entire exchange.

5

16.    Meanwhile, apparently Mr. Brody and Ms. Calvo had called the police and Bushra Vahat, the supervising Administrative Law Judge, with regard to the situation.

17.    The police and Judge Vahat allegedly obtained affidavits from everyone in the courtroom; including people who did not even witness the exchange.

18.    Neither Judge Vahat nor the police took any statement from CAPOGROSSO regarding his version of the events.

19.    The next day, December 23, 2010, CAPOGROSSO arrived at the Brooklyn South adjudication center ready to appear for the clients he was meeting there. When he arrived he encountered chaos. There were "police" in the courtroom taking affidavits from attorneys who were not even present the day before.

20.    Senior ALJ Gelbstein, the supervising Administrative Judge of the center, met CAPOGROSSO in the courtroom and asked to see him in his office. When CAPOGROSSO arrived in the office there were two "officers" in blue uniforms and Judge Vahat in the office. CAPOGROSSO was told by Judge Gelpstein "You have to leave and if you come back here you are going to be arrested." Judge Vahat added "If you go into any Department of Motor Vehicle center you are going to be arrested."

21.    After Judge Vahat proclaimed this *ad hoc* expulsion, CAPOGROSSO started to speak and ask what was going on. Judge Vahat told him that he wasn't wanted there and to get out. CAPOGROSSO left the Brooklyn South adjudication center immediately thereafter.

22.    CAPOGROSSO never received anything in writing with respect to this *ad hoc* ban issued by Judge Vahat and Judge Gelbstein without benefit of any hearing of any sort, which ban applied not only to the Brooklyn South adjudication center, but

6

purportedly to all Traffic Violations Bureau adjudication centers, until a letter response
was received on February 8, 2012 (described in more detail below).

23.    Two weeks after the December 23, 2011 ouster, CAPOGROSSO
contacted Judge Vahat and asked her to explain her determination.  She advised that if
CAPOGROSSO was "good" and "stayed quiet" she would reconsider her determination
in three months, and at that time determine *if* he could go back *into other* Department of
Motor Vehicle adjudication centers, but that she would not allow him to practice again in
the Brooklyn South center at that time.

24.    She further stated that he *might* eventually work his way back into the
Brooklyn South center at some unspecified date in the future, but that for an *indefinite*
period of time he was prohibited from entering that center.

25.    By letter dated January 25, 2012, CAPOGROSSO'S counsel wrote to the
Commissioner of the NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES
advising that the handling of matters on December 23, 2011 and the ban on
CAPOGROSSO'S right to practice law in Brooklyn South adjudication center without an
unbiased investigation and the right to be heard before and unbiased arbiter on the
issues, was arbitrary and capricious, and violated CAPOGROSSO'S constitutional right
to due process of law.   A copy of that correspondence dated January 25, 2012 is
annexed hereto as **Exhibit "A"**.

26.    By letter dated February 8, 2012, the NEW YORK STATE DEPARTMENT
OF MOTOR VEHICLES responded to CAPOGROSSO'S request for reconsideration
advising that it was adhering to the decision to ban CAPOGROSSO from all Traffic
Violations Bureau centers for an indefinite period of time (a copy of the correspondence

7

dated February 8, 2012 is annexed hereto as **Exhibit "B"**) apparently without unconcerned about the requirements of due process of law.

27.     The New York State Department of Motor Vehicles in its letter, alleged other incidents involving CAPOGROSSO as justification for their actions. The February 8, 2012, setting forth these other incidents, contains untruths and mischaracterizations regarding CAPOGROSSO'S behavior and interactions.

28.     Significantly, CAPOGROSSO was never before advised of any of these other alleged complaints against him nor was he provided with any of the alleged "evidence" supporting them nor given a chance to respond or defend himself against the charges.

29.     No hearing was ever conducted with respect to any of these allegations and CAPOGROSSO was never given an opportunity to respond to the allegations being made against him.

30.     CAPOGROSSO'S Livelihood is based in the Brooklyn South adjudication center. That is where his clients are and that is where the cases he handles are venued.

31.     CAPOGROSSO currently has approximately 496 clients, and someone has to appear on their matters. This illegal and improper prohibition is preventing CAPOGROSSO from representing his clients, has deprived him of his livelihood and has interfered with his clients' rights to be represented properly, zealously and by an experienced attorney of their choosing who is familiar with their businesses, their histories, and the pending charges.

8

JSA-308

32.     Since the date of this incident and determination, CAPOGROSSO has been forced to hire other attorneys to handle his cases in the Brooklyn South center so that no defaults or other negative results occur.

33.     Since December 23, 2011, Mr. Capogrosso has lost and continues to lose significant income as a result of this unjustified and unlawful banning of him from the Traffic Violations Bureau adjudication centers.

34.     Respondent's unjustified, improper and unlawful banning of him from the Traffic Violations Bureau adjudication centers has caused CAPOGROSSO to incur excessive and unnecessary financial expenses in hiring covering attorneys, which he can ill-afford given his current loss of income due to respondent's decision and determination.

35.     The banning of CAPOGROSSO from Traffic Violations Bureau adjudication centers was in violation of lawful procedure in that Mr. CAPOGROSSO was not provided with the alleged "evidence" used against him, was not given an opportunity to confront his accusers and was never given the opportunity of a fair and unbiased hearing on the charges.

36.     Moreover, if there is any substance whatever to the allegations made against CAPOGROSSO, they are so trivial under the circumstances that under no reasonable view do they justify the measure of punishment or penalty adopted and such measure of punishment or penalty clearly constitutes an abuse of discretion on the part of the Respondent.

37.     The banning of CAPOGROSSO from Traffic Violations Bureau adjudication centers was illegal, arbitrary and capricious, and an abuse of discretion.

9

38.     It is respectfully submitted that a temporary restraining order is required on these facts if justice is ever to be reached as allowing this unauthorized ban on a licensed attorney in good standing,  to continue his practice without *any* due process of law as a predicate, violates the fundamental constitutional protections due the citizens of this country.

39.     This unwarranted and constitutionally defective ban on CAPOGROSSO, interfering with the highest concentration of his legal practice, and preventing him from appearing in any Traffic Violations Bureau in the State has far reaching consequences.

40.     CAPOGROSSO has been forced to suffer grave financial loss and to incur significant unwarranted expenses in meeting his obligations to defend his clients in pending matters; he has suffered great harm to his professional reputation in the venue where his practice is concentrated , which continues so long as the ban is in place;  he has suffered and continues to suffer a loss of new clientele and of new matters from established clientele;  his reputation and relationship with his existing client base, built up over many years, has been imperiled by his inability to service their legal needs; and, most importantly, CAPOGROSSO'S clients have been negatively impacted on matters pending before the very Bureau that has improperly and directly interfered with COMPASSO'S representation on those pending charges.

41.     The Traffic Violations Bureau interfered with the attorney-client relationships between CAPOGROSSO and his clients and prevented them from being represented by the counsel of their choice,  a zealously guarded right under our jurisprudence.  They did so without even the indicia, let alone the reality of due process of law: an opportunity to be heard; an opportunity to be apprised of the evidence against

10

you; an opportunity to confront the evidence against you; and the opportunity to prevent evidence in defense.

42.     As none of these occurred in this instance and as basic rights have been denied the Petitioner and his clients without due process of law, the temporary restraining order must be issued precluding the proliferation of the ban pending the resolution of this proceeding.

43.     Petitioner therefore further prays for an Order of this Court staying and restraining the Respondent from taking any action pursuant to the decision and determination dated February 8, 2012 until a final decision is rendered in regard to all matters and all issues raised herein.

44.     No previous application has been made for the relief requested herein.

**WHEREFORE**, pursuant to CPLR §7803(3) Petitioner prays that this Court review the aforesaid decision and determination of Respondent and grant a final judgment pursuant to CPLR §7806 as follows:

A.     Annulling and setting aside Respondent's determination of punishment and penalty in banning Petitioner from all Traffic Violations Bureau adjudication centers for an indefinite period of time as being arbitrary, capricious, illegal, unlawful and an abuse of discretion;

B.     Compelling Respondent to forthwith restore and reinstate Petitioner's privileges to enter Traffic Violations Bureau adjudication centers to perform his business of acting as an attorney to clients in said centers;

11

C.      Directing Respondent to pay Petitioner his lost wages as a result of this

arbitrary, capricious, illegal and unlawful banning of Petitioner in an amount to be

determined by the Court; and,

D.      Granting such other, further and different incidental relief as this Court

deems just and appropriate including, but not limited to, reasonable attorneys' fees and

the costs and disbursements of this action.

Dated:  Garden City, New York
        March  1 , 2012

                                Yours, etc.,

                                McDONOUGH & McDONOUGH, LLP
                                Attorneys for Petitioner


                        By:     _____
                                Chris G. McDonough
                                401 Franklin Avenue, Suite 210
                                Garden City, New York 11530
                                (516) 33-2006

12

**VERIFICATION**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF ~~KINGS~~ Westchester    )

I, MARIO CAPOGROSSO, am the Petitioner in the above entitled action.  I have read the foregoing petition and know the contents thereof.  The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
MARIO CAPOGROSSO

Sworn to before me this 29 day
of February, 2012.

_____
Notary Public

MARYANN PRATA
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01PR6004623
QUALIFIED IN WESTCHESTER COUNTY
My Commission Expires March 23, 20__

13

January 25, 2012

Barbara J. Fiala, Commissioner
Department of Motor Vehicles
6 Empire State Plaza
Albany, New York 12228

Re:       Improper Expulsion of Mario Capogrosso, Esq.

Dear Ms. Fiala:

This office represents Mario Capogrosso, Esq. in connection with his unilateral expulsion from the Brooklyn South DMV Adjudication center, and suspension from all DMV Adjudication centers. The purpose of this submission is to request reconsideration of the decision of December 23, 2011, as that decision was arbitrary and capricious, violated his constitutional rights of due process and has severely impacted his professional and personal lives.

Mr. Capogrosso has been practicing in the New York State Department of Motor Vehicle adjudication centers since 1995. He has mainly practiced in the Brooklyn South location. He has practiced by zealously representing his clients and has never had any founded complaints or grievances regarding his work. He has had nothing but a stellar record and his practice has grown as his clients appreciate his hard work and routinely seek out his representation.

On December 22, 2011, Mr. Capogrosso was in the attorneys' room at the Brooklyn adjudication center. He put his coffee down to the side of a table and thereafter asked another attorney, who regularly practices at the same center, Yakov Brody, Esq., "Excuse me, can I get my coffee." Out of nowhere Mr. Brody started screaming and spewing ethnically based expletives at Mr. Capogrosso; which will not be repeated here. Mr. Brody was yelling at the top of his voice. Mr. Capogrosso backed away, but thereafter Mr. Brody again began screaming racially expletives at him without cause. Feeling attacked Mr. Capogrosso responded in kind. While Mr. Capogrosso realizes his outburst was uncalled for and unprofessional, and is extremely shameful that he stooped to the level of his attacker, his response was in retaliation to the out of the blue verbal attack by Mr. Brody, which started the whole situation.

One of the managers of the center, Danielle, heard the exchange (again, Mr. Brody was yelling at the top of his lungs) and came into the room. In front of Mr. Cappagroso She stated "now's our chance to get rid of him", referring to Mr. Capogrosso. After she and Mr. Brody had left the room, Jeffrey Myers, Esq. then entered the room and sat where Mr. Brody had been sitting. He told Mr. Capogrosso that he overheard the exchange and said that Mr. Capogrosso should have hit Mr. Brody. Mr. Capogrosso responded "This is what I would have done" and punched the air. He **never** punched anyone or touched anyone during this whole exchange.

Meanwhile, apparently Mr. Brody and Danielle had called both the police and Bushra Vahat, the supervising Administrative Law Judge, with regard to the situation. The police and Ms. Vahat obtained affidavits from everyone in the courtroom, even people who did not witness the exchange. They did **not** take a statement from Mr. Capogrosso or ask for his version of events.

The next day, December 23, 2010, Mr. Capogrosso arrived at the Brooklyn South center ready to work for the clients he was meeting there. When he arrived he encountered chaos. There were "police" in the courtroom taking affidavits from attorneys who were not even present the day before. Judge Gelpstein, the supervising Administrative Judge of the center, met Mr. Capogrosso in the courtroom and asked to see him in his office. When Mr. Capogrosso arrived in the office there were two "officers" in blue uniforms and Judge Vahat in the office. Mr. Capogrosso was told by Judge Gelpstein "You have to leave and if you come back here you are going to be arrested." Judge Vahat added "If you go into any Department of Motor Vehicle center you are going to be arrested." After Judge Vahat proclaimed this ad hoc expulsion, Mr. Capogrosso started to speak and ask what was going on. Judge Vahat told him that he wasn't wanted there and to get out. Mr. Capogrosso left the Brooklyn South adjudication center immediately thereafter.

Two weeks later Mr. Capogrosso contacted Judge Vahat and asked her to explain her determination. She advised that if Mr. Capogrosso was "good" and "stayed quiet" she would *reconsider* her determination three months later, and at that time determine *if* he can go back *into other* Department of Motor Vehicle adjudication centers, but he would not be allowed back into the Brooklyn South center. She further stated that he *might* eventually work his way back into the Brooklyn South center, but for an *indefinite* period of time he was prohibited from entering that center.

Mr. Capogrosso's livelihood is based in the Brooklyn South adjudication center. That is where his clients are, that is where the cases he handles are venued. He has approximately 496 clients currently, and someone has to appear on their matters. This illegal and improper prohibition is preventing Mr. Capogrosso from representing his clients and has deprived him of his livelihood. Since the date of this incident and determination, Mr. Capogrosso has been forced to hire other attorneys to handle his cases in the Brooklyn South center so that no defaults or other negative results occur.

To date, Mr. Capogrosso has not received anything in writing with respect to this determination. Moreover, as stated above, no hearing was ever conducted in connection with this matter nor was Mr. Capogrosso even heard with respect to the facts surrounding the incident that led to the determination to prohibit Mr. Capogrosso from the adjudication centers. Clearly, the determination of Judge Gelpstein and Judge Vahat was arbitrary and capricious and violated Mr. Capogrosso's constitutional due process rights.

This matter is akin to that in *Lindemann v. American Horse Shows Association*, 164 Misc.2d 937, 624 N.Y.S.2d 723 (Sup.Ct. N.Y.Cty. 1994). In *Lindemann* the defendant banned members from participation in equestrian sporting events, initiated after the members' indictment for alleged participation in a scheme to electrocute horses. The Court therein held "[u]nder New York law a fair hearing involving the possible suspension of a property right is 'an obligation imposed ... by those fundamental principles of basic justice and fair play which underlie our entire system of jurisprudence (citation omitted)." *Id* at 730. Moreover, the Court found that "[t]here can be no fair and impartial hearing unless the person charged is accorded a meaningful opportunity to respond to the charges and to rebut them." *Id* at 731. "As noted by our Court of Appeals in *Saumell v. N.Y. Racing Association, Inc.,* 58 N.Y.2d at 242, supra, while the association "was not obligated to resolve questions of credibility

before denying petitioner access to its facilities, the evidence ... was at best equivocal and, in light of the 20-day delay and importance of access to petitioner's livelihood, an insufficient basis for exclusion without a hearing." *Id* at 733.

In the instant matter, Mr. Cappagosso was similarly banned indefinitely from his livelihood, without a hearing and without decision makers even hearing Mr. Capogrosso's side of the story. No affidavit was taken from Mr. Capogrosso nor was he entitled to view the alleged 'evidence' against him. Yet, summarily, the supervising Administrative Judges banned him from entering the centers at which he practices law.

Putting aside the violation of Mr. Capogrosso's constitutional rights in the matter, and the arbitrary and capricious nature of the determination, the penalty imposed was so disproportionate to the alleged offense as to shock the conscience. If sanction imposed 'shocks the judicial conscience" it "constitutes an abuse of discretion as a matter of law" (citations omitted). *Diefenthaler v. Klein*, 27 A.D.3d 347, 811 N.Y.S.2d 653 (1st Dept. 2006). In the instant matter, the expulsion of Mr. Capogrosso from all adjudication centers for a three month period of time and from the Brooklyn South center at which he makes his living indefinitely based upon the incident that occurred is shocking to the conscience and clearly an abuse of discretion. Mr. Capogrosso did not start the verbal assault. While he now recognizes that he shouldn't have verbally struck back, it was not he who first used ethnic comments and profanity in a professional setting. Indeed, Mr. Brody was not punished in the same way (or at all), yet he created this whole situation and made similar types of improper comments. Moreover, while Mr. Capogrosso realizes he should not have even intimated how he would have punched by swinging at the air, he did not touch or strike any person; a demonstration which took place when Mr. Brody was not in the room.

In sum, Mr. Capogrosso was verbally attacked while merely trying to do his job. He reacted to the attack and went on the defensive. The situation never should have occurred, and unfortunately escalated out of control – but this situation occurred due in no part to the actions of Mr. Capogrosso. He was the victim of a horrible verbal assault; yet he has been the one prejudiced. To ban him from entering any adjudication center for three months and from indefinitely entering the Brooklyn South center where he earns his livelihood is so disproportionate to the offense it is shocking and abusive.

By reason of all of the foregoing, it is respectfully requested that the prohibition imposed upon Mr. Capogrosso be reversed. He should be allowed to enter any adjudication center he needs to in order to continue representing his clients forthwith.

As this matter has had a direct and substantial impact upon Mr. Capogrosso's practice and income, we await your prompt response to this submission.

Very truly yours,

Chris McDonough

CGM/hs

**JSA-316**



# STATE OF NEW YORK
# DEPARTMENT OF MOTOR VEHICLES

6 EMPIRE STATE PLAZA, ALBANY, NY 12228

**BARBARA J. FIALA**
Commissioner

**NEAL W. SCHOEN**
Deputy Commissioner and Counsel

**IDA L. TRASCHEN**
First Assistant Counsel
Legal Bureau

February 8, 2012

Mr. Chris McDonough, Esq.
McDonough & McDonough  LLP
401 Franklin Avenue, Suite 210
Garden City, New York  11530

Re:  Mario Capogrosso, Esq.

Dear Mr. McDonough:

Your letter of January 25, 2012 to Commissioner Fiala, concerning Mr. Capogrosso, has been referred to me for a response.

As the summary of events below documents, the decision to ban Mr. Capograsso from appearing at any of our Traffic Violations Bureau ("TVB") offices was neither capricious nor arbitrary, but rather, was made in the best interests of both the agency and motorists and attorneys appearing at the TVBs.

On January 6, 2011, Supervising ALJ Vahdat received a petition signed by eighteen employees of Brooklyn South TVB, asking her to address Mr. Capogrosso's behavior.  The employees stated that Mr. Capogrosso's presence on the premises of Brooklyn South TVB constituted a threat to their physical safety. They explained that Mr. Capogrosso's behavior was unstable and that he had confrontations with many TVB employees during the previous year. One incident nearly escalated to a physical altercation between Mr. Capogrosso and a TVB employee whom Mr. Capogrosso had threatened.

On January 10, 2011, Supervising ALJ Vahdat visited the Brooklyn South TVB to discuss this situation with Senior ALJ Gelbstein. He expressed concern about Mr. Capogrosso's behavior over the past year. Senior ALJ Gelbstein had previously notified the Division of Field Investigation about Mr. Capogrosso's behavior.  In addition, Senior ALJ Gelbstein had a letter of complaint from George Han (a clerical employee) and a letter of complaint from an attorney whose assistant had been pushed by Mr. Capogrosso.  Senior ALJ Gelbstein stated that he had spoken to Mr. Capogrosso on many occasions and asked him to exercise a calmer demeanor when dealing with the staff, other attorneys practicing at TVB and his own clients. Senior ALJ Gelbstein concluded that his many conversations with Mr. Capogrosso had not resulted in a change in Mr. Capogrosso's behavior and he continued to be concerned for his staff's safety.

On that day, Supervising ALJ Vahdat also interviewed five TVB employees who expressed deep concern for their safety when dealing with Mr. Capogrosso. One employee stated, "I can no longer interact with Mr. Capogrosso at the service counter because I fear for my safety…..he even went so far as to assault a female assistant who works for another lawyer". On that day, Supervising ALJ Vahdat also spoke with three attorneys who shared the staff's concerns for the safety of all employees and attorneys due to Mr. Capogrosso's behavior.

Following these conversations, Supervising ALJ Vahdat and Senior ALJ Gelbstein spoke to Mr. Carogrosso concerning his behavior. Mr. Capogrosso admitted that, "I sometimes lose my temper and need to blow off steam". Supervising ALJ Vahdat and Senior ALJ Gelbstein warned Mr. Capogrosso that

**JSA-317**

Mr. Chris McDonough, Esq.
Page 2
8 February 2012

he must conduct himself in a professional manner; otherwise he would not be allowed to practice at TVB. Mr. Capogrosso agreed to calm down and stop his abusive behavior. When Supervising ALJ Vahdat explained to him that if his behavior did not improve she would have to report him to the Grievance Committee, he stated that, "If I have any more altercations with anyone here I will just stop coming here myself".

On December 22, 2011, Supervising ALJ Vahdat received an e-mail from Danielle Calvo, SMVRI at Brooklyn South TVB, informing her that Mr. Capogrosso was screaming in the attorney's room and shouting religious slurs at attorneys of the Jewish faith. Ms. Calvo had asked all the other attorneys to step away from Mr. Capogrosso and leave him to himself. Half an hour later, Ms. Calvo called Supervising ALJ Vahdat and informed her that Mr. Capogrosso had thrown his coffee cup (still half full) at one of the other attorneys and when a third attorney had tried to calm down Mr. Capogrosso, he had thrown a punch that had missed the third attorney by about an inch. Supervising ALJ Vahdat asked Ms. Calvo to escort Mr. Capogrosso out of the building and tell him not to come back until the next day. That same day three attorneys who had witnessed this altercation called Supervising ALJ Vahdat about this incident. Their recitation of the facts matched Ms. Calvo's.

The next morning, the above mentioned three attorneys met with Supervising ALJ Vahdat and Senior ALJ Gelbstein and submitted affidavits elucidating the facts. In addition, TVB staff, the police room staff and other attorneys notified Supervising ALJ Vahdat that Mr. Capogrosso regularly punches the walls and steel poles of the TVB office with his fists. The sounds from these punches at times are so loud that the police room employees are startled and run out of the room to see what has happened. Mr. Capogrosso admitted to this odd behavior and stated, "I do it to let off steam, otherwise I could hurt someone". Supervising ALJ Vahdat observed that Mr. Capogrosso's knuckles were all bruised, black and blue. Mr. Capogrosso's behavior is clearly in contravention of 15 NYCRR 124.2, which provides, in part:

(a) The motorist may be represented by an attorney or, in the administrative law judge's discretion, by any other person the motorist chooses. **Any person representing the motorist must conform to the standards of conduct required of attorneys appearing before State courts, and failure to conform to these standards will be grounds for declining to permit his or her continued appearance in the proceeding.** (Emphasis added.)

Based upon this regulation and the fact that Mr. Capogrosso's behavior is disruptive of the TVB process and induces fear in its employees, attorneys and motorists who work at and use the TVB, a decision was made to ban Mr. Capogrosso from all TVB offices for an indeterminate time period.

It is the policy of the New York State Department of Motor Vehicles to preserve the safety and well-being of its employees and visitors. DMV will strive to ensure that its workplace is free from violence, threats of violence, harassment and intimidation. Until such time that it can be determined that Mr. Capogrosso is no longer a threat to the safety and well-being of TVB employees and visitors, he will not be allowed to practice at any of Department of Motor Vehicles' TVB offices.

I trust this information assists you.

Very truly yours,

*Ida L. Traschen*

Ida L. Traschen
First Assistant Counsel

ILT/mjs

**JSA-318**

3 15 09:01p                                                                 P. 1

JUN-14-2012 14:23 From:                          To:516 541 1833        P.1/3
                                                 5168233373             P. 2
Jun 14 2012 12:31

# John T. McCann, PhD
1087 Franklin Avenue, No. Valley Stream, NY 11580
Tel: 888-775-COPE    Fax: 516-823-3373

RE:                    Mario Capogrosso
DOB:                   July 4, 1961
Date of Report:        June 14, 2012

### BACKGROUND AND RELEVANT HISTORY:

Mario Capogrosso is a 50-year-old divorced male who was married for four years. Mr. Capogrosso is the son of Mario and Eleanor Capogrosso who have been married for 54 years and he is the middle child of three children.

In 1983 he obtained a Bachelor of Arts Degree in History from Columbia University. In 1992 he obtained a Bachelor of Science Degree in Mechanical Engineering from Manhattan College of Engineering. In 2000 he obtained a J.D. Degree from Quinnipiac University School of Law. He was admitted to practice law in New York in September 2004 and Connecticut in June 2005.

In 2001 Mr. Capogrosso was employed by an engineer company, Washington Group International. The company had offices in the World Trade Center and Princeton, New Jersey. On September 11, 2001, 14 of his colleagues were killed in the World Trade Center. He was close friends with many of them.

Mr. Capogrosso was referred to me secondary to an incident in Traffic Court on December 22, 2011. He was ordered by a Judge to attend anger management for a total of 21 hours. Mr. Capogrosso has been an extremely compliant patient. He completed reading and doing numerous assignments from an anger management book titled, "Anger Control Workbook," by Matthew McKay, PhD and Peter Rogers, PhD. We have explored alternative ways to handle his stress and he gained considerable insight into issues that he had previous difficulties processing.

### SUMMARY:

Mr. Capogrosso has successfully completed an anger management program. He has learned alternative stress management techniques including conflict resolution, impulse control and alternative coping skills. Mr. Capogrosso has gained insight into the reasons that caused him to act unprofessionally. Since his successful completion of the program it is highly unlikely that Mr. Capogrosso would be in a situation like this again. He was compliant with all treatment modalities, including exercise. Mr. Capogrosso has completed a total of 21 hours of anger management.

RECEIVED
AD- 107919    JUL 23.2015
OSIG

P- 28

JSA-319

EXHIBIT
Exhibit 17

RE: Mario Capogrosso                                               Page Two

**TESTS ADMINISTERED:**

- Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
- Millon Clinical Multiaxial Inventory-III (MCMI-III)
- Comprehensive Mental Status Exam (CMSE)
- Diagnostic Interviews

**DIAGNOSIS:**

Axis I      V71.09, No Diagnosis
Axis II     V71.09, No Diagnosis

**ATTESTATION:**

I, John T. McCann, PhD, am a clinical and forensic psychologist, duly licensed by the State of New York. I hereby certify that the statements contained herein are true and accurate to the best of my knowledge.



John T. McCann, PhD
License NY # 015944
Diplomate in Clinical Psychology
Diplomate in Forensic Psychology
Diplomate in Posttraumatic Stress
Diplomate of American Board of Law Enforcement Experts
Fellow American Association of Disability Analysts
Certified DOT Substance Abuse Professional
Member American Psychological Association
Member National Association of Alcoholism and Drug Abuse Counselors
OASAS Provider

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
_____

In the Matter of an Article 78 Proceeding
MARIO CAPOGROSSO,

                           Petitioner,

           -against-

NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

                         Respondent.
_____

Index No. 7738/2012

Hon. Bernadette Bayne
Part 18

**STIPULATION OF
DISCONTINUANCE**

      WHEREAS, no party to this proceeding is an infant, incompetent person for whom a

committee has been appointed or conservatee, and no person not a party has an interest in the

subject matter of the proceeding;

      IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned

counsel for petitioner and respondent, as follows:

      1.     The above-captioned Article 78 proceeding is dismissed with prejudice and

without costs or fees to any party.

      2.     A facsimile signature on this Stipulation shall be deemed an original.

      3.     This Stipulation may be executed in counterparts.

Dated: Garden City, New York
        June 22 2012

McDONOUGH & McDONOUGH, LLP
Attorney for Petitioner
By:

_____
JACQUELINE A. RAPPEL, ESQ.
McDonough & McDonough, LLP
401 Franklin Avenue, Suite 210
Garden City, New York 11530
(631) 747-7194

Dated: New York, New York
        June 21, 2012

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Respondent
By:

_____
SERWAT FAROOQ
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-6240

**JSA-321**

EXHIBIT

Exhibit 18

## Law Office of Mario H. Capogrosso, Esq.

### 245 Saw Mill River Road, Suite 106
### Hawthorne, New York 10532

March 20, 2015

Ms. Elizabeth Prickett-Morgan
NYS Office of the Attorney General
120 Broadway, 24th floor
New York City, NY 10027

Dear Madam:

I am an attorney in the state of New York.

My Registration number is 424431.

Please reference Index number 7738/2012. Capogrosso vs. State Dept of Motor Vehicles for which I was in litigation. A settlement agreement was reached on June 20, 2012. As part of this settlement agreement I was required to take an anger management course and upon completion of this course I was to be allowed to practice law in all DMV courts on an equal and unbiased standing with all other attorneys in the DMV.

To this date, I have been in complete compliance with all conditions as set forth as part of this settlement agreement.

However, the DMV has not upheld its side of this agreement.

on numerous occasions, I have been harassed, threatened and now currently my files are being tampered with while they are left unprotected in the attorneys room at the DMV at 2875 West 8th Street, Brooklyn, the principal DMV location at which I practice.

The threatening and harassment I have let go because I do not easily get intimidated nor harassed. But at this point my client's files are being tampered with and I must, as a attorney, object.

I provide the following in evidence:

1) On numerous occasions your security guard Dave Sparks has told me to go F___ myself (will provide proof upon request);

2) on several occasions your security guard Sparks has redirected other clients who come have looking for me specifically or other attorneys or has interfered with my conversations while speaking to a clients (will provide proof upon request);

3) your security guard Sparks has approached me, gotten in my face, stared and glared, I asked him what was the problem was and he told me I was the problem, F___ you.;

P- 41

EXHIBIT

Exhibit 28

4) your security guard Sparks, has stood  looked at me directly while I was standing on the DMV traffic line gave me the sign of the cross twice and directed a spear hand in my direction.

After several complaints to Administrative Judge Gelbstein, the Senior judge at the Brooklyn TVB, I called Sparks employer. Subsequently, your security guard Sparks was relieved from his duties at the Brooklyn DMV for two weeks (proof to be provided).

I have made numerous complaints to Judge Gelbstein. His response has been " a spade is a spade (his words not mine), he laughs and giggles.

Judge Gelbstein is either complicit, incapable or incompetent to handle this issue.

As I have stated, I have ignored these incidents and have attempted at all levels not to aggravate the situation.

I have been in countless courts in my ten years of practice as an attorney and have never seen such behavior in any court system.

As I have stated, I can defend myself and absolutely will, so to this point I have ignored these incidents.

However, at this point your security guard Sparks is entering the attorney's room and tampering with my files. I have asked Judge Gelbstein to look at security tapes and have gotten no response.

As an attorney, I must now object. I cannot have my files tampered with.

I do not want an incident on your floor, I do not want an incident in your courtroom, I have no reason to have any trouble with any of your employees at the Brooklyn DMV.

To date, I have been a perfect gentleman and in complete with all conditions as set upon me by the settlement reached on June 12, 2012.

The DMV has not upheld their side of this agreement.

All I ask is that they do so.

I do not seek to litigate but I will if I have to.

Please take any and all action to expedite and resolve these issues

Mario H.Capogrosso, Esq.

914-806-3692

NY Registration No. 4244331

2

JSA-323

P-42

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARIO H. CAPOGROSSO,

                Plaintiff,

       -against-

ALAN GELBSTEIN, *in his individual capacity*,
IDA TRASCHEN, *in her individual capacity*,
DANIELLE CALVO, *in her individual capacity*,
SADIQ TAHIR, PEC GROUP OF NY, INC.,
DAVID SMART, and MARK SCHROEDER,
*in his official capacity as Commissioner of*
*the New York State Department of Motor Vehicles*,[1]



                Defendants.
-----------------------------------------------------------------X

**REPORT & RECOMMENDATION**
**18 CV 2710 (EK)(LB)**

**BLOOM, United States Magistrate Judge:**

        Attorney Mario H. Capogrosso, proceeding *pro se*, brings this civil rights action pursuant

to 42 U.S.C. §§ 1983 and 1988, alleging that defendants retaliated against him for exercising his

First Amendment rights by permanently barring him from the Traffic Violations Bureau ("TVB")

in May of 2015. Defendant David Smart[2] and defendants Alan Gelbstein, Ida Transchen, Danielle

Calvo, and New York State Department of Motor Vehicles Commissioner Mark Schroeder,

(collectively, "the State Defendants") move for summary judgment on plaintiff's claims against

them pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF Nos. 178, 179. Plaintiff

opposes the motions. ECF Nos. 246, 258. The Honorable Eric R. Komitee referred defendants'

---

[1] The Court granted the State defendants' request to add DMV Commissioner Mark Schroeder in his official capacity regarding plaintiff's claim for prospective injunctive relief pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. See ECF Nos. 96, 104.

[2] The Court notes with gratitude that Davis Polk & Wardwell LLP appears as pro bono counsel for *pro se* defendant Smart for the limited purpose of his motion for summary judgment. See ECF Nos. 162, 167–68.

1

motions to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b).[3] For the reasons set forth below, it is respectfully recommended that defendants' motions for summary judgment should be granted.

## FACTS[4]

The following facts are taken from plaintiff's complaint, ECF No. 1 ("Compl."), defendants' Local Civil Rule 56.1 Statements of Facts,[5] and the exhibits filed by defendants with their summary judgment briefing.[6] Even though plaintiff is an attorney, defendants provided plaintiff with requisite notice to a *pro* se litigant opposing summary judgment under Local Rule 56.2. See ECF Nos. 178-8, 182.

---

[3] This case, originally assigned to the Honorable Margo K. Brodie, was reassigned to the Honorable Eric R. Komitee. See Feb. 11, 2020 Order.

[4] Unless otherwise stated, the facts are undisputed.

[5] See ECF No. 178-7, Smart's Rule 56.1 Statement ("Smart's 56.1 Stmt.") and ECF No. 181, State Defendants' Rule 56.1 Statement ("State Defs' 56.1 Stmt."). Plaintiff files counterstatements. ECF No. 239, Plaintiff's Counterstatement to Smart's Rule 56.1 Statement ("Pl. Opp'n Smart's 56.1 Stmt.") and ECF No. 235, Plaintiff's Counterstatement to the State Defendants' Rule 56.1 Statement (Pl. Opp'n State Defs' 56.1 Stmt."). The Court deems admitted only those facts in defendants' Rule 56.1 statements that are supported by admissible evidence and not controverted by the record. See Local Rule 56.1(a); see also Gianullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). The Court may not rely solely on the statement of undisputed facts contained in the Rule 56.1 statement: "[i]t must be satisfied that the citation to the evidence in the record supports the assertion." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see Gianullo, 322 F.3d at 143 n.5.

[6] State defendants' counsel filed exhibits to the instant motion as separate ECF entries, making this docket difficult to follow. In the future, Mr. Thompson shall file motions as a single ECF entry with attachments. In the interest of clarity, documents in the record can be located as follows: with their motion, the State Defendants filed Danielle Calvo's Declaration ("Calvo Decl."), ECF No. 183, with Exhibits 1–6, ECF Nos. 184–89, Alan Gelbstein's Declaration ("Gelbstein Decl."), ECF No. 190, with Exhibits 1–26, ECF Nos. 191–216, Ida Traschen's Declaration ("Traschen Decl."), ECF No. 217, with Exhibits 1–9, and James Thompson's Declaration ("Thompson Decl."), ECF No. 220, with Exhibits 1–9, ECF Nos. 221–29. Defendant Smart attaches Maura Douglas' Declaration ("Douglas Decl."), ECF No. 178-2, with Exhibits 1–4, ECF No. 178-3–6 to his motion. Plaintiff attaches Exhibits A–T, W–Z, and AA–EE. ECF Nos. 235-2–6, 236–38, 248–56, 259–265 to his opposition to defendants' motions. The Court has thoroughly reviewed the record.

The instant action arises out of plaintiff's bar from the Traffic Violations Bureau ("TVB") in May 2015. Compl. ¶¶ 5, 11. Plaintiff began representing motorists at the TVB in 2005. Compl. ¶ 3; ECF No. 221, Plaintiff's Deposition Transcript, ("Pl. Dep."), 18:13–18, 21:15–23.[7] The TVB is a division within the Department of Motor Vehicles ("DMV"), an agency of New York State, and proceedings within the TVB are overseen by Administrative Law Judges ("ALJs"). See generally, N.Y. Traffic Law §§ 225 et seq.

In 2009, the DMV began to receive complaints about plaintiff's behavior at the TVB. State Defs' 56.1 Stmt. ¶ 9; Gelbstein Dec. ¶ 7 ("I received more complaints about Plaintiff than I received about any other attorney in my entire time at DMV"); Calvo Dec. at ¶¶ 2–6 (describing plaintiff yelling obscenities at clerks and other attorneys); Traschen Dec. ¶ 7.[8]

On January 6, 2011, eighteen Brooklyn South TVB employees signed a petition stating that "the confrontations [with plaintiff] have been escalating," and that they felt plaintiff's presence at the TVB "constitutes a threat to [their] physical safety." ECF No. 195 ("the Petition"); see State Defs' 56.1 Stmt. ¶ 13; Gelbstein Dec. ¶ 13, Calvo Dec. ¶ 6. After receiving the petition, then-

---

[7] Plaintiff's deposition transcript is formatted as two separate entries: ECF Nos. 221–22. As the page numbers are continuous, reference is made to "Plaintiff's Deposition."

[8] These complaints, from other attorneys, TVB staff, and third-party witnesses, include allegations of plaintiff making verbal threats, yelling obscenities and ethnic slurs, and plaintiff's physically aggressive, threatening behavior. See Gelbstein Dec. Exs. 1–4. For example: "I fear for my safety… I no longer feel comfortable at my place of employment," ECF No. 193, Complaint by TVB Clerk Marisol Cervoni; "[Plaintiff] called me a variety of vulgar and profane names and threatened me with violence…. I was especially nervous because I am 6 months pregnant and I was in fear his outbursts would turn violent," ECF No. 194, Complaint by Attorney Diantha Fuller. Plaintiff acknowledges that confrontations occurred and admits he raised his voice but denies using profanity and states that he does not recall "hitting" anyone. See Pl. Dep. 148:15–150:6, 168:22–24, 175:11–176:8, 206:16–206:23, 211:9–223:20. He acknowledges making physical contact during altercations on occasion. See Pl. Opp'n State Defs' 56.1 Stmt ¶ 10 ("I affirm, upon personal knowledge, bumping into [Tanya Rabinovich]."); contra Pl. Dep. 149:24–150:6 (plaintiff states he does not recall making contact with Rabinovich).

Administrative Law Judge ("ALJ") Alan Gelbstein[9] and Supervising ALJ Vahdatlamas advised plaintiff that if he "did not conduct himself appropriately," he would not be allowed to appear on behalf of motorists at the TVB. Gelbstein Dec. ¶ 14.

On December 21, 2011, plaintiff was involved in another incident in which he used anti-Semitic language towards one attorney and then "punched the air" near another attorney's face. Id. at ¶ 9; see ECF No. 196 (email from ALJ Vahdatlamas, memorializing the investigation following the event); ECF Nos. 197–200 (statements from four attorneys who witnessed the incident). Plaintiff admits to using threatening language and "[throwing] the punch at the wall." Pl. Dep. 260:18–21, 272:18–22, 306:22–307:06. After obtaining plaintiff's version of events, Gelbstein, Vahdatlamas, and Neil Schoen, the Deputy Commissioner for Legal Affairs, determined that plaintiff would be suspended from practicing at any TVB location for three months, and from practicing at the Brooklyn South location indefinitely. Gelbstein Dec. ¶ 19.

On April 12, 2012, plaintiff commenced an Article 78 proceeding challenging his suspension. See Capogrosso v. N.Y. State Dep't of Motor Vehicles, Index No. 7738/2012 (Sup. Ct. Kings Cty.). The parties eventually reached a settlement, and the DMV agreed to lift plaintiff's suspension upon his completion of an anger management course. Pl. Dep. 321:12–322:20. Plaintiff was allowed to resume practice at the TVB on the condition that he "strictly adhere to the standards of conduct required of attorneys appearing before State courts." ECF 219. Further, the DMV warned plaintiff that "in the event that Mr. Capogrosso commits an act of physical violence, he

---

[9] Gelbstein, now retired, was a Senior Administrative Law Judge at the New York State DMV TVB at the time of the events giving rise to this action. Gelbstein Dec. ¶ 1. Gelbstein reported to Supervising ALJ Bushra Vahdatlamas, who in turn reported to Ida Traschen, the First Assistant Counsel, who oversaw the entire TVB system on a state-wide basis at the time. Id. at ¶ 5; Traschen Dec. ¶ 6. Traschen retired from her position as First Assistant Counsel in 2017. Traschen Dec. ¶ 1.

4

shall be immediately and permanently barred from appearing on behalf of DMV licensees at TVB offices." Id. at 2; see Pl. Dep. at 414:4–6.

Plaintiff returned to the Brooklyn South TVB mid-2012 and soon after, he and David Smart, a security guard at TVB, employed by the private security firm PEC Group of NY, Inc. ("PEC"), made complaints against one another. See Pl. Dep. at 344:5–345:2 (plaintiff recounts complaining about Smart to Gelbstein), id. at 412:19–21 (same); ECF No. 202 (Workplace Violence Report stating that plaintiff accused Smart of "looking at him" and that a police officer had to intervene); ECF No. 204 (Smart complains that plaintiff deliberately walked into him).[10] Others also filed complaints about plaintiff's aggressive behavior at the TVB. Gelbstein Dec. ¶ 27–34; see, ECF No. 203, 205–07, 209.[11]

On March 20, 2015, plaintiff sent a letter (hereinafter, "the AG Letter") to Assistant Attorney General ("AAG") Elizabeth Prickett-Morgan of the New York State Office of the Attorney General,[12] complaining that, inter alia, Smart was tampering with plaintiff's files, that Smart had "gotten in [his] face, stared and glared," and that Smart had gestured in plaintiff's direction. ECF No 227. Plaintiff's letter further complained that Gelbstein failed to respond to his complaints about Smart. Id. Gelbstein and Traschen became aware of the letter but did not respond to it or take any action because, in their view, the letter contained "stale claims" that plaintiff had

---

[10] Plaintiff does not deny that he walked into Smart but denies that it was deliberate if he did. Pl. Dep. 354:12–355:22.

[11] Plaintiff, again, does not deny that these incidents took place, but denies that he was the aggressor. In his Opposition to State Defendants' 56.1 Statement, he repeatedly writes "[w]here is the proof of 'verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs' … There is none, I see no proof." Pl. Opp'n State Defs' 56.1 Stmt ¶¶ 25, 26, 27, 28, 29, 33, 34, 35, and 36.

[12] It is not clear why plaintiff sent the letter to Prickett-Morgan. In his deposition, he states that "on Google for a correspondence address, Prickett-Morgan's name was attached to [the Office of the Attorney General]." Pl. Dep. 410:14–413:22.

5

previously raised to Gelbstein. State Defs' 56.1 Stmt ¶ 32; Gelbstein Dec. ¶¶ 36–37; Traschen Dec. ¶ 10.

On May 5, 2015, plaintiff was involved in another incident at the TVB. Reports of the incident state that plaintiff began yelling when Sadiq Tahir, another lawyer who practiced at the TVB, touched his bag. ECF Nos. 210–13 (witness statements and Workplace Violence Report).[13] Less than a week later, on May 11, 2015, plaintiff and Smart got into an argument and plaintiff shoved Smart; Smart left the scene and filed a report with the police. See ECF Nos. 214–16 (witness statements and Workplace Violence Report); Calvo Dec. ¶ 15. Plaintiff does not deny that an incident took place, but states that "Smart approached [plaintiff] for no reason" and that plaintiff "tried to avoid an altercation." Pl. Opp'n Smart's 56.1 Stmt. ¶ 17. Gelbstein was not at the TVB when the incident happened, but Danielle Calvo, a Supervising Motor Vehicle Representative, called Gelbstein to inform him of the incident. Calvo Dec. ¶ 14.[14] Gelbstein directed Calvo to call Traschen and Traschen advised Calvo to escort plaintiff out of the TVB. Gelbstein Dec. ¶ 46. In the presence of police, Calvo asked plaintiff to leave the premises. Calvo Dec. ¶ 14. Smart left the TVB with the police to file a report regarding the incident. Id. ¶ 15.

Later that day, Gelbstein and Traschen discussed the incident and concluded that plaintiff should be permanently barred from the TVB considering his history of aggressive behavior, the fact that his suspension and anger management classes had not tempered his outbursts, and that plaintiff had already been explicitly warned that any incident of physical violence would lead to his permanent bar from the TVB. Gelbstein Dec. ¶¶ 46–47; Traschen Dec. ¶¶ 12–13. Plaintiff

---

[13] Plaintiff does not dispute that there was a dispute between him and Tahir but claims that Tahir initiated the argument. ("Maybe I told Tahir leave my bag alone." Pl. Dep. 450:17–454:19). Tahir and two witnesses cite plaintiff as the aggressor in filed statements. ECF Nos. 210–12.

[14] Calvo was a "Supervising Motor Vehicle Representative 2" at the TVB from June 2012 until February 2016, when she left for a position in the Office of Court Administration. Calvo Dec. ¶ 6.

claims defendants barred him from the TVB in retaliation for his exercise of his "First Amendment Rights [to] criticize the way [Gelbstein] administered his official office." Compl. ¶ 42. Gelbstein and Trachen state that plaintiff's letter to the AG "played no role in this decision to bar the Plaintiff from [TVB] practice." State Defs' 56.1 Stmt. ¶ 42.

## PROCEDURAL HISTORY

Plaintiff filed the instant complaint against defendants on May 8, 2018. ECF No. 1. Proof of service was filed for Calvo, Gelbstein, Morgan, and Smart on June 8, 2018 and for Traschen, Vahdatlamas, and PEC Group of NY, Inc. ("PEC"), on July 27, 2018. ECF Nos. 10, 24.[15] *Pro se* defendants Smart and Tahir answered plaintiff's complaint and raised a counterclaim against plaintiff. ECF Nos. 6–7. Smart and Tahir's counterclaims were dismissed on October 17, 2018. ECF No. 50.[16]

The State Defendants[17] moved to dismiss plaintiff's complaint, ECF No. 42, and Judge Brodie referred the motion to me for a Report and Recommendation. See Nov. 5, 2018 Order. I

---

[15] PEC never appeared in this action.

[16] Defendant Tahir has not appeared since the Court held a pre-motion conference on August 2, 2018. Starting February 12, 2019, mail sent to Tahir's address has been returned to the Court as undeliverable. See, ECF Nos., 56, 58, 64, 80, 87, 92, 95, 97, 98, 100, 112, 115, 116, 130, 132, 141, 156, 160, 165, 169, 172, 176, 240, 269, 276, and 277.

[17] In addition to Gelbstein, Traschen, and Calvo, plaintiff also named state defendants Elizabeth Morgan (formerly Elizabeth Prickett-Morgan), Jean Flanagan, Boshra Vahdatlamas, and Vincent Palmieri.

7

recommended that the State Defendants' motion should be granted in part and denied in part[18] and the Court adopted the Report and Recommendation. ECF No. 71.[19]

Plaintiff filed an amended complaint, ECF No. 74, but voluntarily withdrew the amended complaint and the Court set a deadline for the parties to complete discovery. ECF No. 82.[20] Plaintiff requested that the Court order defendant Commissioner Schroeder be produced for a deposition and that defendant Smart be ordered to respond to his interrogatories. ECF No. 147. The Court granted defendant Schroeder's request for a protective order pursuant to Federal Rule of Civil Procedure 26(c), ECF No. 146, and directed plaintiff to provide his outstanding interrogatories to the Court for review. ECF No. 148. Discovery closed on December 22, 2020.[21] Defendant Smart and the State Defendants now move for summary judgment, ECF Nos. 178–79, and plaintiff opposes the motions, ECF Nos. 246, 258.

---

[18] I recommended that the State Defendants' motion to dismiss should be granted as to plaintiff's due process, Section 1985, and Section 1986 claims, as well as all claims against Vahdatlamas, Morgan, Flanagan, and Palmieri. I recommended that the State Defendants' motion to dismiss plaintiff's First Amendment retaliation claim against Gelbstein, Calvo, and Traschen should be denied without prejudice. Lastly, I recommended that the State Defendants' motion to dismiss plaintiff's claims for prospective injunctive relief against Gelbstein, Calvo, and Traschen should be denied. See ECF Nos. 51–53.

[19] Defendant Smart moved to dismiss the complaint, ECF No. 57, and the Court denied his motion without prejudice "because Smart [had] not stated a proper basis to dismiss the Complaint against him." ECF No. 72.

[20] Plaintiff requested to enter TVB premises to conduct discovery, ECF No. 91, and the Court denied his request, ECF No. 104. Plaintiff moved for reconsideration of the Court's Order denying his request to enter the TVB, ECF No. 106, and the Court denied his motion, ECF No. 108. Although the Court made a room in the Brooklyn Courthouse available for depositions in this matter, ECF No. 111, the national emergency caused by the emergence of the COVID-19 pandemic in March 2020 led to the depositions being conducted remotely. See ECF Nos. 118, 131.

[21] The Court directed *pro se* defendant Smart to respond to plaintiff's interrogatories by February 12, 2021. ECF No. 154. When Smart did not timely respond, the Court held a telephone conference, swore Smart to the truth of his testimony, and Smart answered plaintiff's interrogatories orally on the record. See ECF Nos. 159, 162–63. The Court had a transcript of the conference made part of the record.

8

## DISCUSSION

### I. Standard of Review

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also, Baker v. Home Depot, 445 F.3d 541, 543 (2d Cir. 2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

If the moving party meets its burden in establishing the absence of any genuine issue of material fact, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). The non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.

9

1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

Although plaintiff proceeds *pro se* and courts generally read the papers of *pro se* litigants liberally, Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006), plaintiff is a licensed attorney in New York and Connecticut. Compl. ¶ 2. *Pro se* attorneys are not entitled to the solicitude afforded to other *pro se* litigants. See Tracy v. Freshwater, 623 F.3d 90, 102 (2d Cir. 2010) ("[A] lawyer representing himself ordinarily receives no such solicitude at all."); Holtz v. Rockefeller & Co., 258 F.3d 62, 82 n.4 (2d Cir. 2001) (*pro se* attorneys are not entitled to the special consideration courts customarily grant *pro se* parties).

## II. The State Defendants

### A. Judicial Immunity and Quasi-Judicial Immunity

Plaintiff claims that defendants Calvo, Gelbstein, and Traschen, in their individual capacities, retaliated against him in violation of his First Amendment rights.[22] The State Defendants move for summary judgment on the ground that the decision to bar plaintiff from practice at TVB offices was attorney discipline, a judicial act, and thus the State Defendants are protected by judicial and quasi-judicial immunity. The Court agrees.

It is well settled that judges generally have "absolute immunity from suits for money damages for their judicial actions" and thus "even allegations of bad faith or malice cannot overcome judicial immunity." Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009). However, judges are not immune from liability if the action was taken in the complete absence of jurisdiction or "if the action in question is not judicial in nature, as when the judge performs an administrative, legislative, or executive act." Huminski v. Corsones, 396 F.3d 53, 74 (2d Cir. 2005).

---

[22] His claim against Commissioner Schroeder is in his official capacity.

Judicial immunity also extends to "certain others who perform functions closely associated with the judicial process." See McKeown v. N.Y. State Comm'n on Judicial Conduct, 377 F. App'x 121, 124 (2d Cir. 2010) (summary order) (citing Oliva v. Heller, 839 F.2d 37, 39 (2d Cir. 1988) (internal citations omitted)); Chris H. v. New York, 764 F. App'x 53, 55 (2d Cir. 2019) (summary order) (quasi-judicial immunity affords similar absolute immunity "to a person whose role is functionally comparable to that of a judge.") (internal quotations omitted). Indeed, "[a]bsolute immunity flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual officer." Heller, 839 F.2d at 39 (quoting Cleavinger v. Saxner, 474 U.S. 193, 201 (1985)).

Administrative Law Judges (ALJs) like Gelbstein have absolute judicial immunity. Butz v. Economou, 438 U.S. 478, 513 (1978); see also Nash v. Califano, 613 F. 2d 10, 15 (2d Cir. 1980) ("ALJs enjoy absolute immunity from liability in damages for actions taken in their quasi-judicial capacity"); Walker v. NYS Justice Ctr. for the Prot. of Special Needs, 493 F. Supp. 3d 239, 248 (S.D.N.Y. 2020) ("[ALJs] perform adjudicatory functions within a government agency, and as such [are] entitled to absolute immunity"); Stankovic v. Smith, No. 12-cv-2457 (DLI) (RER), 2012 WL 3597760, at *7 (E.D.N.Y. Aug. 20, 2012) ("Judges, including ALJs, have absolute immunity…").

Additionally, courts have held that court clerks and senior court administrative employees are an "integral part of the judicial process" and are entitled to absolute immunity. Jackson v. Pfau, No. 9:10-CV-1484 (GTS) (DEP), 2011 WL 13127988, at *9 (N.D.N.Y. May 12, 2011), aff'd, 523 Fed. App'x. 736 (2d. Cir. 2013) (summary order) (affirming the finding that the actions of an attorney in the Division of Court Operations for the Office of Court Administration and Chief and Associate Clerks were judicial in nature or closely related to the judicial process); see McKeown

11

v. N.Y. State Comm'n on Judicial Conduct, 377 F. App'x 121, 124 (2d Cir. 2010) (summary order) (Office of Court Administration employees are protected by quasi-judicial immunity in decision not to initiate attorney disciplinary proceedings because "prosecutors, hearing examiners, and law clerks are eligible for absolute immunity, and those involved in preparing and adjudicating attorney discipline proceedings share analogous roles."). Defendant Traschen served as the DMV's First Assistant Counsel and oversaw the TVB system across the state. Defendant Calvo was a supervising clerk at the Brooklyn South TVB. Both defendants Traschen and Calvo were thus immune from suit when performing functions closely associated to judicial functions.

The State Defendants are empowered by statute to regulate the conduct of attorneys appearing in DMV proceedings. See 15 N.Y.C.C.R. § 124.2(a) ("Any person representing the motorist must conform to the standards of conduct required of attorneys appearing before State courts, and failure to conform to these standards will be grounds for declining to permit his or her continued appearance…"). Thus, defendants' action barring plaintiff from the TVB was not taken in the absence of jurisdiction.

Moreover, barring an attorney from practice in a tribunal is a judicial act. Libertarian Party v. Cuomo, 970 F.3d 106, 124 (2d Cir. 2020) ("the act of disbarring an attorney as a sanction for the attorney's contumacious conduct in connection with a particular case is a judicial act"). There need not be a formal hearing for immunity to apply. Bliven, 579 F.3d at 210 (that a decision is "informal and ex parte . . . has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character") (quoting Forrester v. White, 484 U.S. 219, 227 (1988)). Accordingly, the State Defendants are immune from plaintiff's § 1983 suit for damages arising from his bar from the TVB.

In his opposition, plaintiff attempts to characterize the decision to bar him from practicing law in the TVB as an administrative act regarding "an individual's right to [be] present in a building." ECF No. 258, Plaintiff's Opposition Memorandum to State Defendants' Motion ("State Opp'n") at 4. However, this action is not about plaintiff's right to enter the TVB building, but his bar from representing motorists at the TVB. See Compl. at ¶ 16 ("[plaintiff] had a property and/or liberty interest in practicing his profession in the [TVB]"), ¶ 72 ("[plaintiff] had a right to practice his profession in the TVB Court").[23] The State defendants disciplined plaintiff for his conduct and attorney discipline decisions are "judicial acts." McNamara v. Kaye, No. 06-CV-5169 (DLI) (CLP), 2008 WL 3836024, at *1 (E.D.N.Y. Aug. 13, 2008). Accordingly, I recommend that the Court should grant the State Defendants' motion for summary judgment on the ground that the State Defendants are immune from plaintiff's suit for monetary damages under § 1983.

**B. First Amendment Retaliation**

The State Defendants additionally argue that, even if they were not immune from suit, they would be entitled to summary judgment on plaintiff's First Amendment Retaliation claim. The Court agrees.

To determine the appropriate test for a First Amendment claim under Section 1983, the court must consider whether the claim is being made by a public employee or a private citizen. To survive a motion for summary judgment on a First Amendment retaliation claim, a public

---

[23] Plaintiff spills a great deal of ink arguing about due process and whether he was given an opportunity to challenge his bar from the TVB. However, as stated in the Court's decision on the State Defendants' motion to dismiss, his opportunity to challenge the bar was through an Article 78 proceeding. Plaintiff was aware of this: he challenged his prior suspension through Article 78. Moreover, plaintiff's claims that defendants were obligated to investigate his version of the incidents and the many complaints about him is without basis. See ECF No. 235-2, Deposition of Alan Gelbstein ("Gelbstein Dep.") at 50:10–17 ("Q: So, how could I have responded to what he said against me; you are a judge am I right? A: I'm not a judge with regard to interactions between the various attorneys in the Office. I'm a judge with regard to motorists, police officers and specific charges against them.)"

employee plaintiff must set forth evidence demonstrating "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 106–07 (2d Cir. 2001). "For public employees, speech that 'principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection.'" Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 95 (2d Cir. 2020) (quoting Montero v. City of Yonkers, 890 F.3d 386, 399–400 (2d Cir. 2018).

For a private individual plaintiff to survive a motion for summary judgment on a First Amendment retaliation claim, he must set forth evidence demonstrating: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right. Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998). As discussed in my previous Report and Recommendation, ECF No. 51, plaintiff, an attorney practicing before a State administrative tribunal, does not fall squarely into either category. However, the Court need not resolve which standard applies here since plaintiff's claim for First Amendment retaliation fails under either standard.[24]

As to the second element of the public employee standard, even assuming, *arguendo*, that plaintiff's letter to Assistant Attorney General Prickett Morgan constituted protected speech (a big

---

[24] Plaintiff's Opposition states that "this Court's previous decision […] seems to indicate that it viewed the plaintiff as a 'private citizen.'" State Opp'n at 6. This is incorrect. The Report and Recommendation states "*For the purposes of this motion*, plaintiff's letter to Morgan is protected by the First Amendment." ECF No. 51 at 16 (emphasis added).

14

assumption on this record),[25] there is no evidence of a causal relationship between plaintiff's letter and plaintiff's permanent bar from the TVB. Similarly, as to the second element of the private citizen test, plaintiff has proffered no evidence of defendants' improper motive beyond his own conclusory statements. "[S]pecific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001). Indeed, plaintiff has not provided *any* specific proof that the State Defendants were motivated by an improper retaliatory purpose in barring him from the TVB.

Meanwhile, the State Defendants proffer a litany of complaints about plaintiff's aggressive behavior. Although plaintiff wishes to litigate the "who said what" of his interpersonal disputes in federal court, see ECF No. 237 (plaintiff responds to the State Defendants' exhibits, giving his side of each complaint made against him), the record demonstrates that many individuals, including TVB staff and other attorneys, reported feeling unsafe at the TVB because of plaintiff's behavior.[26] One report states that plaintiff was "more often than not[,] a menace to the office," Gelbstein Dec. ¶ 41 (quoting, ECF No. 211, Rivers Statement); another describes plaintiff as causing an "atmosphere of fear," id. at ¶ 42 (quoting ECF No. 212, Beer Statement). Moreover, plaintiff's behavior was deteriorating. Id. at ¶ 27. It was not one incident, but the culmination of many incidents and complaints that led to plaintiff's bar from the TVB.

---

[25] Plaintiff attempted to raise an issue about "Jewish ticket brokers" he saw in Gelbstein's Office at defendants' depositions. See e.g., Gelbstein Dep. at 83:5–24; ECF No. 235-5, Deposition of Danielle Calvo ("Calvo Dep.") at 65:15–68:23. However, this is irrelevant to plaintiff's retaliation claim as the letter to the AG contains no mention of these allegations. See also Pl. Dep. at 418:21–23 (A: I think Gelbstein is as corrupt as they come…"). Plaintiff's AG Letter manifestly relates to his own situation, to "redress personal grievances." Agosto, 982 F.3d at 95 (quoting Montero, 890 F.3d at 399–400).

[26] Even if plaintiff successfully demonstrated that some of the complaints against him were unreliable and should not have been considered by the defendants, it would not help him overcome the primary deficiency in his case—a lack of evidence that he was retaliated against because of his letter to AAG Prickett Morgan.

15

Prior to plaintiff sending his letter to AAG Pricket Morgan, plaintiff was suspended from practice at TVB due to his aggressive and harassing behavior. Plaintiff was explicitly warned that he would be barred from the TVB if "[he] commits an act of physical violence." ECF No. 219 at 2. Even with that warning, plaintiff could not abide by the conditions of his reinstatement. Plaintiff was a proverbial powder keg waiting to blow.  Defendants did not have to wait for something worse to happen to take disciplinary action against him.

Plaintiff offers only his suspicion that the AG letter was the true cause of his bar. He states that Gelbstein allegedly asked him to "go practice elsewhere" and that Gelbstein was "conveniently, if not purposefully, not present in the Brooklyn TVB" on the morning of May 11, 2015. State Opp'n at 7.[27] Plaintiff's speculation is insufficient to overcome defendants' motions. See Perez de Leon-Garritt v. State Univ. of N.Y., 785 F. App'x 896, 899 (2d Cir. 2019) (summary order) (affirming summary judgment because plaintiff did not provide specific proof that defendants were motivated by retaliatory purpose). As there is no record evidence that plaintiff's letter to the AG motivated defendants to bar him from the TVB, I recommend that the State Defendants' motion for summary judgment should be granted.

## C.  Injunctive Relief

Plaintiff's complaint also demands injunctive relief, to enjoin the State Defendants from denying plaintiff "the right to practice law in the [TVB]." Compl. at p. 21. Section 1983 provides, however, that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Plaintiff could have sought declaratory relief by filing an Article 78 proceeding in the New York Supreme Court. As was previously stated, plaintiff

---

[27] Plaintiff's conclusory conspiracy theory that Gelbstein and Traschen arranged for Smart to provoke plaintiff on the day he was barred is without any record support. See Calvo Dep. 11:8–12.

was well aware of Article 78 proceedings as he challenged his prior suspension. There is nothing in the record that reflects an Article 78 proceeding was unavailable to plaintiff regarding his bar from TVB. As he did not seek declaratory relief, his demand for injunctive relief should be denied.

## III. Defendant Smart

Defendant Smart moves for summary judgment on the grounds that he is not a state actor. The Court agrees. Smart, a private security guard, did not act under color of state law, and therefore, his motion for summary judgment should be granted.[28]

Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." Filarsky v. Delia, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983). To state a claim under § 1983, a plaintiff must allege (1) the deprivation of rights, privileges, or immunities secured by the Constitution and its laws, and (2) that the deprivation was "committed by a person acting under the color of state law." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002). If a private individual's conduct is "fairly attributable to the State," that individual can be sued as a state actor under § 1983. Filarsky, 566 U.S. 838; see Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). There must be "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Tancredi v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003), cert. denied, 539 U.S. 942 (2003). Indeed, private action may be deemed governmental when (1) private

---

[28] Smart also argues that he did not violate plaintiff's First Amendment rights. See Smart Memorandum of Law in Support ("Smart Supp. Mem.") at 11–13. As Smart was not acting under color of state law, the Court need not reach this argument. However, the Court notes that there is no evidence in the record to support plaintiff's conclusory assertions that Smart engaged in any retaliatory action against him.

actors are jointly engaged with state actors to deprive a person of constitutional rights, <u>Dennis v. Sparks</u>, 449 U.S. 24, 27–28 (1980); (2) where the state compels the act, <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004 (1982); (3) or when the state delegates a public function to a private entity, <u>West v. Atkins</u>, 487 U.S. 42, 55-56.

Generally, private security guards are not state actors. <u>Bishop v. Toys "R" Us—NY LLC</u>, 414 F. Supp. 2d 385 (S.D.N.Y. 2006); <u>Guiducci v. Kohl's Dept. Stores</u>, 320 F. Supp. 2d 35, 37-38 (E.D.N.Y. 2004) (collecting cases). However, private guards may be sued (1) "when they are given the authority of state law" or (2) "if they are willful participants in the joint activity of the State or its agents." <u>Id.</u> at 37. For example, a private security guard may act under state law if he is delegated state authority as a deputized "special patrolman," <u>see</u> <u>Rojas v. Alexander's Dep't Store, Inc.</u>, 654 F. Supp. 856, 858 (E.D.N.Y. 1986), or if he acts in tandem with police officers, <u>see</u> <u>Brooks v. Santiago</u>, No. 93 Civ. 206 (HB), 1998 WL 107110, at *4 (S.D.N.Y. Mar. 10, 1998). However, a private security guard providing information to police officers who then make an arrest does not constitute action under color of state law. <u>See</u> <u>Ginsberg v. Healey Car & Truck Leasing, Inc.</u>, 189 F.3d 268, 272 (2d Cir. 1999); <u>Orellana v. Macy's Retail Holdings, Inc.</u>, 2018 WL 3368716, at *18 (S.D.N.Y. July 1, 2018). Nor does the fact that a private employee works in a state building transform him into a state actor. <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 840 (1982).

Here, although Smart worked in a state building, he was employed by a private security company. Plaintiff argues that "if [Smart] was in fact a participant in the occurrences and decision that led to Plaintiff's administrative removal and preclusion from return to the TBV building, his conduct is automatically considered as part of the State's." ECF No, 258, Plaintiff's Opposition Memorandum to Smart's Motion ("Smart Opp'n.") at 2. That is not the law. Mere participation in an event that led to a state action does not confer the authority of state law on Smart.

18

Moreover, plaintiff fails to establish that Smart was involved in the decision to bar plaintiff from the TVB. Indeed, Smart was not even involved with removing plaintiff from the TVB. Plaintiff fails to show that Smart was compelled to act by the state on May 11, 2015, or that any public function was delegated to Smart. Plaintiff provides no evidence to support his theory that Smart was involved in the decision to bar him from the TVB. Plaintiff's "self-serving affidavit that merely reiterates conclusory allegations in affidavit form . . . [is] insufficient to preclude summary judgment." Pressley v. City of New York, No. 11-cv-3234 (PKC)(RER), 2016 WL 1271480, at *3 (E.D.N.Y. Mar. 31, 2016). Therefore, I recommend that the Court should grant defendant Smart's motion for summary judgment.

## IV. State Law Claims Defendants PEC Group of NYC, Inc. and Sadiq Tahir

Plaintiff's complaint contains two remaining state law claims: "filing a false report" against Tahir, Compl. at ¶¶ 89–94, and "negligent hiring and training" against PEC, the private security company that employed Smart, Compl. at ¶¶ 95–101. A Court may decline to exercise jurisdiction over state-law claims once it dismisses all claims over which it has original jurisdiction. See 28 U.S.C. § 1367(c). Both the Second Circuit and the Supreme Court have "held that when the federal claims are dismissed, the 'state claims should be dismissed as well.'" In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 61 (2d Cir. 1998) (quoting Gibbs, 383 U.S. at 726); see Valencia v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) ("'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors […] will point toward declining to exercise jurisdiction over the remaining state law claims.'") (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). "[A]bsent exceptional circumstances," where federal claims are disposed of on summary judgment grounds, courts should abstain from exercising pendent jurisdiction. Rafano v. Patchogue-Medford School Dist., No. 06 Civ. 5367 (JFB) (ARL), 2009 WL 789440, at

19

*13 (E.D.N.Y. Mar. 20, 2009) (quoting <u>Walker v. Time Life Films, Inc.</u>, 784 F.2d 44, 53 (2d Cir. 1986)). Here, there are no exceptional circumstances, and the Court should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

## CONCLUSION

For the reasons set forth herein, it is respectfully recommended that defendants' motions for summary judgment should be granted and plaintiff's complaint should be dismissed. Plaintiff's state law claims should be dismissed without prejudice.

## FILING OF OBJECTIONS TO REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections. <u>See</u> Fed. R. Civ. P. 6. Such objections shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. <u>Marcella v. Capital Dist. Physicians' Health Plan, Inc.</u>, 293 F.3d 42 (2d Cir. 2002); <u>Small v. Sec'y of Health and Human Servs.</u>, 892 F.2d 15 (2d Cir. 1989); <u>see</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

SO ORDERED.

_____/S/_____
LOIS BLOOM
United States Magistrate Judge

Dated: February 1, 2022
      Brooklyn, New York

**JSA-343**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------x

MARIO H. CAPOGROSSO

                Plaintiff,            **MEMORANDUM & ORDER**
                                                      18-CV-2710( EK)( LB)

       -against-

ALAN GELBSTEIN, in his individual
capacity; IDA TRASCHEN, in her
individual capacity; et al.,

                Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

        Plaintiff Mario Capogrosso, an attorney proceeding *pro*

*se*, brought this action pursuant to 42 U.S.C. §§ 1983 and 1988.

He alleges, among other things, that the defendants violated his

First Amendment rights when they permanently barred him from the

Traffic Violations Bureau ("TVB") for what they concluded was

his threatening behavior. Compl., ECF No. 74. Five defendants

moved for summary judgment. ECF Nos. 178-179.[1]

        In a Report and Recommendation ("R&R") dated February

1, 2022, Magistrate Judge Bloom recommended that I grant the

defendants' motions in their entirety. R&R, ECF No. 278. She

---

[1] Defendants David Smart, Danielle Calvo, Alan Gelbstein, Ida Traschen,
and New York State Department of Motor Vehicles Commissioner Mark Schroeder
moved for summary judgment. Defendants Sadiq Tahir and PEC Group of NY, Inc.
did not join in those motions.

**JSA-344**

also recommended that I decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, against defendants Sadiq Tahir and PEC Group of NY, Inc. *Id.* at 19-20. Plaintiff filed timely objections, ECF Nos. 282-283, to which Defendants responded. *See* ECF Nos. 286, 288. [2] After reviewing the very comprehensive R&R, Plaintiff's objections thereto, and the parties' evidentiary submissions, I adopt the recommendation in its entirety. I grant Defendants' motions for summary judgment and decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. I write briefly to supplement the record with my views on two issues: the question of whether defendant Smart's conduct constituted state action, and the judicial or quasi-judicial immunity accorded to certain TVB employees.

## I. Legal Standard on Review of Report & Recommendation

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The district

---

[2] Plaintiff filed one set of objections in a 65-page document, followed by supplemental objections. After Defendants responded, Plaintiff filed two replies. ECF Nos. 289-290. The State Defendants moved to strike ECF No. 289. *See* ECF No. 291. "[N]either the Federal Rules of Civil Procedure nor the Local Civil Rules of this Court . . . authorize litigants to file surreplies." *Prentice v. Port Auth. of N.Y. & N.J.*, No. 15-CV-738, 2017 WL 2271364, at *1 (E.D.N.Y. May 23, 2017). Plaintiff's sur-replies are also prohibited by Rule III(D)(1) of my Individual Rules because he did not request permission to file them. Accordingly, the motion to strike is granted. Both of Plaintiff's unauthorized filings, at ECF Nos. 289 and 290, are stricken.

**JSA-345**

court must review *de novo* those portions of an R&R to which a
party has specifically objected.  *Id.*; Fed. R. Civ. P. 72(b)(3);
*see also Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d
290, 296 (E.D.N.Y. 2013) ("A proper objection is one that
identifies the specific portions of the R&R that the objector
asserts are erroneous and provides a basis for this
assertion."), *aff'd*, 578 F. App'x 51 (2d Cir. 2014).

## II.  Discussion

Plaintiff makes two primary objections to the R&R,
neither of which has merit.  *First*, he argues that Judge Bloom
erred in concluding that defendant Daniel Smart, a private
security guard working at the TVB, could not be liable under
Section 1983 because he was not acting under color of state law
when he allegedly participated in Plaintiff's removal from the
TVB premises.  *See* Objs. to R&R 63–64, ECF No. 282; R&R 17.
*Second*, he argues that three of the defendants are not entitled
to judicial or quasi-judicial immunity.  *See* Objs. to R&R 60–62.

### A.  Defendant Smart and the State Action Doctrine

As is often the case, the question of whether Smart
acted under color of state law is tied up with the question of
what he is alleged actually to have done.  To prevail against
Smart, Plaintiff must demonstrate not only that Smart was a
"state actor" in the abstract, but also that the alleged
constitutional deprivation was "caused by" Smart's ostensibly

3

**JSA-346**

official conduct.  *See, e.g.*, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  Put differently, a Section 1983 plaintiff must show that the "*conduct* allegedly causing the deprivation of a federal right" was "fairly attributable to the state." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982) (emphasis added).[3]

Private action is "fairly attributable" to the state "in a few limited circumstances – including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).  The mere fact that a private company (such as the security company that employed Smart) is operating pursuant to a government contract does not make it a state actor.  *See, e.g.*, *Kach v. Hose*, 589 F.3d 626, 648 (3d Cir. 2009) (private security guard working at a public school was not a state actor); *Rabieh v. Paragon Sys. Inc.*, 316 F. Supp. 3d 1103, 1106, 1111 (N.D. Cal. 2018) (finding no state action, and dismissing Section 1983 complaint, where private security guards at federal building allegedly tackled and handcuffed plaintiff).

---

[3] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

As an intuitive matter, it does seem likely that the power to throw people out of courthouses (or administrative-law facilities) is a public function. But Smart is not alleged to have ejected the Plaintiff from anywhere, and Plaintiff has adduced insufficient evidence that Smart even had the power to do so. On the contrary, as Smart points out, the undisputed fact that he *called the police* to have Plaintiff removed from the TVB would seem to suggest the opposite. Smart Br. 7-8, ECF No. 178-1; *cf., e.g.*, *Rabieh*, 316 F. Supp. 3d at 1111 (allegations suggesting "that the security guards had some power to detain a person on the premises, temporarily confiscate personal property . . . , and place a person in handcuffs" were "insufficient under the public function test").

Here, Plaintiff's only meaningful evidence concerning Smart shows that he and Smart had multiple arguments and that on May 11, 2015, after a nebulously described "altercation," Smart left the building to get attention from the police and file a complaint. Pl. Objs. to R&R 44-45; *see also* Workplace Abuse Report, ECF No. 214. Plaintiff then was asked to, and did, leave the building. Workplace Abuse Report. Neither speaking to, nor filing a report with, the police constitutes a public function — *i.e.*, a function that is "traditionally the exclusive prerogative of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).

5

**JSA-348**

Moreover, as Judge Bloom notes, Plaintiff has presented no evidence (beyond his own conclusory and self-serving allegations in an affidavit) that Smart's actions were compelled by the state, or that he participated in the later decision to bar Plaintiff from the TVB.   R&R 17-19, 17 n.28. Accordingly, I adopt the R&R's recommendation that I dismiss the claim against Smart on this basis.

**B.    Judicial and Quasi-Judicial Immunity**

Plaintiff also argues that defendants Danielle Calvo, Ida Traschen, and Alan Gebstein ("State Defendants") are not entitled to judicial or quasi-judicial immunity because their actions were not judicial, but rather administrative, in nature. Plaintiff's argument has no merit.

Judge Bloom correctly determined that each State Defendant is immune from suit arising from the decision to ban Plaintiff from continuing to practice in TVB administrative proceedings.   This attorney discipline was authorized under 15 N.Y.C.C.R. § 124.2(a), and it constituted a judicial action. *See Libertarian Party v. Cuomo*, 970 F.3d 106, 124 (2d Cir. 2020).   Defendant Gelbstein, an administrative law judge, is entitled to absolute judicial immunity because "ALJs enjoy absolute immunity from liability in damages for actions taken in their quasi-judicial capacity." *Nash v. Califano*, 613 F.2d 10, 15 (2d Cir. 1980).

6

**JSA-349**

Defendants Calvo and Traschen, too, are immune because they were acting in their respective capacities as a senior clerk at the TVB and First Assistant Counsel for the TVB. Though the record is somewhat thin concerning Taschen's job description as First Assistant Counsel, the available evidence indicates that her duties were closely related to the judicial process at the TVB.  *See* Traschen Decl. ¶ 5 (duties included overseeing the DMV's Counsel's Office; overseeing safety hearings statewide; managing litigation; and overseeing compliance with Freedom of Information Law requests).  This is enough.  *See, e.g.*, *Jackson v. Pfau*, No. 10-CV-1484, 2011 WL 13127988, at *9 (N.D.N.Y. May 12, 2011) (actions of attorney in Division of Court Operations for the Office of Court Administration were judicial in nature), *aff'd*, 523 F. App'x 736 (2d. Cir. 2013).  Accordingly, I adopt the R&R's recommendation and dismiss the claim against the State Defendants on the basis that they are immune from suit.

**C.   Other Objections**

In Plaintiff's sixty-five pages of objections, the two arguments discussed above come through most clearly. Plaintiff's other objections are largely disorganized and conclusory. [4]  "[T]o trigger *de novo* review, even a *pro se* party's

---

[4] Where Plaintiff does point to specific portions of the R&R, he makes

7

objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate judge's report." *Klein v. City of New* York, No. 10-CV-9568, 2012 WL 546786, at *2 (S.D.N.Y. Feb. 21, 2012). "[W]hen the objections . . . make only conclusory statements, the court should review the Report and Recommendation for clear error." *Telfair v. Le Pain Quotidien U.S.*, No. 16-CV-5424, 2017 WL 1405754, at *1–2 (S.D.N.Y. Apr. 18, 2017). Having reviewed the remainder of Plaintiff's objections, and the R&R's treatment of the underlying issues, I find those objections to be without merit.

### III. Conclusion

Defendants' motions for summary judgment are granted. As recommended in the R&R, I also decline to exercise supplemental jurisdiction over Plaintiff's state-law claims against defendants Tahir and PEC Group of NY, Inc. Further, Defendants' motion to strike Plaintiff's unauthorized sur-replies (ECF Nos. 289 and 290) is granted. The Clerk of Court

---

conclusory objections such as, "I oppose this conclusion, it is not true," or "The record evidence creates a genuine issue as to material facts." *See, e.g.*, Objs. to R&R ¶¶ 2-31. In other places, his arguments do not refer to a specific potion of the R&R and are immaterial or nonsensical. *See, e.g.*, *id.* at 10 (arguing that there are triable issues of fact with respect to his threatening conduct or verbal abuse because "I affirm I like women, I like women, I like women. I affirm, woman make the party. I am dating two women currently and they both call me to take them out - so I must be doing something right").

**JSA-351**

is respectfully directed to enter judgment in Defendants' favor and to close the case.

        SO ORDERED.

                                    /s/ Eric Komitee
                                  ERIC KOMITEE
                                  United States District Judge

Dated:     September 29, 2022
            Brooklyn, New York

**JSA-352**

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 30 2022 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
MARIO H. CAPOGROSSO,

                 Plaintiff,

       -against-

ALAN GELBSTEIN, in his individual capacity;
IDA TRASCHEN, in her individual capacity;
et al.,

                 Defendants.
-------------------------------------------------------------- X

JUDGMENT
18-CV-2710(EK)(LB)

    A Memorandum and Order of Honorable Eric Komitee, United States District Judge,

having been filed on September 29, 2022, adopting the Report and Recommendation of

Magistrate Judge Lois Bloom, dated February 1, 2022, granting Defendants' motions for

summary judgment; declining to exercise supplemental jurisdiction over Plaintiff's state-law

claims against defendants Tahir and PEC Group of NY, Inc.; granting Defendants' motion to

strike Plaintiff's unauthorized sur-replies (ECF Nos. 289 and 290); it is

    ORDERED and ADJUDGED that Defendants' motions for summary judgment are

granted; that the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law

claims against defendants Tahir and PEC Group of NY, Inc.; and that Defendants' motion to

strike Plaintiff's unauthorized sur-replies (ECF Nos. 289 and 290) is granted.

Dated: Brooklyn, NY
       September 30, 2022

                           Brenna B. Mahoney
                           Clerk of Court

                         By: */s/Jalitza Poveda*
                           Deputy Clerk